**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MARYLAND**

| | |
|---|---|
| **Julia Kim,** on behalf of herself and all others similarly situated, 935 North Beneva Rd. Sarasota, FL 34232 <br><br> Plaintiff; <br><br><br><br><br> **v.** <br><br> **Cedar Realty Trust, Inc**., 7 St. Paul Street, Suite 820 Baltimore, MD 21202 <br><br> **Bruce J. Schanzer,** 7 St. Paul Street, Suite 820 Baltimore, MD 21202 <br><br> **Gregg A. Gonsalves,** 7 St. Paul Street, Suite 820 Baltimore, MD 21202 <br><br> **Abe Eisenstat,** 7 St. Paul Street, Suite 820 Baltimore, MD 21202 <br><br> **Steven G. Rogers,** 7 St. Paul Street, Suite 820 Baltimore, MD 21202 <br><br> **Sabrina Kanner,** 7 St. Paul Street, Suite 820 Baltimore, MD 21202 <br><br> **Darcy D. Morris,** 7 St. Paul Street, Suite 820 Baltimore, MD 21202 | Case No.: <br><br><br> **JURY TRIAL DEMANDED** |

**Richard H. Ross, and**
7 St. Paul Street, Suite 820
Baltimore, MD 21202

**Sharon Stern**
7 St. Paul Street, Suite 820
Baltimore, MD 21202

Defendants.

## CLASS ACTION COMPLAINT

1.      The directors of the Maryland real estate investment trust Cedar Realty Trust, Inc. ("Cedar" or the "Company") have devised a scheme to rob their preferred shareholders of their investment value and transfer it to themselves and their common stockholders. Specifically, Cedar's board of directors (the "Board") has structured a transaction whereby they will essentially cease all meaningful operations, sell off the lion's share of the Company's material assets, and use the proceeds of the sale of these assets to retire all of Cedar's debt and pay the Board and the common stockholders nearly $400 million.  Meanwhile, the preferred shareholders, who collectively invested $161.25 million into the Company, will receive nothing. Worse, if this transaction is consummated, the preferred shares will fall under the control of Wheeler Real Estate Investment Trust, L.P. ("Wheeler"), a company with a history not only of underperformance, but of an unwillingness to honor its obligations to its own preferred shareholders. This sham "merger" the Defendants have devised will, in the end, leave the surviving shell company with no ability to honor the obligations to its preferred shareholders to which Cedar, members of its senior management, and its Board are legally bound. This transaction must therefore be stopped.

2.      Brought on behalf of Cedar's preferred shareholders, this class action lawsuit seeks to enjoin this sham transaction or, at the very least, require Cedar to honor the terms of its

agreements with the preferred shareholders by requiring a vote by the preferred shareholders on the fairness of this transaction.  Moreover, if this Proposed Transaction is allowed to proceed, it will not only result in harm to the Company's preferred shareholders, it will have far reaching implications for Maryland law and damage the investment prospects for Maryland REITs.

## PARTIES

3.      Plaintiff Julia Kim ("Kim") is, and has been at all relevant times, the owner of Series C preferred shares of Cedar Realty. She purchased these shares prior to the announcement of the Proposed Transaction and has continuously held her shares since that time. Plaintiff Kim is a citizen of Florida.

4.      Defendant Cedar is a Maryland corporation and maintains its principal offices at 928 Carmans Road, Massapequa, New York 11758. It is a real estate investment trust ("REIT"). Organized in 1984, it has elected to be taxed as a REIT under applicable provisions of the Internal Revenue Code. To qualify as a REIT under those provisions, Cedar must have a preponderant percentage of its assets invested in, and income derived from, real estate and related sources. To that end, Cedar has focused primarily on ownership, operation and redevelopment of approximately 50 grocery-anchored shopping centers in high-density urban markets from Washington, D.C. to Boston.

5.      Defendant Bruce J. Schanzer is President and Chief Executive Officer ("CEO") of Cedar. He has been a director since June 2011. He currently owns, directly or indirectly, 384,410 shares of Cedar common stock. On information and belief, Defendant Schanzer is a citizen of New York.

6. Defendant Gregg A. Gonsalves is Chairman of Cedar. He has been a director since 2017. He currently owns 18,626 shares of Cedar common stock. On information and belief, Defendant Gonsalves is a citizen of New Jersey.

7. Defendant Abe Eisenstat is a member of the Board and has been since July 2015. He currently owns 41,829 shares of Cedar common stock. On information and belief, Defendant Eisenstat is a citizen of New York.

8. Defendant Steven G. Rogers is a member of the Board and has been since March 2016. He currently owns 19,746 shares of Cedar common stock. On information and belief, Defendant Rogers is a citizen of Mississippi.

9. Defendant Sabrina Kanner is a member of the Board and has been since June 2018. She currently owns 16,987 shares of Cedar common stock. On information and belief, Defendant Kanner is a citizen of New York.

10. Defendant Darcy D. Morris is a member of the Board and has been since April 2021. He currently owns 2,493 shares of Cedar common stock directly, but indirectly owns another 1,103,277 shares through his company Ewing Morris & Co. Investment Partners Ltd. These shares represent almost 8.1% of the total outstanding common shares. On information and belief, Defendant Morris is a citizen of Toronto, Canada.

11. Defendant Richard H. Ross is a member of the board and has been since April 2021. He currently owns 2,493 shares of Cedar common stock. On information and belief, Defendant Ross is a citizen of Georgia.

12. Defendant Sharon Stern is a member of the board and has been since April 2021. She currently owns 6,093 shares of Cedar common stock. On information and belief, Defendant Stern is a citizen of Montreal, Canada.

4

## JURISDICTION AND VENUE

13.      Cedar Realty Trust, Inc. is organized under Maryland law as a corporation with its primary place of business in Massapequa, New York.

14.      Both the Series B and Series C Preferred Stock at issue here were issued under Cedar Realty Trust, Inc.'s Series B and Series C Articles Supplementary, both of which were filed with the State of Maryland.

15.      The Defendants have availed themselves of Maryland and Maryland law through their own choice. Part of the Transaction at issue involves a sale of grocery-anchored properties and is governed by the Grocery-Anchored Sale Agreement that states, under Article 8.5, it is governed by the laws of Maryland and contains a forum-selection clause.  The Defendants have also selected Maryland and Maryland law as inclusions in Section 9.5 of the Merger Agreement pursuant to which this transaction would be effected.

16.      Each and every individual defendant serves as a director of Cedar Realty Trust, Inc. and so have acquiesced to the jurisdiction of Maryland.

17.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a). There is complete diversity of citizenship between Plaintiff and Defendants. In addition, on information and belief, two of Defendants are citizens of a foreign state. The amount in controversy exceeds $75,000, exclusive of interest and costs.

18.      This Court also has jurisdiction under the provisions of 28 U.S.C. § 1332(d). This is a putative class action involving more than $5,000,000 in controversy. As demonstrated by the Plaintiff, members of the Class are citizens of different States from Defendants. In addition, members of the Class are citizens of various States while, on information and belief, two Defendants are citizens of foreign states.

19.     Venue is proper with this Court under 28 U.S.C. § 1391(b) as a substantial part of the events occurred in this district, a substantial part of the property at issue is situated in this district, and the corporate Defendant is located in this district.

## FACTUAL ALLEGATIONS

20.     Founded in 1984, Cedar is a Maryland corporation that has elected to qualify as a REIT for federal income tax purposes. It focuses primarily on the ownership, operation and redevelopment of grocery-anchored shopping centers in high-density urban markets from Washington, D.C. to Boston. As of December 31, 2021, the Company owned and managed a portfolio of 50 operating properties (excluding properties "held for sale") totaling 7.3 million square feet of gross leasable area.

21.     Cedar owns 99.4% of Cedar Realty Trust Partnership L.P. (the "Operating Partnership"). The Operating Partnership is a Delaware limited partnership, with its primary place of business in Port Washington, New York. Virtually of all of Cedar's assets are owned by, and nearly all business is conducted through, the Operating Partnership.

22.     Cedar derives substantially all of its revenues from rents and operating expense reimbursements received pursuant to long-term leases. Its operating results depend on the ability of its tenants to make the payments required by the terms of their leases.

23.     According to its most recent Annual Report on Form 10-K filed with the Securities and Exchange Commission ("SEC") on March 10, 2022 (the "2021 10-K"), Cedar focuses on properties "which will provide substantial cash flow, currently and in the future, taking into account an acceptable modest risk profile, and which will present opportunities for additional growth in income and capital appreciation." 2021 10-K at 4.

24.     Cedar focuses on grocery-anchored properties. The Company represents to investors that because of "the need of consumers to purchase food and other staple goods and services generally available at such centers, its type of 'necessities-based' properties should provide relatively stable revenue flows even during difficult economic times." *Id*.  This has been a consistent strategy of Cedar for the at least the past decade.

25.     Cedar's capital structure consists of common and preferred shares. The preferred shares have two series, a "B" Series and a "C" Series. In relevant part, the terms of the preferred B and C shares are virtually identical. Cedar's common stock is traded on the NYSE under the symbol "CDR." Preferred shares are also traded on the NYSE under the symbols "CDR-PB" and CDR-PC."

26.     The general purpose of issuing the Series B and Series C preferred shares was to retire various forms of debt, whether they were in the form of preferred shares, reduce the amount of outstanding credit lines, or reduce or retire other forms of debt.

27.     The terms of the preferred shares are contained in the Articles Supplementary for each series, enacted by Cedar and filed with the Maryland Secretary of State.

**Cedar Investigates Strategic Options**

28.     In mid-2019, Cedar's Board formed a special committee to commence a strategic review process for the Company. This process was disrupted by the COVID-19 pandemic.

29.     Cedar had numerous options to pursue a sale of the company that could have yielded a liquidation payout to the preferred shareholders.

30.     In July 2019, the Board discussed the challenges facing Cedar as a public company, with representatives of the Company's outside counsel, Goodwin Procter LLP ("Goodwin Procter"), present. A variety of possible paths and strategies were considered in an

effort to maximize shareholder value, including maintaining the Company's current strategy, selling non-core assets (including the sale of the Company redevelopment assets), pursuing larger asset sales in portfolio or company-level transactions, or seeking to effect a phased liquidation of the Company and all its properties. At that meeting, the Company's CEO, Defendant Schanzer expressed to the Board that he was exploring the potential formation of an investor group to pursue an acquisition of the Company.

31.     On December 12, 2019, an investment group affiliated with Defendant Schanzer submitted a preliminary acquisition proposal to acquire Cedar in a merger transaction that valued Cedar's common stock at $26.40 per share.

32.     Following those discussions about strategic alternatives for Cedar, BofA Securities, the Global Banking and Global Markets divisions of Bank of America Corp., on behalf of Cedar, engaged with 33 potential counterparties, including other shopping center REITs, private real estate funds, real estate investors and financial sponsors. Twenty-five parties, including the investor group affiliated with Defendant Schanzer, signed non-disclosure agreements with the Company and received data room access.

33.     During January and February 2020, the Company, BofA Securities, and Goodwin Procter facilitated due diligence and engaged in discussions and negotiations regarding a variety of potential transactions with a number of these parties. As of January 31, 2020, BofA Securities had received seven non-binding bids for the Company as a whole and one additional non-binding bid for select assets, ranging in price from $19.80 to approximately $25.00 per share

34.     On June 9, 2021, Defendant Schanzer met via videoconference with representatives of BofA Securities to discuss a potential liquidation strategy versus a whole-company sale alternative. The possibility of selling Company assets in large portfolio sales –

related assets grouped and sold in one transaction – rather than individually, was also discussed as a way of minimizing execution risk and shortening the overall timeline of returning cash to shareholders. At a meeting of the Board held telephonically on July 15, 2021, Defendant Schanzer reported to the Board the results of their conversations with BofA Securities and other market observations, and Defendant Schanzer presented a proposed dual-track strategic process that included pursuing a so-called "asset sale/remainco" strategy in tandem with a traditional whole-company sale process. It was noted that a dual-track process might benefit the Company and shareholders by engendering greater competition among a greater range of bidders, resulting in better overall pricing. At the conclusion of the meeting, the Board authorized management to interview brokers for the possible sale of discrete asset pools.

35.     On September 9, 2021, Cedar issued a press release ("September 2021 Press Release") announcing that the Cedar Board had initiated a dual-track process to review the Company's strategic alternatives to maximize stockholder value. As part of this process, the September 2021 Press Release advised that Cedar was exploring, among other alternatives, "a potential sale or merger involving the entire Company, and alternatively the potential sale of its core grocery-anchored shopping center portfolio and its mixed-use redevelopment projects." The September 2021 Press Release quoted Defendant Schanzer:

> We believe there is a profound disconnect between Cedar's share price and the underlying value of our real estate, as evidenced by recent transaction activity both within our portfolio and in our markets. The Board is committed to maximizing value for all our shareholders and, accordingly, we believe that this dual-track strategic review process will enable us to achieve that.

36.     From September 7, 2021 through October 23, 2021, BofA Securities, Jones Lang LaSalle Securities LLC("JLL"), and CBRE Group, Inc. engaged with 55 potential counterparties, including other shopping center REITs, private real estate funds, real estate investors and

financial sponsors. Thirty-six parties signed non-disclosure agreements with the Company and received expanded data room access.

37.     On October 26, 2021, the Board and management met by videoconference, with representatives from each of BofA Securities, JLL, and Goodwin Procter. The representatives from BofA Securities and JLL advised the Board that, as of October 23, 2021, the Company had received two preliminary bids for the Company as a whole, two preliminary bids for the Grocery-Anchored Portfolio, and one non-conforming bid for a select number of Remainco assets. Of the whole Company bids, one was from Party A, a private real estate investment firm, for $21.90 per share in cash, and the other from Party B, a private owner and operator of retail real estate, for $23.00 per share in cash. The non-conforming bid was from Party C, a private commercial real estate investment firm, and proposed to acquire a portfolio of 16 (of 19) Remainco assets for a total cash purchase price of $200.0 million. For the Grocery-Anchored Portfolio, one of the bids was from DRA Advisors and certain of its affiliates for $810.0 million in cash, and the other bid was from Party D, a group of private investors and financing parties, for $965.0 million,

38.     On January 21, 2022, the Company received two proposals for potential whole-company transactions. One was from Party A, who proposed a traditional go-private transaction at a gross cash purchase price of $25.75 per share, and the other was from Party C, who proposed that Party C and its affiliates acquire all of the Company's assets other than the redevelopment assets in an asset purchase transaction, for an aggregate cash purchase price of $1.05 billion, which valued the Grocery-Anchored Portfolio at $810.0 million and Remainco at $240.0 million.

**The Proposed Transactions**

39.     Rather than pursue an option that would maximize both common and preferred shareholder value, Cedar's Board chose a novel approach that would effectively liquidate all value in the Company and pay out that value to common shareholders while locking the preferred shareholders into a drastically different portfolio of lower quality assets not reasonably capable of satisfying the Defendants' duties to the preferred shareholders.

40.     The Proposed Transaction was disclosed by the Company on March 3, 2022, in a Form 8-K filed with the SEC ("March 2022 Cedar Form 8-K"). It consists of two parts that will operate in conjunction to affect the unfair outcome here:  the Grocery-Anchored Transaction and the Merger.

The Grocery-Anchored Transaction

41.     The first step consists of an Asset Purchase and Sale Agreement ("Grocery-Anchored Sale Agreement") with DRA Fund X-B LLC ("DRA") and KPR Centers LLC ("KPR"; together with DRA, the "Grocery-Anchored Purchasers").

42.     DRA Growth and Income Master Fund X-B, LLC and DRA Fund X-B LLC are Funds managed by DRA Advisors LLC ("DRA"). DRA Advisors LLC is a New York-based registered investment advisor with approximately 89 employees specializing in real estate investment management services for institutional and private investors, including pension funds, university endowments, sovereign wealth funds, foundations, and insurance companies. Since DRA was founded in 1986, the firm has opened additional offices in Miami and San Francisco while acquiring over $36 billion of real estate. The acquisitions include 82 million square feet of industrial, 63 million square feet of office, 83 million square feet of retail and 76,000 multifamily units. As of December 31, 2021, DRA has $11.7 billion in gross assets under management.

DRA's principal executive office is located at 575 Fifth Avenue, 38th Floor, New York, New York 10017.

43.     KPR, together with its affiliates, is a vertically-integrated commercial real estate investment, development and management company with regional offices in Florida, New Hampshire, New York and Pennsylvania. Established in 2003, KPR has a defined strategy of acquiring and improving retail properties, with a primary focus on grocery-anchored shopping centers and power villages in select submarkets within the eastern United States. KPR maintains in-house leasing, management and development operations and is currently active in 15 states. KPR's principal executive office is located at 254 West 31st Street, 4th Floor, New York, New York 10001.

44.     Under the Grocery-Anchored Sale Agreement, Cedar will sell to the Grocery-Anchored Purchasers substantially all of its assets, as represented in a portfolio of 33 grocery-anchored shopping centers (the "Grocery-Anchored Properties") for a cash purchase price of $840 million (less the outstanding principal of any assumed mortgage debt) (the "Grocery-Anchored Transaction"). The assets of Cedar included in the Grocery-Anchored Properties are:

> New London Mall, New London, CT
>
> Bethel Shopping Center, Bethel, CT
>
> Groton Shopping Center, Groton, CT
>
> Jordan Lane, Wethersfield, CT
>
> Christina Crossing, Wilmington, DE
>
> Franklin Village Plaza, Franklin, MA
>
> The Shops at Suffolk Downs, Revere, MA
>
> Norwood Shopping Center, Norwood, MA

Yorktowne Plaza, Cockeysville, MD

Shoppes at Arts District, Hyattsville, MD

Valley Plaza, Hagerstown, MD

Oakland Mills, Columbia, MD

The Shops at Bloomfield Station, Bloomfield, NJ

Carman's Plaza, Massapequa, NY

Quartermaster Plaza, Philadelphia, PA

Colonial Commons, Harrisburg, PA

Trexlertown Plaza, Trexlertown, PA

The Point, Harrisburg, PA

Fishtown Crossing, Philadelphia, PA

Shops at Crossroads (Crossroads II), Bartonsville, PA

Lawndale Plaza, Philadelphia, PA

Academy Plaza, Philadelphia, PA

Meadows Marketplace, Hummelstown, PA

Swede Square E. Norriton, Township, PA

Palmyra Shopping, Palmyra, PA

Newport Plaza, Newport, PA

Northside Commons, Campbelltown, PA

Halifax Plaza, Halifax, PA

Girard Plaza, Philadelphia, PA

General Booth Plaza, Virginia Beach, VA

Kempsville Crossing, Virginia Beach, VA

Elmhurst Square, Portsmouth, VA

Oak Ridge Shopping Ctr., Suffolk, VA

45.     These 33 properties are the best income generating properties in the Cedar portfolio, representing nearly 80% of the Company's entire assets. Without these assets and the revenues generated thereby, Cedar cannot satisfy its obligations to its preferred shareholders.  If two additional redevelopment projects have not been sold to third parties by the closing, DRA will also acquire those assets for an additional price of up to $80.5 million. If that occurs, DRA will purchase 87.7% of Cedar's total assets.

46.     The net proceeds from the Grocery-Anchored Transaction will be distributed exclusively to Common Stockholders (with no distribution or reserve for the Preferred Stockholders, except for any accrued but unpaid preferred dividends as of the closing).

The Wheeler Merger

47.     The second step of the Proposed Transaction consists of a "merger" agreement between Cedar and a shell corporation created by Wheeler in order to effect the terms of this transaction.

48.     Wheeler is a Maryland corporation and a fully-integrated, self-managed commercial REIT that owns, leases and operates income-producing retail properties with a primary focus on grocery-anchored centers. Substantially all of Wheeler's assets are held by, and all of Wheeler's operations are conducted through, its operating partnership, Wheeler REIT, L.P. As of December 31, 2021, Wheeler owned 98.59% of this operating partnership. Wheeler's principal executive office is located at 2529 Virginia Beach Blvd., Virginia Beach, Virginia, 23452.

49.     The shell corporation Wheeler will create will be named WHLR Merger Sub Inc. ("Merger Sub"). It is a Maryland corporation and a wholly owned subsidiary of Wheeler, with principal executive offices located at 2529 Virginia Beach Blvd., Virginia Beach, Virginia, 23452, the same address as Wheeler's principal corporate office. It was formed for the purpose of engaging in the transactions contemplated by the merger agreement. Pursuant to the merger agreement, Merger Sub will merge with and into the Company, with Merger Sub ceasing to exist and the Cedar being the surviving entity.

50.     Along with the shell corporation, Wheeler will fabricate an LLC, as well, called WHLR OP Merger Sub LLC ("OP Merger Sub").  Wheeler will create this limited liability company under Delaware law and it will be a wholly owned subsidiary of the Merger Sub, with principal executive offices located at 2529 Virginia Beach Blvd., Virginia Beach, Virginia, 23452. It was formed for the purpose of engaging in the transactions contemplated by the merger agreement. Pursuant to the merger agreement, OP Merger Sub will merge with and into the Operating Partnership, with OP Merger Sub ceasing to exist and the Operating Partnership being the surviving entity. In effect, these fictional subsidiaries of Wheeler will merge into Cedar and Cedar Realty Trust Partnership, L.P. The Cedar entities will survive the merger as wholly owned subsidiaries of Wheeler.

51.     This sham "merger" will take place immediately following the closing of the Grocery-Anchored Transaction, and Wheeler will acquire the balance of Cedar's shopping center assets consisting of nineteen properties for $130 million by way of a merger that purports to value these remaining properties at $291.3 million.

52.     Immediately before the close of the merger, Cedar will declare a special dividend for common shareholders in the amount of the proceeds of the sale of the grocery-anchored properties and the redevelopment properties.

53.     Upon the close of the merger, Cedar's common shares will be cancelled and converted into the right to receive consideration from the Proposed Transactions, effectively eviscerating all of the capital in Cedar and giving it solely to the common shareholders. As stated in the April 5, 2022 Preliminary Proxy:

> *Closing Dividend and Merger Consideration*. It is anticipated that the total amount of cash to be returned to holders of Company common stock as a result of the Transactions will be approximately $29.00 per share/unit. Specifically, prior to the consummation of the Mergers, the Board will declare one or more special dividends (the "Closing Dividend") payable to record holders of the Company's common stock and common units of limited partnership interest in the Operating Partnership ("OP Units") in an aggregate amount equal to the net proceeds available for distribution from all prior sales of assets by the Company and its subsidiaries, including the Grocery-Anchored Portfolio Sale, less certain amounts described below. To the extent two of the Company's redevelopment projects have not been separately sold to third parties, the Grocery-Anchored Portfolio Sale will also include the acquisition by the Grocery-Anchored Purchasers of the redevelopment assets for an additional aggregate purchase price of up to $80.5 million. In addition, in connection with consummation of the Mergers, each share of Company common stock and each OP Unit issued and outstanding immediately prior to the effective time of the Mergers will be converted into the right to receive cash merger consideration (the "merger consideration") in an amount equal to $130.0 million divided by the total number of outstanding shares of Company common stock and OP Units.
>
> The exact amount of net proceeds available for distribution through the Closing Dividend is subject to customary real estate prorations as of the closing date for the Grocery-Anchored Portfolio Sale, payment by the Company of all applicable transaction costs and expenses, and satisfaction of other Company liabilities and indebtedness. Accordingly, while we currently anticipate that the total amount of cash returned to holders of Company common stock by way of the Closing Dividend and merger consideration will be approximately $29.00 per share, it is possible that the total amount received may be more or less than $29.00 per share. The Company will issue a press release specifying the exact amount of the Closing Dividend prior to the effective time of the Mergers.

**The Effect of the Proposed Transaction on Plaintiff and the Proposed Class of Preferred Shareholders**

54.     After the close of the merger, preferred shares will remain outstanding as shares of Cedar, which will survive the merger as a wholly owned subsidiary of Wheeler.

55.     Instead of over $1 billion dollars in assets to support the preferred shares, however, after the close of the merger, the assets available to support the preferred shares will be reduced by approximately 87.5%.

56.     Not surprisingly, the market interpreted this proposed merger as posing a tremendous risk to the value of the preferred shares. The day before the transaction was announced, the closing price of the B and C shares were $25.61 and $22.85, respectively. Following the announcement, the shares closed at $12.95 and $9.85, respectively, representing a drop of 49% and 57%.

57.     In contrast to the share-price evisceration of the preferred shares, the common shareholders stand to reap an unfair windfall in the Proposed Transactions.  By selling out the preferred shareholders, the Proposed Transaction will net an aggregate consideration of approximately $29.00 per share, which is the highest aggregate amount of consideration proposed in any oral or written offer received by the Company and represents a 16.6% premium to the closing price of the Company's common stock on March 2, 2022, and a 70.6% premium to the closing price on September 9, 2021, the last day of trading prior to the public announcement by the Company of its dual-track review of strategic alternatives.

58.     Not only are the total assets available to support the preferred shares being drastically reduced, but the quality will also be significantly reduced as well.

59.     The 19 properties being sold to Wheeler are, by any measure, the lower quality assets, as demonstrated by both the average dollar value of the properties and the type of properties. The average value of the 33 Grocery-Anchored Properties sold to DRA is

approximately $25.5 million per property. In contrast, the assets sold to Wheeler, even using the

"value" amount rather than the cash paid, is $15.3 million. If only the cash consideration is taken

into account, the value per property is even lower, averaging $6.8 million.

60.     The properties sold to Wheeler have a lower value because they are not all

grocery anchored. It appears that only 9 of the 19 properties, less than half, are grocery anchored.

61.     Grocery-anchored properties are the most valuable assets in the Cedar real estate

portfolio. Prior to the pandemic, Defendant Schanzer touted Cedar's grocery-anchored

properties:

> [W]e own a portfolio of relatively stable, grocery-anchored shopping centers that are retaining their value, based not on our opinion or hope, but based on real transaction comps that we are executing in real time.
>
> *       *       *
>
> We don't own B malls that are experiencing some fundamental secular decline. Rather, we own a portfolio of relatively stable, grocery-anchored shopping centers that are retaining their value, based not on our opinion or hope, but based on real transaction comps that we are executing in real time.

February 7, 2019, 2018Q4 Earning Call.

62.     At the start of the pandemic, Defendant Schanzer noted that the grocery-anchored

properties provided resistance against the threat of the internet to bricks-and-mortar retail

because they sold necessities.

> The secular decline in bricks-and-mortar retail didn't begin with the arrival of COVID-19, though the low tide it has provoked underscores many of the differentiating characteristics we have spoken about often. There are 2 specific themes to highlight in this regard: first, Cedar's assets are almost entirely grocery-anchored shopping centers with predominantly necessity-based retailers. These services are more internet resistant. And our centers are, therefore, simply more resilient than other retail real estate assets to many of the trends negatively impacting retailers. Second, there is a fundamental difference between retail real estate such as malls, lifestyle centers, street retail and big box assets, levered to soft good and

discretionary good retailers and the smaller format neighborhood centers, such as those owned and operated by Cedar.

May 14, 2020 20Q1 Earnings Call

63.　During the pandemic, Defendant Schanzer continued to note the importance of the grocery-anchored properties.

Cedar has a predominantly grocery-anchored portfolio with among the highest percentage of grocer-anchored centers of any retail REIT. This is a critical feature that has helped insulate us during the pandemic and will serve as the foundation for our portfolio in the years ahead.

August 10, 2020, 2020Q2 Earnings Call.

64.　Only a few months later, Defendant Schanzer noted that, contrary to the decline occurring generally in retail properties, grocery-anchored properties were growing:

[T]he accelerated secular demise in many bricks and mortar retail categories has led to grocery anchored shopping centers being the strongest performing category within retail real estate. Notably, our grocer anchors have experienced a growth in sales during this period, and the inline tenants and junior anchors in our centers have benefited from the strong traffic and overall center vitality resulting from the strong grocer performance.

October 29, 2020, 2020Q3 Earnings Call.

65.　In fact, the most recent Form 10-K reiterates the importance of the grocery-anchored properties. Cedar "believes that, because of the need of consumers to purchase food and other staple goods and services generally available at such centers, its type of 'necessities-based' properties should provide relatively stable revenue flows even during difficult economic times." Form 10-K, at 4 (filed Mar. 10, 2022).

66.　By changing the makeup of the portfolio from "predominately" grocery-anchored properties to a basket where they do not comprise a simple majority, Cedar is materially changing the assets supporting the preferred shares.

67.     Cedar attempts to justify the transaction by asserting that "[f]or the year ended December 31, 2021, these assets [the 19 properties to be sold to Wheeler] generated net operating income in excess of $19 million."

68.     On the surface, this appears reasonable, since the preferred dividends total approximately $11 million per year. But net operating income does not actually provide that information.

69.     Net operating income does not include loan principal and interest, financing costs, capital costs, or taxes. It is therefore impossible to know whether there will be enough, or even any, money available to pay dividends to holders of the preferred shares.

70.     For example, Wheeler has not disclosed the terms of the $130 million loan, which will likely be of critical importance to the preferred shareholders. If this loan is a ten-year loan, at a modest 4.25% rate, the principal and interest payments alone would be almost $16.3 million annually. This is not unreasonable given other loans taken out by Wheeler. *See*, *e.g.*, Form 10-K, Wheeler Realty Trust, Note 5. The remaining $2.8 million would likely be consumed by the most modest capital expenses, necessary for the upkeep of the properties.

71.     Also, Cedar has only provided the net operating income for one year for these 19 properties. It has not provided historical performance, nor is it possible to derive it from prior company disclosures, for these properties. Further, it has not provided current or projected performance.

72.     Using only one year's net operating income makes the number subject to manipulation. For example, necessary repairs can be deferred, reducing expenses and therefore increasing net operating income.

73.    Further, the value Cedar and Wheeler assigned to the 19 properties – $291.3 million – is very likely inflated. Despite this alleged value, Wheeler is only paying $130 million, financed by a loan. If the properties were actually worth $291.3 million, Cedar simply could have sold them for that amount, paid the liquidation preference, and still paid $130 million to its common shareholders. The fact that this is not occurring casts doubt on the purported value.

74.    Reinforcing this point, Jones Lang LaSalle has only opined on the fairness of the transaction for the common shareholders. It explicitly stated it was not opining on the fairness to the preferred shareholders.

75.    Despite repeated statements that grocery-anchored properties were essential to continued growth and income in the face of the threats to brick-and-mortar retail, Cedar now wants to liquidate these premium assets and leave preferred shareholders with the dregs of the portfolio.

76.    If these assets do not produce enough income, the preferred shareholders will not be paid. Wheeler itself cannot support payment of the dividends from its own assets and hasn't paid a dividend on its own preferred shares since 2018.

77.    Cedar has previously recognized this very issue. In November 2017, just over four years ago, Wheeler made an unsolicited offer for Cedar. It was promptly rejected by Cedar, who called it an "unrealistic proposal."

78.    Writing on behalf of the Cedar's Board, Chairman Roger M. Widmann, noted some of the reasons Cedar was rejecting the offer from Wheeler. In responding, Cedar stated:

> We have sincere reservations, however, as to how an acquisition of Cedar by Wheeler could possibly create value for Cedar shareholders.  Of particular concern are the following factors:
>
> **Poor Returns and Financial Performance:** Wheeler's total shareholder returns have significantly underperformed both Cedar

and relevant indices. In addition, Wheeler has regularly missed analyst estimates, including for the third quarter 2017.

**Dividend Sustainability:** In May 2017, Wheeler cut its quarterly dividend by 19 percent, reportedly due to its inability to generate sufficient cash flows.

**Lower Quality Portfolio:** Wheeler's portfolio comprises class B and C assets in smaller, less attractive markets, which do not fit with Cedar in terms of quality and geographic positioning.  Cedar has substantially repositioned its portfolio – and continues to do so – by acquiring and redeveloping high-quality core assets in high-density markets in the attractive D.C. to Boston corridor.

**Over-leveraged:** Despite recent efforts to stabilize its balance sheet, Wheeler remains highly leveraged with debt to EBITDA of nearly 10 times.

**Incompatible Size:**  Cedar is a $1.35 billion company, with a current equity market capitalization of approximately $550 million. Wheeler is a $375 million company with a current equity market capitalization of approximately $95 million.  While there are instances where relative size differences may not matter, the above factors demonstrate that in the instant case, the size differences would be adversely consequential.

79.     The exact reasons that the Board rejected Wheeler's proposal in late-2017 still exist today.  For example, Wheeler still has "**Poor Returns and Financial Performance**." As of the date of the announcement of the sale and merger, Wheeler continued to significantly underperform both Cedar and the indexes. Cedar was up approximately 40% from the prior year. The overall REIT indexes were up as well. For example, the Dow Jones U.S. Real Estate Index was up approximately 14%. By comparison, Wheeler was down almost 41%. Since no analysists covered Wheeler after 2018, there were not any estimates for the company to miss.

80.     In addition, as to "**Dividend Sustainability**," Wheeler has not declared a dividend since 2017. Further, and more concerning to Plaintiff, It has not paid its own preferred shares a dividend since 2018.

81.     Likewise, Wheeler still has a "**Lower Quality Portfolio**." In the intervening four years, the quality of Wheeler's property portfolio remains unchanged. According to the Form 10-Ks, Wheeler continues to own 61 of the identical properties at the end of 2021 as it did at the end of 2017. In addition, while it appears to have sold a dozen properties, Wheeler only added one new property to its portfolio. Cedar has recognized that Wheeler's primary assets are in decline. In earnings calls, Cedar's own President and CEO has noted that asset like Wheeler holds (B malls) "are experiencing some fundamental secular decline." February 7, 2019, 2018Q4 Earnings Call.

82.     Wheeler also remains "**Over-leveraged**" having remained virtually unchanged debt to EBITDA of just over 10 times.

83.     Wheeler and Cedar are still of "**Incompatible Size**." Wheeler's market capitalization has fallen dramatically since 2017, when its market capitalization was 17% of that of Cedar's. On the day before the merger was announced, Wheeler had a market capitalization of approximately $19.35 million, down over $75 million since 2017. Its current market capitalization is 5.7% of Cedar's, almost two-thirds less than it was four years ago.

84.     In fact, Wheeler's treatment of its own preferred shareholders is cause for alarm. Not only has it suspended the dividend on all preferred series since 2018, it has repeatedly acted against the interests of its preferred shareholders.

85.     For example, in August 2021, Wheeler announced a special meeting to eliminate the accrued unpaid dividends on two classes (A and B) of its preferred shares, worth approximately $12 million, and eliminate cumulative dividend rights. This subsequently was approved and has spawned litigation challenging the legality of the change. It appears that the only reason the third class (the D class) of preferred shares were not subject to this change is

because immediately prior, Wheeler had acquired nearly 500,000 shares of the D series on favorable terms.

86.     In addition, Wheeler also amended the articles supplementary on its remaining class of preferred stock, the D series, reducing the changing the ratio of assets to obligations that provided security for the preferred shareholders. As with the other changes, this too has spawned litigation.

### Defendants Statements About the Proposed Transaction

87.     On March 3, 2022, Defendants Schanzer announced in a press release that the Proposed Transactions were the "best possible outcome for [Cedar's] common shareholders," but made no mention of Cedar's Preferred Stockholders. He stated:

> We believe this combination of transactions represents the best possible outcome for our common shareholders and we are very pleased with the progress thus far of our dual-track review of strategic alternatives[.]

88.     Defendant Schanzer's statement that the Proposed Transactions is the "best possible outcome for our common shareholders" diverges from his earlier representation on September 9, 2021, that the "Board is committed to maximizing value for all our shareholders," which encompasses both common and Preferred Stockholders. Schanzer thus concedes that the Proposed Transactions are not in the best interests of Preferred Stockholders.

89.     In the April 5, 2022 Schedule 14A, Defendants disseminated the following description of the Proposed Transaction:

> Accordingly, immediately following the Mergers, the Company Preferred Stock will remain senior to Wheeler and all of Wheeler's securityholders with respect to the cash generated from the Remainco assets. For the year ended December 31, 2021, these assets generated net operating income in excess of $19 million.

90.     These statements imply that there will be sufficient cash to satisfy the preferred

dividends for the foreseeable future. At best, this is unknown. At worst, this is false.

91.     Further, in the April 5, 2022 Preliminary Proxy Statement, the Director

Defendants admit that the transaction is, in effect, a complete liquidation of the Company, as

they announce in an opening letter by Defendant Schanzer regarding the special meeting of the

company's common stock holders to vote on the Proposed Transaction:

> At the special meeting, holders of our common stock will be asked to consider and
> vote on a proposal to sell the Company and substantially all of its assets (the
> "Transactions"), which will be effected by the sale by the Company of a portfolio of
> 33 grocery-anchored shopping centers to DRA Fund X-B LLC and KPR Centers LLC
> or their designees, followed by the acquisition by Wheeler Real Estate Investment
> Trust, Inc. of the Company and the balance of its assets by way of an all-cash merger
> transaction. It is anticipated that the total amount of cash to be returned to holders of
> our common stock as a result of the Transactions will be approximately $29.00 per
> share, as described in more detail in the section of the enclosed proxy statement titled
> "*The Transactions—Closing Dividend and Merger Consideration*". The exact amount
> of net proceeds available for distribution in connection with the Transactions is
> subject to customary real estate prorations applicable to sales of commercial real
> estate, payment by the Company of all applicable transaction costs and expenses, and
> satisfaction of other Company liabilities and indebtedness.

92.     Similarly, in the Notice of Special Meeting of Stockholders dated April 5, 2022,

Defendants admit that the sale of the grocery-anchored shopping centers represents

"substantially all of its assets:

> The special meeting will be held for the following purposes:

> To consider and vote on a proposal to approve the sale of the Company and
> substantially all of its assets (the "Transactions"), which will be effected by the
> sale by the Company of a portfolio of 33 grocery-anchored shopping centers to
> DRA Fund X-B LLC and KPR Centers LLC, followed by the acquisition by
> Wheeler Real Estate Investment Trust, Inc. of the Company and the balance of its
> assets by way of an all-cash merger transaction between the Company and a
> Wheeler subsidiary.

### The Board's Interest in the Transaction

93.    Defendants Morris, Ross and Stern were appointed to the Board pursuant to cooperation agreements between Cedar, Barington Companies Equity Partners, L.P., Camac Partners LLC, and Ewing Morris & Co. Investment Partners Ltd. Camac and Ewing own, respectively, approximately 11% and 8% of the outstanding common stock of Cedar. It is unknown how much common stock Barington owns.

94.    Upon completion of the transaction, because the transaction qualifies as "change in control," the directors will each immediately receive cash compensation for liquidation of restricted stock as follows:

| | Shares of Restricted Stock | Aggregate Payment for Restricted Stock ($) | Number of Shares Underlying RSU Awards | Aggregate Payment for RSU Awards ($) | Dividend Equivalent Rights on RSU Awards ($) | Total Equity Award Consideration ($) |
|---|---|---|---|---|---|---|
| Bruce J. Schanzer | 151,514 | 4,393,906 | 113,636 | 3,295,444 | 500,000 | 8,189,350 |
| Abraham Eisenstat | 12,577 | 364,733 | — | — | — | 364,733 |
| Gregg A. Gonsalves | 12,577 | 364,733 | — | — | — | 364,733 |
| Sabrina L. Kanner | 12,577 | 364,733 | — | — | — | 364,733 |
| Darcy D. Morris | 2,493 | 72,297 | — | — | — | 72,297 |
| Steven G. Rogers | 12,577 | 364,733 | — | — | — | 364,733 |
| Richard H. Ross | 2,493 | 72,297 | — | — | — | 72,297 |
| Sharon Stern | 2,493 | 72,297 | — | — | — | 72,297 |

95.    The compensation the directors will receive for their restricted stock units is in addition to the compensation the directors will receive for the shares of common stock they each currently own. Each director will receive an additional minimum liquidation of their currently held shares of between $72,297 (Ross) up to $32,067,330 (Morris).

96.    In addition, under the deferred compensation plan, the transaction qualifies as a "change in control" that immediately results in additional payments to Defendants Schnazer and Eisenstat in the amounts of, respectively, $8,436,300 and $472,796.

97.     Defendant Schnazer is also entitled to additional money under his severance agreement because the transaction will result in a change in control. This entitles him to another $14,730,088.

98.     All told, including other payments from Cedar, upon completion of the transaction, Defendant Schnazer will receive $30,891,078. To put that in perspective, that is 150% of the entire market capitalization of Wheeler.

## CLASS ACTION ALLEGATIONS

99.     Plaintiff brings this as a class action pursuant to Federal Rule Civil Procedure 23, individually and on behalf of all other preferred stockholders of the Cedar, except Defendants herein and any persons, firm, trust, corporation, or other entity related to or affiliated with them and their successors in interest (the "Class").

100.    This action is properly maintainable as a class action for the following reasons:

a)      The Class is so numerous that joinder of all members is impracticable. As of December 31, 2021, there were 6.45 million shares outstanding of Cedar preferred shares. Of these, there were 1.45 million of Series B outstanding and 5 million outstanding of Series C. Upon information and belief, Cedar Series B and Series C preferred stock is owned by thousands of shareholders of record nationwide.

b)      Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.

Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

c)      The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

d)      To the extent defendants take further steps to effectuate the Proposed Transaction, preliminary and final injunctive relief on behalf of the Class as a whole will be entirely appropriate because defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

101.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member.  The common questions include, inter alia, the following:

a)      Whether defendants breached their fiduciary duties of due care, good faith and loyalty with respect to Plaintiff and the other members of the Class as a result of the conduct alleged herein;

b)      Whether the Proposed Transaction should be enjoined to: (1) allow preferred shareholders to vote as a class, (2) prevent the consummation of

the Proposed Transaction, and (3) prevent the distribution of the proceeds

of the Proposed Transaction pending resolution of Plaintiff's claims;

c)      Whether the Proposed Transaction constitutes a Change in Control

invoking conversion rights under the Series B and Series C governing

documents;

d)      Whether the Proposed Transaction requires the preferred shareholders to

vote on it as a class under the Series B and Series C prospectuses; and

e)      Whether Plaintiff and the other members of the Class would be irreparably

harmed if Cedar, the Defendants, and Wheeler are not enjoined from

effectuating the conduct described herein.

### COUNT I
### Conversion Rights of Series B and C Preferred Shareholders
### (against Cedar Realty Trust, Inc.)

102.      Plaintiff realleges the previous paragraphs as if fully set forth herein.

103.      In relevant part, the prospectus for the preferred shares defines "Change of

Control" as:

> (x) the acquisition by any person, including any syndicate or group deemed to be a "person" under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended, or the Exchange Act, of beneficial ownership, directly or indirectly, through a purchase, merger or other acquisition transaction or series of purchases, mergers or other acquisition transactions of shares of our capital stock entitling that person to exercise more than 50% of the total voting power of our capital stock entitled to vote generally in elections of directors (except that such person will be deemed to have beneficial ownership of all securities that such person has the right to acquire, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition), and (y) following the closing of any transaction referred to in clause (x), neither we nor the acquiring or surviving entity has a class of common securities (or American Depositary Receipts ("ADRs"), representing such securities) listed on the NYSE, the NYSE American, LLC exchange (the "NYSE American") or the NASDAQ Stock Market ("NASDAQ"), or listed or quoted on an exchange or quotation system that is a successor to the NYSE, the NYSE American or NASDAQ[.]

104.    Upon a change in control, each holder of preferred shares "will have the right (unless, prior to the Change of Control Conversion Date, we have provided or provide notice of our election to redeem the [] Preferred Stock) to convert some or all of the [] Preferred Stock held by such holder on the Change of Control Conversion Date into a number of shares of our common stock."

105.    A formula for the conversion is provided, which is moderately altered depending on whether the shares to be converted are Series B or Series C.

106.    The first requirement of change in control will be met upon the merger date. Wheeler will acquire 100% of the voting shares of Cedar.

107.    The second requirement will also be met. Following merger, "neither we nor the acquiring or surviving entity has a class of common securities" listed on an exchange. Following the transaction, neither the acquiring entity, WHLR Merger Sub Inc., nor the surviving entity, Cedar Realty Trust, will have common shares traded on any exchange. All common shares of Cedar will be cancelled.

108.    As such, the merger will result in a change in control that gives preferred shareholders the right to convert to common stock.

109.    The parties undeniably dispute the application of the conversion rights to the proposed transaction. Declaratory judgment would serve to terminate the uncertainty or controversy giving rise to these proceedings.

110.    Further, there is an actual controversy exists between contending parties about the application of the conversion rights, presenting antagonistic claims between them which indicate imminent and inevitable litigation, and the Plaintiff and the Class assert conversion rights that are denied by Defendants.

111.    Cedar will not honor the conversion rights and has structed the transaction to thwart those rights. Upon consummation of the merger, all outstanding Cedar stock will be cancelled. Even if Plaintiff and the Class could convert, as is their right, there would be nothing to convert to.

112.    If the merger is allowed to be consummated, Plaintiff and the Class will lose their conversion rights and the proceeds associated with the conversion. By vitiating the stock and distributing the proceeds before a determination of Plaintiff and the Class's rights, they will suffer irreparable injury with no adequate remedy at law because it will be impossible to claw back distributions.

113.    There is minimal harm to Defendants or other parties if the proceeds enjoined from being distributed. If kept in escrow, they will accrue interest which will compensate affected parties for the time value of any delay.

114.    Count I hereby seeks this Court enter a declaratory judgment that defines the conversion rights of the Series B and Series C Preferred Shareholders and an injunction against Cedar Realty Trust, Inc. that forbids the distribution of any money to the defendants or the Cedar Realty Trust common stockholders until the Series B and C Preferred Shareholders have had their conversion rights satisfied.

### Count II
### Injunction Requiring Approval of Preferred Stockholders
### Regarding the Proposed Transaction
### (against Cedar Realty Trust, Inc.)

115.    Plaintiff realleges the previous paragraphs as if fully set forth herein.

116.    The Articles Supplementary require an affirmative vote of the holders of at least two-thirds of the Series B and the Series C Preferred Stock, voting as separate classes in the event of a proposed amendment or repeal of the Company charter—including via merger or

consolidation—in a manner that would materially and adversely affect the rights of the holders of the Series B and Series C Preferred Stock.

117.    The Proposed Transaction here materially and adversely affects the rights of the Series B and C Preferred Stock by materially altering the terms of these preferred holders' purchase.

118.    First, the Proposed Transaction materially alters the very nature of the Series B and C holders' investment by fundamentally altering the purpose of the company. Currently, at and all relevant previous times, Series B and C Preferred Stock in Cedar Realty Trust represented an investment in an on-going concern dedicated operating a portfolio of grocery-anchored shopping centers in high-density urban markets from D.C. to Boston. The Preferred Stock was backed by over $1 billion in real estate assets. And, as repeatedly recognized by Cedar, these grocery-anchored properties cater to "the need of consumers to purchase food and other staple goods and services generally available at such centers, its type of 'necessities-based' properties should provide relatively stable revenue flows even during difficult economic times." Form 10-K, at 4 (filed Mar. 10, 2022).

119.    Second, the Proposed Transaction materially alters the very nature of the Series B and C holders' investment by drastically changing the financial prospects of the company. Currently, and at all relevant previous times, Series B and C Preferred Stock in Cedar Realty Trust represented an investment in an on-going concern dedicated to properties "which will provide substantial cash flow, currently and in the future, taking into account an acceptable modest risk profile, and which will present opportunities for additional growth in income and capital appreciation" backed by over $1 billion in real estate assets. As detailed in the Fact section of this Complaint, the financial risk at issue in the Preferred Stock investment before and

after the Proposed Transaction would be materially different and the financial terms of the

Preferred Holders purchase would be materially and adversely affected by the Proposed

Transaction.

120.     Third, the Proposed Transaction eviscerates the liquidation preference term of the

Series B and C Preferred Stock. Under the Liquidation Preference, the Series B and C Preferred

Stock has the right to receive out of the assets legally available for distribution to our

stockholders the sum of the liquidation preference of $25 per share and any accrued and unpaid

dividends. But by selling off over 80% of the total assets of the company, all of which are the

most valuable and high-earning, and then paying out those proceeds to the common

shareholders, the Proposed Transaction would materially and adversely affect the ability of the

preferred holders to any ability to exercise their liquidation preference.

121.     Fourth, the Proposed Transaction materially alters the voting rights of the Series

B and C Preferred Stock. Now, Series B and C Preferred holders have the right to vote for the

election of two additional directors to serve on the Cedar Realty Trust, Inc. Board of Directors in

the event that the holders are not paid dividends for six or more quarterly periods (whether or not

consecutive). Such a right confers real power to the preferred holders by allowing them board

access and 20% voting power on the board that runs the company, should the company fail to

pay the preferred's dividends at least six times. But as a result of the Proposed Transaction, that

power will be materially diluted. Under the new structure, the preferred holders' voting rights

will not be to any board that could affect change or protect their rights, but instead to a board that

is wholly controlled and dominated by a separate entity, Wheeler Realty Trust. Because the

Wheeler Board has no interest in the preferred stockholders or any fiduciary duty to them, The

Proposed Transaction materially and adversely alters the voting rights of the preferred holders.

122.    Cedar has not, nor will it, hold allow or honor a vote on the proposed transaction by the Preferred Shareholders.

123.    The preferred shares voting rights are a key protection possessed by Preferred Shareholders. If the merger is allowed to be consummated without allowing a vote by the Preferred Shareholders, Plaintiff and the Class will suffer irreparable injury with no adequate remedy at law.

124.    There is minimal harm to Defendants or other parties if the voting rights promised to the Preferred Shareholders is honored.

125.    Plaintiffs hereby request the Court enter an injunction requiring Defendants to:

- Issue and disseminate a Proxy to all holders of Series B and C Preferred Stock, and hold a vote among those shareholders as to whether they approve or disapprove on the Transaction; and

- Forestall closing the Proposed Transaction until the voting results have been received for both the common and the Preferred Stockholders.

## COUNT III
**Claim for declaratory judgment that the Proposed Transaction triggers the Preferred Stockholders' liquidation rights under the Articles Supplementary (against Cedar Realty Trust, Inc.)**

126.    Plaintiff realleges the previous paragraphs as if fully set forth herein.

127.    The proposed transaction is a liquidation.

128.    In relevant part, the prospectus for both the Series B and Series C preferred shares provides:

> If we liquidate, dissolve or wind up, holders of the Series [B or C] Preferred Stock will have the right to receive out of assets legally available for distribution to our stockholders (after payment or provision for payment of all of our debts and other liabilities) the sum of (a) the liquidation preference of $25.00 per share and (b) accrued and unpaid dividends (whether or not declared) to, but excluding, the date of payment, before any payments are made to the holders of our common stock

129.    The prospectus purports to exclude from the liquidation preference certain transactions:

> The consolidation or merger of us with or into any other corporation, trust, or entity or of any other corporation with or into us, a statutory share exchange by us or the sale, lease or conveyance of all or substantially all of our assets or business shall not be deemed to constitute a liquation, dissolution or winding up of us.

130.    The proposed transaction is a merger in name only. It is, for all intents and purposes, a liquidation of Cedar.

131.    First, Cedar is ceasing primary operations. The overwhelming majority of its assets, some 87.5%, are being sold to other entities. The proceeds of these sales will be used to extinguish liabilities of Cedar and, for amounts remaining, be distributed to Cedar common shareholders.

132.    Second, the remaining assets will effectively be sold to Wheeler for $130 million. These proceeds will be utilized to extinguish any remaining liabilities of Cedar and, with what remains, be distributed to Cedar common shareholders. At the end of this, the common shares of Cedar will be extinguished.

133.    Third, prior to the closing, Cedar will terminate all employees. Cedar is required to pay the terminated employees all severance, benefits, or other obligations. Among these benefits includes the immediate vesting of restricted stock awards and performance restricted stock units. This benefits, for example, Cedar's directors who will immediately vest in thousands of shares of common stock that will be liquidated to cash.

134.     Fourth, Cedar's governing charter and bylaws will be terminated and replaced with Wheeler's charter and bylaws.

135.     Fifth, Cedar preferred shareholders will no longer have the protections they had under Cedar. Their right to vote two additional directors onto Cedar's board in case of dividend arrearage allowed them a 20% voting block in a board that: (1) was the pinnacle of the company, and (2) had common shareholders who elected the remaining 80% of the directors. After the proposed transaction, the two directors would be appointed to a board of a subsidiary company, where the other directors would be entirely appointed by Wheeler and not voted upon by common shareholders. This puts preferred shareholders at the mercy of Wheeler management, left with a useless right to vote directors onto an ineffectual and controlled board.

136.     At the end of the transaction, Cedar will look nothing like the company in which Plaintiff and the putative class held their preferred shares. Nearly 90% of the assets will be owned by other companies, there will be no Cedar common stock, and over $1 billion in proceeds will have either been used to extinguish liabilities or distributed to common shareholders. Preferred shareholders will see their primary method of protection, appointing directors to the board, effectively extinguished.

137.     The parties undeniably dispute whether the Proposed Transaction constitutes a liquidation under the Article Supplementary. Declaratory judgment would serve to terminate the controversy giving rise to these proceedings.

138.     Further, there is an actual controversy exists between contending parties about whether this is a liquidation triggering certain rights for Preferred Shareholders. In addition, whether this is a liquidation presents antagonistic claims between the Preferred Shareholders and

Defendants that has resulted in imminent and inevitable litigation. Finally, Defendants deny that the Proposed Transaction is a liquidation.

**COUNT IV**
**Breach of Fiduciary Duty of Loyalty and Good Faith and Fair Dealing**
**(against the Individual Defendants)**

139.   Plaintiff realleges the previous paragraphs as if fully set forth herein.

140.   As directors of the Cedar Realty Trust, Inc., each of the individual directors owe the shareholders of the Company, including the Preferred Shareholders, a fiduciary duty of loyalty, good faith, and fair dealing. The directors, though, have breached these duties by structuring the Proposed Transaction so that they reap significant monetary consideration by harming the value of the Preferred Shareholders investments.

141.   As detailed in this Complaint, a majority of the Board of Directors will receive significant cash consideration in the Proposed Transaction. None of the individual directors hold Preferred Stock.  The cash considerations for a majority of the board of directors in this Proposed Transaction are material and that consideration is different and less valuable than the consideration that the Proposed Transaction will pay the Preferred Shareholders.

142.   As constructed, the Proposed Transaction will not treat the Preferred Stockholders fairly. No independent negotiating structure was utilized in negotiated the Proposed Transaction, and there were no negotiations at all regarding compensation to the Preferred Stockholders.

**COUNT V**
**Breach of fiduciary duty of disclosure**
**(against the individual defendants)**

143.   Plaintiff realleges the previous paragraphs as if fully set forth herein.

144.     As directors of a Maryland corporation, each of the individual defendants had a duty of candor and full and fair disclosure to each and every Cedar stockholder, including the preferred stockholders.

145.     The directors have breached the duty of candor and disclosure by disseminating at least three false or misleading statements about the Proposed Transaction.

146.     First, the individual defendants have disseminated, through the "March 2022 Cedar Form 8-K" and again in the April 5, 2022 Schedule 14A, the individual defendant board of directors caused Cedar to disseminate the following description of the Proposed Transaction: "immediately following the Mergers, the Company Preferred Stock will remain senior to Wheeler and all of Wheeler's securityholders with respect to the cash generated from the 19 shopping center assets that will remain in the Company at the time of the Mergers. For the year ended December 31, 2021, these assets generated net operating income in excess of $19 million." However, the defendants misleadingly omitted information regarding expenses or any other supporting data that would allow a stockholder to make a reasonable calculation of those properties' ability to generate enough income to support the preferred dividend obligation of the company.

147.     Those statements were false and misleading and the board of directors knew or should have known that the statements were untrue.

148.     Second, Defendant Schanzer's statement that the Proposed Transactions is the "best possible outcome for our common shareholders" diverges from his earlier representation on September 9, 2021, that the "Board is committed to maximizing value for all our shareholders," which encompasses both common and Preferred Stockholders. Schanzer thus concedes that the Proposed Transactions are not in the best interests of Preferred Stockholders.

149.    Defendant Schanzer's statements were false and misleading because he knew that the outcome that was negotiated did not maximize value for all shareholders, specifically, the preferred shareholders.

150.    Plaintiff and the Class have been damaged by the Defendants' breaches of their duty to disclose.

## PRAYER FOR RELIEF

Plaintiff requests this Court enter judgment as follows:

A.    Certifying the proposed Class as requested in this Complaint, appointing the Plaintiff as Class Representative ad Plaintiff's counsel as Class Counsel;

B.    Declaring the holders of Series B and C Preferred Stock entitled to exercise either their conversion rights or liquidation rights under the terms of the Articles Supplementary if the Proposed Transaction closes;

C.    Enjoining distribution of any proceeds from the sale of any assets in the Proposed Transaction to the Common Stockholder or any of the individual Board Defendants as a result of the Proposed Transaction until this Court rules on the merits of Plaintiff's claims;

D.    Imposing a constructive trust on the sale of any asset in conjunction with the Proposed Transaction, for the benefit of the Plaintiff and Class, until this Court rules on the merits of Plaintiff's claims;

E.    Awarding compensatory damages;

F.    Awarding any applicable pre-judgment and post-judgment interest;

G.    Awarding Plaintiff and the Class the cost of this action including reasonable attorneys' fees and expert's fees; and

H.    Awarding any other relief the Court finds appropriate or just.

Respectfully submitted,


/S/      *Thomas J. Minton*
Thomas J. Minton – No. 03370
Goldman & Minton, P.C.
3600 Clipper Mill Rd., Suite 201
Baltimore, MD 21211
Tel: (410) 783-7575
Fax: (410) 783-1711
*tminton@charmcitylegal.com*


Matthew Heffner
mheffner@heffnerhurst.com
Matthew Hurst
mhurst@heffnerhurst.com
HEFFNER HURST
30 North LaSalle Street, Suite 1210
Chicago, Illinois 60602
Tel: (312) 346-3466


Lawrence Deutsch
ldeutsch@bm.net
Andrew abramowitz
aabramowitz@bm.net
Berger Montague PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3062


*Counsel for the Plaintiff and the
Putative Class*

**Jury Demand**

Plaintiff and the Class seek, on all maters triable, a trial before a jury.

Respectfully submitted,


/S/      *Thomas J. Minton*
Thomas J. Minton – No. 03370
Goldman & Minton, P.C.
3600 Clipper Mill Rd., Suite 201
Baltimore, MD 21211
Tel: (410) 783-7575
Fax: (410) 783-1711
*tminton@charmcitylegal.com*

41