**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **Julia Kim, On behalf of herself and all Others similarly situated,** | * | |
| | * | **No.: 1:22-cv-1103-GLR** |
| *Plaintiff* | * | |
| **v.** | * | |
| | * | |
| **Cedar Realty Trust, Inc., et al.** | * | |
| *Defendants* | * | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER**

**MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

BACKGROUND...........................................................................................1

    The Proposed Transaction.................................................................1

    The Board's Interest in the Proposed Transaction..............................3

    Wheeler's History with Cedar and its Own Preferred Shareholders..................4

    The Proposed Transaction Puts the Preferred Dividends at Risk.......................7

LEGAL STANDARD...................................................................................9

ARGUMENT...............................................................................................10

    I.    The Court should issue a preliminary injunction because Plaintiffs' claims are likely to succeed on the merits...............................................................................10

    A.  Plaintiffs are likely to succeed on their voting rights because the Articles Supplementary require the Proposed Transaction to be approved by preferred shareholders if that transaction will alter the Cedar charter, harm the Plaintiffs' voting rights, liquidation preference, and ability to rely on dividend payments, and thereby drastically alter the terms of the Plaintiffs' preferred stock.......................... 10

        1.   The Proposed Transaction will effectively invert the liquidation preference Series C preferred stockholders hold over the common shareholders...............11

        2.   The Proposed Transaction will alter, amend, or repeal sections of the Cedar Charter and materially alter Series C preferred shareholders' rights.......12

            (a) The Proposed Transaction will alter, amend, or repeal sections of the Cedar Charter..............................................................................12

            (b) The Proposed Transaction will materially affect rights, preferences, privileges or voting power of the Preferred Stock..............................................14

            (c) While the Preferred Shares will remain outstanding, the terms of those shares will have materially changed............................................................15

    B.  Plaintiffs are likely to succeed on their claim for election of their Conversion Rights because the Proposed Transaction amounts to a "Change of Control" of Cedar Realty Trust, Inc....................................................................................19

II.    Cedar's Preferred Shareholder will suffer irreparable harm in the absence of a
       preliminary injunction......................................................................................24

III.   The balance of equities is in favor of the preferred shareholders...................25

IV.    Issuing the requested preliminary relief is in the public interest....................26

CONCLUSION...............................................................................................................26

Pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, Plaintiff Julia Kim, on behalf of herself and all other Series C preferred shareholders of Defendant Cedar Realty Trust, Inc. ("Cedar" or the "Company"), moves for a preliminary injunction compelling Cedar to, prior to the close of the Proposed Transaction, as defined herein: (1) seek approval of the Proposed Transaction from the Series C preferred shareholders via a majority vote, and (2) alert Series C preferred shareholders of their right to elect their Conversion Rights under Section 7 of the Articles Supplementary governing their shares.

## BACKGROUND

Cedar is a real estate investment trust ("REIT") focusing on grocery-anchored shopping centers. Grocery-anchored centers differ from traditional brick-and-mortar shopping malls because the need for essentials, such as groceries, drives traffic to the shopping center. Ex. A, May 14, 2020, 20Q1 Earnings Call at 3-4. This focus has been a key strategy of Cedar to avoid the systemic decline in traditional brick-and-mortar centers caused by internet shopping. *Id*.; Ex. B February 7, 2019, 2018Q4 Earning Call at 3. Cedar is a publicly traded company, with approximately (i) 13,640,000 shares of Common Stock outstanding, (ii) 1,450,000 shares of Series B Preferred Stock, and (iii) 5,000,0000 shares of Series C Preferred Stock. The Series C Preferred Stock was issued pursuant to Cedar's Articles Supplementary. Ex. C.

**The Proposed Transaction**

On March 3, 2022, Cedar announced it was engaging in a two-stage transaction that would effectively dissolve the Company as it is currently known. This would occur in two phases. First, Cedar would sell to DRA Fund X-B LLC ("DRA") and KPR Centers LLC 33 grocery-anchored properties for a cash purchase price of $840 million (less the outstanding

principal of any assumed mortgage debt) (the "Grocery-Anchored Transaction"). Ex. D, Sch. 14A at 67-68. These 33 properties are the best income generating properties in the Cedar portfolio, representing nearly 80% of the Company's assets. *Id*. In addition, if two additional redevelopment projects have not been sold to third parties by the closing, DRA will also acquire those assets for an additional price of up to $80.5 million. *Id*. If that occurs, DRA will purchase 87.7% of Cedar's total assets. *Id*. The net proceeds from this Grocery-Anchored Transaction would be distributed exclusively to common stockholders. *Id*.

The second step of the Proposed Transaction consists of a "merger" between Cedar and WHLR Merger Sub ("Merger Sub"), through which Wheeler Real Estate Investment Trust, Inc. ("Wheeler") will take 100% control of Cedar. Ex. E, Merger Agreement at Art. 2.1. This merger will take place immediately following the closing of the Grocery-Anchored Transaction. *Id*. at B-1. The Merger Sub will merge with and into the Company, with Merger Sub ceasing to exist and Cedar being the surviving entity. *Id*. at Art. 2.1. This transaction purportedly values Cedar's remaining shopping center assets, consisting of 19 properties, at $291.3 million, even though Cedar will receive only $130 million. *Id.* at Art. 3.1. Compared to the grocery-anchored portfolio, these 19 properties are worth substantially less – the average value of the grocery-anchored portfolio is $25.45 million versus $15.3 million. Ex. D, at 67-68. Upon the close of the merger, Cedar's common shares will be cancelled. Ex. E, at Art. 3.1(a)(ii).

Immediately before the close of the merger, Cedar will declare a special dividend for common shareholders in the amount of the proceeds of the sale of the grocery-anchored properties and the redevelopment properties, minus all outstanding loans and debt obligations. Ex. D, at 69. Common shareholders will also receive the right to share the $130 million in merger consideration. *Id*. In total, the Proposed Transaction values Cedar's assets at over $1

billion and distributes nearly $400 million to the Common Shareholders. *Id*. at 67-69 Despite

their guaranteed contractual right to a liquidation preference, preferred shareholders will receive

nothing. *Id*. at 70.

**The Board's Interest in the Proposed Transaction**

Cedar currently has eight directors, all of whom are named defendants here. All of the

directors, upon completion of the Proposed Transaction, will each immediately receive cash

compensation for liquidation of restricted stock because it qualifies as a "change in control."

According to filings, these directors will receive the following:

**Cash Payments to Executive Officers and Non-Employee Directors in Respect of Company Equity Awards**

| | Restricted Stock Awards | | Restricted Stock Unit Awards | | | |
|---|---|---|---|---|---|---|
| | Shares of Restricted Stock (#) | Aggregate Payment for Restricted Stock ($)[1] | Number of Shares Underlying RSU Awards(#) | Aggregate Payment for RSU Awards ($)[2] | Dividend Equivalent Rights on RSU Awards ($)[3] | Total Equity Award Consideration ($) |
| Bruce J. Schanzer | 151,514 | 4,393,906 | 113,636 | 3,295,444 | 500,000 | 8,189,350 |
| Abraham Eisenstat | 12,577 | 364,733 | — | — | — | 364,733 |
| Gregg A. Gonsalves | 12,577 | 364,733 | — | — | — | 364,733 |
| Sabrina L. Kanner | 12,577 | 364,733 | — | — | — | 364,733 |
| Darcy D. Morris | 2,493 | 72,297 | — | — | — | 72,297 |
| Steven G. Rogers | 12,577 | 364,733 | — | — | — | 364,733 |
| Richard H. Ross | 2,493 | 72,297 | — | — | — | 72,297 |
| Sharon Stern | 2,493 | 72,297 | — | — | — | 72,297 |

*Id*. at 54-55. In addition, the Proposed Transaction qualifies as a "change in control" under the deferred compensation plan, and thus triggers additional payments to Defendants Schanzer and Eisenstat in the amounts of, respectively, $8,436,300 and $472,796. *Id*. at 56. Further, Defendant Schanzer is also entitled to additional money under his severance agreement because the transaction will result in a change in control. This entitles him to another $14,730,088. *Id*. at 59. All told, including other payments from Cedar, upon completion of the transaction, Defendant Schanzer will receive $30,891,078. To put that in perspective, Schanzer will reap 150% of the entire market capitalization of Wheeler from the Proposed Transaction based on the "change of control" clauses in his various agreements.

Some of the directors hold their positions because of cooperation agreements between the largest shareholders, who will directly benefit from the Proposed Transaction. Directors Morris, Ross, and Stern were appointed to the Board pursuant to cooperation agreements between Cedar and Barington Companies Equity Partners, L.P., Camac Partners LLC, and Ewing Morris & Co. Ex. D, at 30. Investment Partners Ltd. Camac and Ewing own, respectively, approximately 9.35% and 8.1% of the outstanding common stock of Cedar. *Id*. at 85. It is unknown the amount of common stock Barington owns.

**Wheeler's History with Cedar and its Own Preferred Shareholders**

Wheeler is a publicly traded REIT with a market capitalization of approximately $22 million. Ex. F. Last year, it lost $9.4 million. Ex. G, Wheeler Form 10-K at 26. As of the first quarter of 2022, Wheeler had negative equity. Ex. H, Wheeler 22Q1 Form 10-Q at 4.

Four years ago, Wheeler made an offer to acquire Cedar, and Cedar rejected it, calling it an "unrealistic proposal." Ex. I, Ltr. From Roger M. Widmann. That letter noted the reasons for rejecting the proposal as follows:

Poor Returns and Financial Performance: Wheeler's total shareholder returns have significantly underperformed both Cedar and relevant indices. In addition, Wheeler has regularly missed analyst estimates, including for the third quarter 2017.

Dividend Sustainability: In May 2017, Wheeler cut its quarterly dividend by 19 percent, reportedly due to its inability to generate sufficient cash flows.

Lower Quality Portfolio: Wheeler's portfolio comprises class B and C assets in smaller, less attractive markets, which do not fit with Cedar in terms of quality and geographic positioning. Cedar has substantially repositioned its portfolio – and continues to do so – by acquiring and redeveloping high-quality core assets in high-density markets in the attractive D.C. to Boston corridor.

Over-leveraged: Despite recent efforts to stabilize its balance sheet, Wheeler remains highly leveraged with debt to EBITDA of nearly 10 times.

Incompatible Size: Cedar is a $1.35 billion company, with a current equity market capitalization of approximately $550 million. Wheeler is a $375 million company with a current equity market capitalization of approximately $95 million. While there are instances where relative size differences may not matter, the above factors demonstrate that in the instant case, the size differences would be adversely consequential.

*Id*.

Nothing has changed in the intervening years. First, Wheeler still has "Poor Returns and Financial Performance." As of the date of the announcement of the Proposed Transaction, Wheeler continued to significantly underperform both Cedar and the indexes: Cedar was ***up*** approximately 40% from the prior year, Ex. J (March 2, 2022 close of $24.88 versus March 2, 2021 close of $15.24), and the Vanguard REIT Index was ***up*** 19%, Ex. K (March 2, 2022 close of $147.39 versus March 2, 2021 close of $123.85), while Wheeler was ***down*** almost 41%. Ex. L (March 2, 2022 close of $1.99 versus March 2, 2021 close of $3.37). Since no analysts covered Wheeler after 2018, there were no estimates for that company to miss. Wheeler has not declared a dividend since 2017. Ex. G, Wheeler Form 10-K at 8. Further, and more concerning to Plaintiff, Wheeler has not paid its own preferred shares a dividend since 2018. *Id*.

Second, Wheeler still has a "Lower Quality Portfolio," as it owned 61 of the identical properties at the end of 2021 as it did at the end of 2017. *Compare* Ex. M, 2017 10-K at Sch. III *with* Ex. G, 2021 10-K at Sch. III. While it appears to have sold a dozen properties, Wheeler only added one. *Id*. Notably, Cedar has publicly recognized that Wheeler's primary assets are in decline. In earnings calls, Cedar's own President and CEO has noted that assets like those that Wheeler holds (B malls) "are experiencing some fundamental secular decline." Ex. B, February 7, 2019, 2018Q4 Earnings Call at 3. And Wheeler still remains "Over-leveraged," with virtually unchanged debt-to-EBITDA of just over 10 times. Ex. G, at 19 (EBITA of $34,307,000) and at 17 (debt of $346,262,000).

Third, Wheeler and Cedar are still of "Incompatible Size." Wheeler's market capitalization has fallen dramatically since 2017, when its market capitalization was 17% of that of Cedar's. On the day before the merger was announced, Wheeler had a market capitalization of approximately $19.35 million, down over $80 million since 2017. Ex. L, and Ex. N (Nov. 27, 2017 price of $10.23 v. Mar. 3, 2022 price of $1.99, times 9,720,532 common shares). As of the announcement date, Cedar's market capitalization was $365.5 million, Ex. J, so Wheeler's relative market capitalization has dropped to 5% of that of Cedar's since 2017.

Importantly, Wheeler has a history of disregarding rights of preferred shareholders. For example, in August 2021, Wheeler announced a special meeting to eliminate the accrued unpaid dividends on two classes (A and B) of its preferred shares and eliminate cumulative dividend rights. Ex. G, Form 10-K at 13. Not surprisingly, this brash move spawned litigation. *Id*. at 57 (it appears that the only reason the third class (the D class) of preferred shares were not subject to this change is because immediately prior, Wheeler had acquired nearly 500,000 shares of the D series on favorable terms. *Id*. at 9. In addition, Wheeler amended its articles supplementary on its

remaining class of preferred stock (Series D), reducing the ratio of assets-to-obligations that provided security for those preferred shareholders. This, too, is being litigated. *Id*. at 56. Finally, Wheeler is $26.16 million in arrears on its Series D preferred shares. *Id*. at 53.

**The Proposed Transaction Puts the Preferred Dividends at Risk**

If the Proposed Transaction is consummated, there is no reason to believe that the 19 properties can generate sufficient income to meet the dividend obligations. While Cedar admits a duty to provide enough in assets to continue to pay the preferred shareholders, the only evidence it has provided that the Proposed Transaction can meet these obligations via a sustainable cash flow is found in its Schedule 14A, where Cedar states:

> As preferred stock of the Surviving Company in the Mergers, the Company Preferred Stock will remain senior Wheeler and all of Wheeler's securityholders following completion of the Mergers with respect to the cash generated from the Remainco assets. For the year ended December 31, 2021, these assets generated net operating income in excess of $19 million, which the Company anticipates will be exceeded for full-year 2022, based on current leasing activity. In 2021, the aggregate Company Preferred Stock dividend was approximately $10.8 million.

Ex. D, Sch. 14A at 8. But this is incomplete at best and, at worst, misleading. Net operating income does not deduct for loan principal and interest, financing costs, capital costs, or taxes. It is therefore impossible to know whether there will be sufficient cashflow to pay any dividends whatsoever.

Worse, Cedar has only provided the net operating income for one year for these 19 properties. It has not provided historical performance, nor is it possible to derive it from prior company disclosures. And using only one year's net operating income makes the number subject to manipulation. For example, necessary repairs can be deferred, reducing expenses and therefore increasing net operating income. And any net income could easily be consumed by the $130 million loan Wheeler is taking out to pay for these properties, the terms of which have not

been disclosed. If this loan is a ten-year loan, at a modest 4.25% rate, the principal and interest payments alone would be almost $16.3 million annually (Wheeler has taken out similar loans in the past. *See*, *e.g.*, Ex. G, Form 10-K, Note 5 at 43-48). The remaining $2.8 million would likely be consumed by the most modest capital expenses, necessary for the upkeep of the properties.

Given Wheeler's history of hostility toward the rights of preferred shareholders, and its own tenuous financial condition, the dividend obligations will likely not be met. The market confirms this thinking: the day before the transaction was announced, the closing price of the C shares was $22.85. Ex. O. Following the announcement, the shares closed at $9.85, representing a drop of 57%. *Id*.

The market also understands that this transaction, if allowed, would violate the change of control provisions that protect REIT preferred shareholders. As a Raymond James analyst has observed, REIT preferred stock investors bargain and pay for change of control and voting-rights protections to ensure companies do not stick them in an underperforming company while the common shareholders abscond with all the assets:

> The preferreds will remain outstanding, but will now be tied to Wheeler's more levered balance sheet and lower quality portfolio of underlying real estate (and we note Wheeler has already suspended its own preferred stock dividend payments). **In short, the CDR common equity shareholders are winning, but at the cost of preferred shareholders.** While we are ill-equipped to provide a legal opinion, the proposed deal structure certainly appears to be circumventing the *spirit* of the change of control provision, and preferred shareholders may have a valid argument in court if it goes down that road (this is exactly the type of situation the change of control provisions were included to avoid in the first place).

Ex. P, Raymond James Company Cmt., Mar. 8, 2022 at 1 (emphasis in original). Also, allowing such a transaction would disrupt the market for preferred shares because it is well known in the industry that such stock has change of control and voting rights protections:

We are concerned that if the preferred shareholders are not made whole (or given some other consideration), this could set a bad precedent for the REIT industry. **Preferred equity has long been a valuable slice of the REIT capital stack, and the treatment of CDR preferred investors in this transaction could weaken investor appetite to provide this form of valuable permanent capital to other REITs in the future.** Certainly other REIT preferred shares have been sent to purgatory in other M&A transactions, but they have been more of a byproduct of M&A, and not the driving factor behind the deal structure. CDR and its advisors may be patting themselves on the back for creative deal/legal gymnastics, but there could be other broader negative implications for the industry. If CDR can use this structure, what's to stop other REITs from structuring a similar transaction? Could that potentially hurt the investability of other outstanding REIT preferred stock? And what kind of updated language needs to be incorporated into preferred offerings to prevent this from happening again? We believe this sets a bad precedent for the sector.

*Id*. at 1-2.

A preliminary injunction is necessary to protect the rights of Cedar's Series C preferred shareholders.

## LEGAL STANDARD

Preliminary injunctions "preserve the court's ability to render a meaningful decision on the merits by sustaining the status quo." *Ehrlich v. Perez*, 394 Md. 691, 733, 908 A.2d 1220, 1245 (2006). To prevail, the moving party must show: (1) they are likely to succeed on the merits; (2) they will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) maintaining the status quo is in the public interest. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008); *J.O.P. v. U.S. Dep't of Homeland Sec.*, 409 F. Supp. 3d 367, 375 (D. Md. 2019). Preliminary injunctions are governed by Federal Rule of Civil Procedure 65, which does not require an evidentiary hearing so long as the non-moving party has a fair opportunity to oppose the injunction and the motion does not turn on a

disputed factual issue. *Mid Atl. Rest. Corp. v. Gumby 1105, Inc.*, No. 5:20-CV-00472-M, 2021

WL 3687029, at *2 (E.D.N.C. Aug. 19, 2021).

## ARGUMENT

I.      **The Court should issue a preliminary injunction because Plaintiffs' claims are likely to succeed on the merits.**

All of Plaintiffs' claims are likely to succeed on the merits given the current structure of

the Proposed Transaction, Maryland law regarding the interpretation of stock agreements, and

Maryland corporate law. Given the timing of the Proposed Transaction, though, Plaintiff seeks a

preliminary injunction on two of her claims: the requirement that Series C preferred shareholders

approve the Proposed Transaction, and in event it is approved, the right of Series C preferred

shareholders to exercise their Change of Control Conversion Rights. If the Court does not issue a

decision on these issues before the contemplated transaction closes, those rights will be lost

forever without the availability of a meaningful remedy.

C.      **Plaintiffs are likely to succeed on their voting rights because the Articles Supplementary require the Proposed Transaction to be approved by preferred shareholders if transaction will alter the Cedar charter, harm the Plaintiffs' voting rights, liquidation preference, and ability to rely on dividend payments, and thereby drastically alter the terms of the Plaintiffs' preferred stock.**

The Articles Supplementary grants Cedar's preferred stockholders the right to vote in

limited situations to protect their interests. If a proposed transaction or event will materially alter

the terms of a preferred stockholder's investment, for example, those preferred stockholders must

approve the transaction. This is an important, bargained-for protection of a preferred

stockholder's rights. Here, Cedar's Articles Supplementary—which are simply amendments to a

corporate charter and must be interpreted in accordance with Maryland corporate law and the

federal securities laws, *see, e.g., Impac Mortg. Holdings, Inc. v. Timm*, 255 A.3d 89, 94 (2021)—

provide just such a protection:

So long as any [] Preferred Stock remains outstanding, the Corporation shall not, without the affirmative vote or consent of the holders of at least two-thirds of the [] Preferred Stock outstanding at the time, given in person or by proxy, either in writing or at a meeting (such series voting separately as a class) (i) authorize, create or increase the authorized or issued amount of any class or series of equity securities ranking senior to the outstanding Series C Preferred Stock with respect to the payment of dividends or the distribution of assets upon voluntary or involuntary liquidation, dissolution or winding up of the Corporation, or reclassify any authorized equity securities of the Corporation into any such senior equity securities, or create, authorize or issue any obligation or security convertible into or evidencing the right to purchase any such senior equity securities or (ii) amend, alter or repeal the provisions of the Charter (including these Articles Supplementary) whether by merger or consolidation (in either case, an "Event") or otherwise, so as to materially affect any right, preference, privilege or voting power of the [] Preferred Stock, provided, however, that with respect to the occurrence of any Event, the occurrence of any such event will not be deemed to materially and adversely affect any right, preference, privilege or voting power of the [] Preferred Stock or the holders thereof so long as the [] Preferred Stock remains outstanding w1th the terms thereof materially unchanged.

Series C Articles Supplementary, ¶ 6(d).

Accordingly, a vote is required if the Proposed Transaction: (1) is a liquidation, or (2) alters, amends or repeals the charter in a way that materially affects any right, preference, privilege or voting power of the preferred stock. Plaintiff is likely to succeed on the merits at each step in this analysis.

### 3. The Proposed Transaction will effectively invert the liquidation preference Series C preferred stockholders hold over the common shareholders.

The Proposed Transaction eviscerates the liquidation preference term of the Series C preferred stock. Under the Liquidation Preference, the Series C preferred stock has the right to receive out of the assets legally available for distribution the sum of the liquidation preference of $25 per share and any accrued and unpaid dividends. Ex. C, Arts. Supp. at 4(a). But the Proposed Transaction will gut Cedar: it will result in the selling off of over 87% of the total assets of the Company, which are the most valuable and highest-earning, and then distribute those proceeds

*only* to the common shareholders. By selling and then distributing such a vast amount of the Company in one fell swoop to the conflicted board and the common shareholders, the Proposed Transaction clearly and materially affects the preferred shareholders' Liquidation Preference. Indeed, it inverts that preference and awards it to the common shareholders, who are not entitled to it.

In addition, given Wheeler's history of poor performance and the lack of assets remaining in Cedar, it is virtually impossible for the surviving Wheeler to honor the preferred shares' liquidation preference; there simply will not be enough money left in the Company. In the four years since Wheeler's last attempt to acquire Cedar, Wheeler has floundered. While Cedar's stock price was up approximately 40% over the past year, Ex. J (March 2, 2022 close of $24.88 versus March 2, 2021 close of $15.24), Wheeler was down almost 41%. Ex. L (March 2, 2022 close of $1.99 versus March 2, 2021 close of $3.37). Wheeler is over-leveraged with debt to EBITDA of just over 10 times. Ex. G, 2021 Form 10-K at 19 (EBITA of $34,307,000), 17 (debt of $346,262,000). Apparently due to its own financial distress, Wheeler has not paid its own preferred shares a dividend since 2018. *Id*. at 8.

Given these economic realities, the Proposed Transaction will effectively eliminate the preferred shareholders' liquidation rights and so it triggers Section 6(d).

   4.   **The Proposed Transaction will alter, amend, or repeal sections of the Cedar Charter and materially alter Series C preferred shareholders' rights.**

        **(d) The Proposed Transaction will alter, amend, or repeal sections of the Cedar Charter.**

The Proposed Transaction will also alter, amend, or repeal at least two different sections of Cedar's corporate charter, invoking Section 6(d). In the first instance, the Proposed Transaction will alter the current number of directors required. The current Cedar charter

requires no less than three directors at all times and Cedar currently has eight directors. Ex. Q, Cedar Charter Art. V(B)( "number of directors . . . shall in no event be less than three."). The need for multiple directors is reinforced by the provision of the charter which calls for classification of directors, mandating they are elected and serve in staggered terms. *Id*. at Art. V(C).

The Proposed Transaction, though, will reduce that number to one sole director, completely controlled by Wheeler, thereby altering the Company's charter. *Compare* Ex. E, Merger Agreement § 2.4(b)("the directors and officers of Merger Sub immediately prior to the Effective Time shall be the initial directors and officers of the Surviving Company and shall hold office until their respective successors are duly elected and qualified, or their earlier death, resignation or removal.") *with* § B-2 ("WHEREAS, the sole director of Merger Sub has (i) declared that the Merger is advisable on substantially the terms and conditions set forth in this Agreement and (ii) recommended that Parent, in its capacity as sole stockholder of Merger Sub, approve the Merger") *and* Ex. R, WHLR Merger Sub Charter at Art. 7 ("The number of directors of the Corporation shall be one").

In the second instance, the Proposed Transaction will effectively repeal one section of the Cedar Charter regarding conversion rights that the preferred shareholders currently have. In the "Change in Control" provisions, the preferred shareholders are entitled to a number of common shares as determined by a formula. That formula, in relevant part, divides the liquidation preference ($25) by the "Common Stock Price," a defined term. Arts. Supp. 7(b)(I). The "Common Stock Price" is:

> (i) the amount of cash consideration per share of Common Stock, if the consideration to be received in the Change of Control by holders of Common Stock is solely cash, or (ii) the average of the closing price per share of Common Stock on the NYSE for the ten consecutive trading days . . . if the consideration to

be received in the Change of Control by holders of Common Stock is other than solely cash.

Id. at 7(b)(VII). Because the Proposed Transaction will cancel all outstanding, traded shares of Cedar, *see* Ex. E, Merger Agreement, § 3.1(a)(ii)("[a]t the Effective Time, all of the shares of Company Common Stock shall cease to be outstanding, shall automatically be cancelled and shall cease to exist"), Arts. Supp. 7(b)(I)(ii) is effectively written out of the document.

### (e)  The Proposed Transaction will materially affect rights, preferences, privileges, and voting power of the preferred stock.

The Proposed Transaction materially alters the "rights, preferences, privileges or voting power" of the preferred stock in several meaningful ways, as admitted in the Form 10-K and the proxy materials.

First, the Proposed Transaction will materially alter the voting power of the Series C preferred stock. Under the current charter and Articles Supplementary, Series C preferred shareholders have the right to vote for the election of two additional directors to serve on the Cedar Board of Directors in the event that the holders are not paid dividends for six or more quarterly periods (whether or not consecutive). Ex. C, Arts. Supp. at 6(b). That voting power is significant—it allows the preferred shareholders to exercise 20% of the company's voting power. And that power incentivizes the continued payment of quarterly dividends to the preferred shareholders, a material term of the preferred shares.

The Proposed Transaction, though, will effectively destroy that power. Under the new structure, the preferred holders' voting rights will not be to any board that could affect change or protect their rights, but instead to a board that is wholly controlled and dominated by the separate entity, Wheeler Realty Trust. Ex. E, Merger Agreement, Arts. 2.1(b) and 2.4(b). In other words, the voting power and incentive behind it will cease to be meaningful.

14

Second and relatedly, because of the structure of the Proposed Transaction and the resulting corporate ownership, the preferred shareholders will lose the right or privilege to receive fair treatment from an impartial, duly elected, board of directors. The Proposed Transaction results in a new entity whose directors will be completely beholden to one shareholder—Wheeler Realty Trust. *Id*. In practice, then, it will be the directors of Wheeler Realty Trust who will be directing the decisions of the new, neutered, and raided Cedar Realty Trust. Those directors will owe no fiduciary duty to Plaintiffs here, and thus Plaintiffs will lose one of their key protections vis-à-vis their board. This is not a hypothetical problem: Wheeler has a history of disregarding rights of preferred shareholders and has been sued twice in the last year alone over not honoring their commitments to their own preferred shareholders. Ex. G, WHLR Form 10-K at 13, 53-57.

> **(f)  While the preferred shares will remain outstanding, the terms of those shares will have materially changed.**

The "terms" of the preferred stock must be analyzed under Maryland law. Maryland law requires a Court to consider the express words of any agreement (which here would be the Articles Supplementary) along with the context in which the agreement was struck and around the words used. *See Langston v. Langston*, 366 Md. 490, 506, 784 A.2d 1086, 1095 (2001)(The terms of the contract must be interpreted in context and given their ordinary and usual meaning); *Lloyd E. Mitchell, Inc. v. Maryland Cas. Co*., 324 Md. 44, 56–57, 595 A.2d 469, 475 (1991)(Our primary consideration, when interpreting a contract's terms, is the "customary, ordinary, and accepted meaning" of the language used)(citations omitted); *Ulico Cas. Co. v. Atl. Contracting & Material Co*., 150 Md. App. 676, 692, 822 A.2d 1257, 1266 (2003), aff'd, 380 Md. 285, 844 A.2d 460 (2004)(contract must be interpreted in context of the deal); *Credible Behav. Health, Inc. v. Johnson*, 466 Md. 380, 394, 220 A.3d 303 (2019)(same); *see also, Impac Mortg.*

*Holdings, Inc. v. Timm*, 474 Md. 495, 503, 255 A.3d 89, 93 (2021)("This case concerns the **rights of holders of preferred stock** of a corporation under the corporation's charter – a document that courts typically construe by reference to principles of **contract law**.")(emphasis added). Importantly, "[a]ny rights, preferences and limitations of preferred stock that distinguish that stock from common stock must be expressly and clearly stated, as provided by statute. Therefore, these rights, preferences and limitations will not be presumed or implied." *Matulich v. Aegis Commc'ns Grp., Inc.,* 942 A.2d 596, 601 (Del. 2008)(internal quotations and citations omitted). *See Wood v. Coastal States Gas Corp.,* 401 A.2d 932, 937 (Del. 1979)("the rights of a preferred shareholder are least affected by rules of law and most dependent on the share contract" (internal quotations and citations omitted)).

      As an initial matter, "preferred stock" has a customary meaning and is a widely used investment term understood to have a particular meaning. *See Oxford Dictionary of Accounting* ("The two basic types of capital stock are common stock and preferred stock."); *see also* Cook, William W., *A Treatise on the Law of Corporations Having a Capital Stock*, Sec. 267 (Little, Brown, 1913)("preferred stock is to be understood stock which entitles the holder to receive dividends from the earnings of the company before the common stock is paid a dividend from such earnings."). By designating the securities at issue here as "preferred stock," the Company has committed itself to particular obligations. *See Poling v. CapLease, Inc.*, 2016 WL 1749803, at *3 (Md. Ct. Spec. App. May 3, 2016)("The difference between common stock and preferred stock lies in preferred stock's preferential rights, which are defined by contract (in this case the Articles) and can include a broad range of terms and conditions.").

      Preferred stock, by definition, entitles the owner to payments of dividends at a specified rate (here 6.5%), Ex. C, Arts. Supp. at 1, and a preference both in payment of dividends and in

the liquidation of assets. That is, when and if a company sells off its assets, it has to pay the preferred stockholder before the common stockholder. Preferred stock also commonly has restricted voting rights as compared to common stock. But preferred stock is still stock and it obliges the directors must treat the preferred shareholders fairly and may not put their own interests ahead of theirs—just like any other shareholder.

Here, the express terms of the Articles Supplementary incorporate the general notion of preferred stock. They also provide protections to the preferred stockholders by requiring a vote of the Preferred Shareholders when the transaction might materially alter the very nature of the Series C holders' terms of investment.[1]

---

[1] As stated by Zack's Investment Research, Inc., a widely-recognized investment resource:

> The investment risk of preferred shares is less than you accept when you invest in common stock, but somewhat higher than for bonds. If a company is liquidated, bondholders and other creditors are paid first. Preferred shareholders must be paid next, before any distribution of company assets is made to common stock shareholders. A company must pay the agreed dividend on preferred shares if at all possible and before any common stock dividends are paid.

https://finance.zacks.com/preferred-stock-referred-hybrid-common-stock-debt-1540.html.

Likewise, according to The Motley Fool, another online investment resource, "[a]s the name suggests, preferred stock has some preferences over common stock, but it also comes with trade-offs that make it behave more like a hybrid between common stock and a bond." Preferred stock's distinguishing characteristics from common stock are:

> First, if a company liquidates, any money that's left over for shareholders goes first to holders of preferred stock up to a set amount, and only if there's any remaining after that do common shareholders get anything. Second, preferred shareholders have preferential treatment with dividends, and if the issuing company doesn't pay the full amount of dividends set forth in the prospectus, then it can't pay common shareholders any dividend.

https://www.nasdaq.com/articles/why-preferred-stock-considered-hybrid-security-2016-03-18.

17

Here, the terms of the preferred stock would be fundamentally altered because the purpose of the company, its size, its management, and its ability to honor its obligation to pay quarterly dividends to its preferred shareholders would all change. That is, taking into account the context of this investment, which is what Maryland law requires, *see Langston*, 366 Md. at 506, 784 A.2d at 1095, at all relevant previous times, Series C preferred stock in Cedar represented an investment in an on-going concern dedicated to operating a portfolio of grocery-anchored shopping centers in high-density urban markets from Washington, D.C. to Boston. The preferred stock was backed by over $1 billion in real estate assets, according to the Company's most recent Form 10-K, "which will provide substantial cash flow, currently and in the future, taking into account an acceptable modest risk profile, and which will present opportunities for additional growth in income and capital appreciation." Ex. S, Form 10-K at 4 & 45 (filed Mar. 10, 2022). And, as repeatedly recognized by Cedar, these grocery-anchored properties cater to "the need of consumers to purchase food and other staple goods and services generally available at such centers, its type of 'necessities-based' properties should provide relatively stable revenue flows even during difficult economic times*." Id.,* at 4.

If the Proposed Transaction is consummated, only 13% of the previous assets (which are the lowest quality) could even be used to support the dividend. Tellingly, Cedar could not even estimate a positive cashflow on these properties in its documents supporting the Proposed Transaction. Is it any wonder the market perceived the Proposed Transaction as so materially altering the terms of the deal that the preferred share price cratered upon the announcement? Cedar's Series C preferred shares traded at $22.85 immediately before the announcement; upon the announcement of the change in the makeup of Cedar and the fact that the preferred shares

would not be liquidated like the common shares, the price plummeted to $9.85, a 57% decrease in price. Ex. O. That is a *very* material change.

**B. Plaintiffs are likely to succeed on their claim for election of their Conversion Rights because the Proposed Transaction amounts to a "Change of Control" of Cedar Realty Trust, Inc.**

Preferred stock also typically contains protections in case the company is acquired by another or control changes to a new party, which might change the nature of the investment. *See* Raymond James report, Ex. P ("this is exactly the type of situation the change of control provisions were included to avoid in the first place."). Here, the Proposed Transaction, obviously will result in a change of control in the company—now, no single entity owns anywhere near 50% of the voting rights of the common shareholders, but through the Proposed Transaction, Wheeler will own 100% of the company outright.

In fact, when it benefits its own directors to the tune of well over $34 million. Ex. D, at 54-59. Cedar admits that the Proposed Transaction is a "change in control," as the Company defines it in other corporate documents. *Id*. That express recognition of the Proposed Transaction as a change in control, must be incorporated into the context of the terms of this portion of the Articles Supplementary for the preferred shareholders, too. *See Langston*, 366 Md. at 506, 784 A.2d at 1095.

But to avoid paying the preferred shareholders their bargained-for Conversion Rights in Section 7(b), Cedar argues for an overly technical and flawed reading of the Articles Supplementary's Change in Control provision in Section 5(j) that ignores the purpose, context, and actual wording of that provision.

Section 7(b) of the Articles Supplementary provides, in relevant part:

(b) Conversion Right

(i) Upon the occurrence of a Change of Control (as defined m subparagraph (j) of Section 5), each holder of Series C Preferred Stock shall have the right, unless, prior to the Change of Control Conversion Date (as defined below), the Corporation has provided or provides notice of its election to redeem the Series C Preferred Stock pursuant to the Redemption Right, to convert some or all| of the Series C Preferred Stock held by such holder (the "Change of Control Conversion Right") on the Change of Control Conversion Date into a number of shares of Common Stock . . . equal to the lesser of
(A) the quotient obtained by dividing (1) the sum of (x) the $25 00 liquidation preference plus (y) the amount of any accrued and unpaid dividends to, but not 1nclud1ng, the Change of Control Conversion Date . . . by (2) the Common Stock Price (as defined below) and (B) 9 8814 (the "Stock Cap"), subject to Section 7(b)(11)

Ex. C. Section 5(j) which defines Change of Control provides, in relevant part:

(j) For the purposes of this Section 5 and Section 7 below, a "Change of Control" is when, after the original issuance of the Series C Preferred Stock, the following have occurred and are continuing

(x) the acquisition by any person, including any syndicate or group deemed to be a "person" under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of beneficial ownership, directly or indirectly through a purchase, merger or other acquisition transaction or series of purchases, mergers or other acquisition transactions of shares of the Corporation entitling that person to exercise more than 50% of the total voting power of all shares of the Corporation entitled to vote generally in elections of directors . . . and

(y) following the closing of any transaction referred to in clause (x), neither the Corporation nor the acquiring or surviving entity has a class of common securities . . . hosted on the New York Stock Exchange (the "NYSE"), the NYSE American, LLC exchange (the "NYSE American"), or the NASDAQ Stock Market (the "NASDAQ") . . .

Ex. C.

The mechanics of the Proposed Transaction clearly satisfy most of requirements of a change in control under Section 5(j): Wheeler Merger Sub will acquire all outstanding common shares of Cedar and retire them, thereby holding 100% of Cedar's common shares; Ex. E, Merger Agreement, Arts. 2.1(b) & 3.1(a); at the close of the transaction, the Corporation—

Cedar—will not have publicly traded stock; *id*; and, the surviving entity is named Cedar as well and will not have publicly traded common stock.

Regarding the language in Section 5 (j), it is ambiguous on its face. It might mean that a change of control occurs only if all three of the following entities do not have publicly traded shares: the Company, the acquiror, and the surviving entity. In this case, which Cedar champions, if any one of the three has publicly traded shares, then a change of control would not occur.

The other interpretation, equally possible on its face, would be that the "neither X nor (Y or Z)" construction means that a change of control happens if X (the Corporation) and either Y or Z do not have publicly traded common shares. If this construction is adopted, then the Proposed Transaction clearly triggers the Articles Supplementary's Conversion Rights.[2]

---

[2] If "the acquiror or the surviving entity" is treated as single member, it is made true if *only one* of them does not have a class of publicly traded common stock, since only one member of a disjunctive phrase (*x or y*) need be true to make that phrase true.

To make this crystal clear, we just need to rewrite the sentence and move the negative connotation from "neither . . . nor" and place it in front of the descriptor "publicly traded" thusly:

following the closing of any transaction referred to in clause (x),

either [(i)] the Corporation

or

[(ii)] the acquiring or surviving entity

does not have a class of publicly traded common securities.

This rewrite, which is logically and grammatically consistent with the Articles Supplementary, shows that a Change of Control would occur if *either* (i) or (ii) above do not have a class of publicly traded common securities. And in this situation, it is clear that *both* (i) and (ii) are satisfied—after the Proposed Transaction *neither* the Corporation (i) has a class of publicly traded shares *nor* does the disjunctive phrase (ii).

Principles of contractual construction, though, show that the second option is the more sensible one. First, given the protections allocated to the preferred shares, the Plaintiffs' interpretation is the best one. As discussed on page 10 of this brief, one of the important protections for preferred stockholders is the ability to add two directors, which would control up to 20% of the current board of directors, in the event that preferred dividends are not paid. Ex. C, Arts. Supp. at 6(b). That is why the change of control protection here—triggering conversion rights—exists. Ex. P, Raymond James Report at 1. If a company, like Wheeler here, can buy up shares, take control, and *not* be subject to pressure from a loss of board control if it doesn't pay the required dividend, then the preferred shareholders' voting ability is rendered worthless. Indeed, this is why Section 5(j) explicitly refers to an acquiring person who will "exercise more than 50% of the total voting power of all shares of the Corporation entitled to vote generally in elections of directors." Ex. C.

Plus, the elimination of Cedar common shares after the merger will render superfluous the very Conversion Rights at issue if they are not allowed to be exercised here. The formula for that conversion is computed by using "the average of the closing prices per share of Common Stock on the NYSE for the end days immediately preceding." *Id*. If there is no Cedar common stock trading, this contractual provision is meaningless. Contracts must be read so as to give all the terms meaning and only the second, Plaintiff-friendly interpretation does that here. *Clancy v. King*, 405 Md. 541, 557, 954 A.2d 1092, 1101 (2008).

Second, given the principle of *contra preferendum* and the rules of English grammar, the Court must construe any ambiguities in Section 5(j) in favor of the Plaintiffs. Under Maryland law, "ambiguous language in a contract that is not clarified by extrinsic evidence or interpretive aids is construed against a party to the contract when that party drafted the language in question."

*Impac Mortg. Holdings, Inc. v. Timm*, 474 Md. 495, 509, 255 A.3d 89, 97 (2021). The construction against the drafter is "based on elementary notions of fairness" and is "meant to discourage the drafter from including ambiguous language in order to induce another to contract with him on the supposition that the words mean one thing while he hopes the court will adopt a construction by which they will mean another thing more to his advantage." *Id*. (internal quotations and citations omitted).

Here, it is clear that if the first interpretation that contradicts the common-sense interpretation desired, Cedar would have written the clause as,

> "If one of the following companies still has publicly traded shares, then there is no change of control: the Corporation, or the acquiror, or the surviving entity,"

or

> "a change of control occurs only if all three of the following entities do not have publicly traded shares: the Company, the acquiror, and the surviving entity,"

or

> "following the closing of any transaction referred to in clause (x), neither the Corporation, nor the acquiring, nor surviving entity has a class of common securities,"

or even

> "following the closing of any transaction referred to in clause (x), neither the Corporation, the acquiring, or the surviving entity has a class of common securities."

*See* Garner's Modern American Usage (3rd Ed.)(entry for neither . . . nor, pg. 564, B. Number of Elements)(explaining "These Correlative Conjunctions should frame only two elements, not more. . . When three or more are involved, it's better not to say *\*They considered neither x, y, nor z.* Instead, say *They didn't consider x, y, or z.* Or it's permissible to use a second *nor* emphatically in framing three elements: *They considered neither x, nor y, nor z.*)

23

By not using an oxford comma between the second and third elements, though, it is reasonable to conclude that the drafters of the Articles Supplementary meant to group "the acquiror or the surviving entity" as a single category. Because the oxford comma appears in other instances in the Articles Supplementary, it is logical and fair to interpret an intended difference between when it is used and when it is not used. *See*, *e.g.*, Ex. C Arts. Supp. at 5(g)(ii) & 6(c). At the very least, this must be construed as an ambiguity, *see* Garner's Modern American Usage (3rd Ed.)(entry for Punctuation, D. Comma, page 676)(explaining the use of the oxford comma and requirement to avoid ambiguity if all members in a series are compound or disjunctive), and so construed in Plaintiffs' favor.

## II.  Cedar's preferred shareholders will suffer irreparable harm in the absence of a preliminary injunction.

Preferred shareholders were granted voting rights under the Articles Supplementary. These voting rights provide protections for the preferreds shareholders against actions by either Cedar or its common shareholders that could diminish the value of their investment. Without the right to vote, the preferred shareholders will be irreparably harmed.

"Courts have consistently found that corporate management subjects shareholders to irreparable harm by denying them the right to vote their shares." *Telcom–SNI Inv'rs, L.L.C. v. Sorrento Networks, Inc.*, 2001 WL 1117505, at *9 (Del. Ch. Sept. 7, 2001)(*quoting Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151 (Del. Ch. Jan. 14, 1991)), *aff'd*, 790 A.2d 477 (Del.2002). *See also Pell v. Kill*, 135 A.3d 764, 793 (Del. Ch. 2016); *Int'l Banknote Co. v. Muller*, 713 F. Supp. 612, 623 (S.D.N.Y. 1989); *Danaher Corp. v. Chicago Pneumatic Tool Co.*, No. 86 CIV. 3499 (PNL), 1986 WL 7001, at *14 (S.D.N.Y. June 19, 1986)("It is well settled in law that corporate management subjects shareholders to irreparable harm by denying them the right to vote their shares and to exercise their rightful control over the corporation."). Money

24

cannot compensate shareholders for the denial of their right to vote. "Monetary damages cannot restore the right of shareholders to effectively exercise their corporate suffrage rights." *Lone Star Steakhouse & Saloon, Inc. v. Adams*, 148 F. Supp. 2d 1141, 1150 (D. Kan. 2001).

It is critical that this Court determine whether the Proposed Transaction is a change in control that would permit conversion. Under the Articles Supplementary, a preferred shareholder must affirmatively exercise their conversion rights. These rights are time-sensitive:

> To exercise the Change of Control Conversion Right, a holder of Series C Preferred Stock shall be required to deliver, *on or before the close of business on the Change of Control Conversion Date*, the certificates evidencing the Series C Preferred Stock, to the extent such shares are certified, to be converted, duly endorsed for transfer, together with a written conversion notice (the "Conversion Notice") to the Corporation's transfer agent.

Ex. C, Arts. Supp. at 7(f)(emphasis added). For the preferred shareholders to know whether they can exercise their rights, and to comply with the delivery requirements in a timely manner, this Court should resolve this issue now. Otherwise, the preferred shareholders would be unlikely to act on their rights.

### III. The balance of equities is in favor of the preferred shareholders.

The fundamental right to vote as a stockholder outweighs any other equities. "[T]he interests of corporate democracy on which [stockholders] rely have the greatest effect on the balance of the equities...." *Sherwood v. Ngon*, 2011 WL 6355209, at *15 (Del. Ch. Dec. 20, 2011). "Shareholder voting rights are sacrosanct. The fundamental governance right possessed by shareholders is the ability to vote for the directors the shareholder wants to oversee the firm." *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012). Cedar and all the common shareholders were aware of the preferred shareholder's voting rights, and the fact that the vote may not turn out as they hope is "no harm at all." *Pell v. Kill*, 135 A.3d 764, 794 (Del. Ch. 2016)(granting injunction).

Furthermore, the equities regarding this transaction clearly favor the preferred shareholders because the entire Proposed Transaction pays them nothing, leaving them holding the bag of a severely crippled company with poor performing assets, while the directors and common shareholders fleece the company and pay themselves $400 million. Such a result is exactly why the preferred shareholders bargained for the conversion rights protection.

**IV.    Issuing the requested preliminary relief is in the public interest.**

In addition to the irreparable harm and the balance of the equities, the public interest favors the preferred shareholders because of the fundamental importance of the right to vote as a shareholder and honoring the Change in Control provision of the Articles Supplementary. If Cedar is allowed to disregard its governing documents and Maryland law, the results will be catastrophic. Not only will investor confidence be undermined, but companies will also no longer be run by their true owners. Put another way, it is in the public's interest to hold corporations to the bargain they negotiated with their shareholders. As stated by the neutral analyst from Raymond James, "this is exactly the type of situation the change of control provisions were included to avoid in the first place." Ex. P, at 1.

**CONCLUSION**

The Proposed Transaction represents a cleverly constructed, albeit flawed, raid on Cedar's assets in violation of both the spirit and the letter of the deal the preferred shareholder's bargained for. If allowed, the directors will reap tens-of-millions of dollars under their change of control provisions, while the preferred shareholders will receive none, while being stuck with a fundamentally changed company that in no way resembles the one they invested in.

Rather than reward this contrivance, this Court should enter an order forcing the Company to provide the Series C preferred shareholders with the protections they deserve and

that are outlined in the Articles Supplementary: the requirement that they vote to approve the

Proposed Transaction, and in the event it is approved, the ability to exercise their Change of

Control Conversion Rights and partake in at least some of the value of the company that they

invested in.

Respectfully submitted,

*/S/    Thomas J. Minton*
Thomas J. Minton – No. 03370
Goldman & Minton, P.C.
3600 Clipper Mill Rd., Suite 201
Baltimore, MD 21211
Tel (410) 783-7575
Fax (410) 783-1711
tminton@charmcitylegal.com

Of counsel:

Matthew T. Hurst
Heffner Hurst
30 North LaSalle Street
Suite 1210
Chicago, Illinois 60602
Phone: (312) 346-3466, Ext. 2
mhurst@heffnerhurst.com

**BERGER MONTAGUE PC**
Lawrence Deutsch
Andrew Abramowitz
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: ldeutsch@bm.net
        aabramowitz@bm.net