## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JULIA KIM, et al., Individually and On
Behalf of All Others Similarly Situated,

                    Plaintiffs,

    v.

CEDAR REALTY TRUST, INC., et al.,

                    Defendants.

Case No.: 8:22-cv-1103-GLR

## PLAINTIFF'S [PROPOSED] FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

## FINDINGS OF FACT

### I.    Introduction

1.    This case arises out of a series of related transactions ("Proposed Transactions") pursuant to which Defendant Cedar Realty Trust, Inc. ("Cedar") proposes to: (i) sell 33 grocery-anchored shopping centers (the "Grocery-Anchored Properties") to certain third parties for $840 million in cash (less the outstanding principal of any assumed mortgage debt) (the "Grocery-Anchored Sale"), and (ii) enter into a merger with Defendant Wheeler Real Estate Investment Trust, Inc. ("Wheeler") pursuant to which Cedar will transfer nineteen (19) shopping centers to Wheeler and merge into and become a wholly-owned subsidiary of Wheeler ("Wheeler Merger"). ECF No. 1 at ¶¶ 41-46, 47-50.

2.    Cedar proposes to distribute the net proceeds from the Proposed Transactions to holders of its common stock, which it estimates will total about $29 per common share, or $396 million (based on 13,640,067 shares of Cedar common stock outstanding as of April 18, 2022). *Id.* at ¶ 53.  Upon the close of the merger, Cedar's common shares will be cancelled and

converted into the right to receive consideration from the Proposed Transactions, effectively eviscerating all of the capital in Cedar and giving it solely to the common shareholders. *Id.*

3.     The holders of Cedar's Series C preferred stock will not receive any of the net proceeds from the Proposed Transactions. *Id.* at ¶¶ 1, 46. Instead, all of Cedar's preferred stock will remain outstanding as an obligation of the post-merger entity, Cedar, which will survive the merger as a wholly-owned subsidiary of Wheeler. *Id*. at ¶ 54.

4.     Plaintiff, a Series C preferred stockholder of Cedar, filed the Class Action Complaint (the "Complaint") in the above-captioned action against Defendants on May 6, 2022. ECF No. 1.  The Complaint asserts claims against Cedar and the members of the Cedar Board of Directors.

5.     Plaintiffs allege that Defendants have breached their fiduciary duties of loyalty and disclosure, as well as their implied duty of good faith and fair dealing, by structuring the Proposed Transactions in order to deprive Preferred Stockholders of their liquidation rights under the Articles Supplementary governing relationship between Cedar and the preferred stockholders. Sections 2, 4(a) and 7(b) of the Articles Supplementary provides preferred stockholders with rights to: (i) priority payment of a liquidation preference ("Liquidation Preference") equal to $25.00 per share in the event of "any" liquidation or winding up of Cedar, and (ii) conversion of their Preferred Stock into Common Stock in connection with a transaction qualifying as a "Change of Control" (defined in the Articles Supplementary to include transactions like the Proposed Transactions pursuant to which an entity acquires more than 50% of Cedar and leaves the Preferred Stock as an obligation of a surviving entity without publicly-traded common stock). ECF No. 1 at ¶¶ 14, 103, 104-114, 116, 120.

6.      The Amended Complaint seeks, among other things: (i) an injunction requiring the preferred stockholders' approval of the Proposed Transactions, and (ii) declaratory judgment that the Proposed Transaction triggers liquidation rights under the Articles Supplementary; (iii) an injunction enjoining distribution of any proceeds from the sale of any assets in the Proposed Transactions to the Common Stockholder or any of the individual Board Defendants as a result of the Proposed Transaction until this Court rules on the merits of Plaintiff's claims; and (iv) the imposition of a constructive trust on the sale of any asset in conjunction with the Proposed Transaction, for the benefit of the Plaintiff and Class, until this Court rules on the merits of Plaintiff's claims. *Id.* at pp. 39-40.

## II.      Relevant Facts Concerning Defendant Cedar

### A.      Cedar Corporate Structure

7.      Cedar is a real estate investment trust ("REIT") that focuses primarily on ownership, operation and redevelopment of grocery-anchored shopping centers in high-density urban markets from Washington, D.C. to Boston. Cedar is incorporated in Maryland and has a principal place of business at 928 Carmans Road, Massapequa, New York 11758. ECF No. 1 at ¶4

### B.      Cedar's Equity Securities

8.      Cedar's common stock ("Common Stock") is publicly-traded on the New York Stock Exchange ("NYSE") under the ticker "CDR." As of April 18, 2022, there were 13,640,067 shares of Common Stock outstanding. ECF No. 11-5, p.3.

9.      Cedar also has two outstanding series of preferred stock ("Preferred Stock"): 7.25% Series B Preferred Stock and 6.50% Series C Preferred Stock. ADE Ex. 8, p. 66. The Series B Preferred Stock is publicly traded on the NYSE under the ticker "CDR.PB," and the Series C Preferred Stock is publicly traded on the NYSE under the ticker "CDR.PC." ADE Ex. 8,

p.1. As of February 25, 2022, there were (i) 1,450,000 shares of Series B Preferred Stock outstanding, and (ii) 5,000,000 shares of Series C Preferred Stock outstanding. *Id.* at pp. B-18-19.

**C.     The Contractual Rights of Cedar's Preferred Stockholders**

10.     The contractual rights of the Series C preferred stockholders are governed by Articles Supplementary. ECF No. 11-4.

**1.     Priority Rank of Preferred Stock**

11.     Under Section 2 of the Articles Supplementary, Preferred Stock ranks above Common Stock with respect to dividend rights, and rights upon liquidation or winding up. For example, Section 2 of Series C Articles Supplementary provides:

> (2) Rank. The Series C Preferred Stock will, with respect to dividend rights and rights upon liquidation, dissolution or winding up of the Corporation, rank (a) senior to all classes or series of Common Stock (as defined in the Charter), and to all equity securities the terms of which provide that such equity securities shall rank junior to the Series C Preferred Stock; (b) on parity with the Series B Preferred Stock (as defined in the Charter) and with all equity securities issued by the Corporation the terms of which specifically provide that such equity securities rank on parity with the Series C Preferred Stock; and (c) junior to all equity securities issued by the Corporation the terms of which specifically provide that such equity securities rank senior to the Series C Preferred Stock. The term "equity securities" shall not include convertible debt securities.

*Id.* at 1.

**2.     Liquidation Preference of Preferred Stock**

12.     Under Section 4(a) of the Articles Supplementary, Preferred Stockholders are entitled to priority payment of the Liquidation Preference of $25.00 per share (plus any accrued but unpaid dividends) in the event of "any" liquidation or winding up. Section 4(a) of the Series C Articles Supplementary provides:

> (a) In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation (referred to herein sometimes as a

4

"liquidation"), the holders of Series C Preferred Stock then outstanding shall be entitled to receive out of the assets of the Corporation legally available for distribution to stockholders (after payment or provision for payment of all debts and other liabilities of the Corporation) the sum of (i) the liquidation preference of $25.00 per share and (ii) an amount equal to any accrued and unpaid dividends (whether or not declared) to the date of payment, before any distribution of assets is made to holders of Common Stock (as defined in the Charter) or any equity securities that the Corporation may issue that rank junior to the Series C Preferred Stock as to liquidation rights.

*Id.* at 3.

13.     Section 4(e) of the Articles Supplementary clarifies that a merger or asset sale—without more—does not constitute a liquidation or winding for purposes of Section 4(a). Section 4(e) of the Series C Articles Supplementary provides:

(e) None of a consolidation or merger of the Corporation with or into another entity, the merger of another entity with or into the Corporation, a statutory share exchange by the Corporation or a sale, lease, transfer or conveyance of all or substantially all of the Corporation's assets or business shall be considered a liquidation, dissolution or winding up of the Corporation.

*Id.*

### 3.      Conversion Rights of Preferred Stock Upon a Change of Control

14.     The Articles Supplementary also entitle Preferred Stockholders to a Conversion Right upon a Change of Control of Cedar, unless Cedar chooses to exercise its right to redeem the Preferred Stock for a $25.00 cash payment. *Id.* at 7. A corporate transaction qualifying as a Change of Control triggers the Conversion Right, which entitles a Preferred Stockholder to convert Preferred Stock into Common Stock pursuant to a prescribed ratio that, subject to a cap, seeks to give Preferred Stockholders the number of shares of Common Stock equivalent to $25.00 (for example, if Cedar's Common Stock was worth $50.00 per share, the formula would dictate that each share of Preferred Stock would be exchanged for 0.50 shares of Common Stock). *Id.* at 7-9. Section 7(b)(i) of the Series C Articles Supplementary provides:

Upon the occurrence of a Change of Control (as defined in subparagraph (j) of Section 5), each holder of Series C Preferred stock shall have the right, unless, prior to the Change of Control Conversion Date (as defined below), the Corporation has provided or provides notice of its election to redeem the Series C Preferred Stock pursuant to the Redemption Right, to convert some or all of the Series C Preferred Stock held by such holder (the "Change of Control Conversion Right") on the Change of Control Conversion Date into a number of shares of Common Stock per share of Series C Preferred Stock to be converted (the "Common Stock Conversion Consideration") equal to the lesser of (A) the quotient obtained by dividing (1) the sum of (x) the $25.00 liquidation preference plus (y) the amount of any accrued and unpaid dividends to, but not including, the Change of Control Conversion Date . . . by (2) the Common Stock Price (as defined below) and (B) 9.8814 (the "Stock Cap"), subject to Section 7(b)(ii).

*Id.* at 7.

15.     Section 7(b)(i) of the Articles Supplementary uses the defined term "Common Stock Price" to determine the applicable conversion ratio. Section 7(b)(vii) provides that:

The "Common Stock Price" shall be (i) the amount of cash consideration per share of Common Stock, if the consideration to be received in the Change of Control by holders of Common Stock is solely cash, or (ii) ***the average of the closing prices per share of Common Stock on the NYSE for the ten consecutive trading days immediately preceding***, but not including, the effective date of the Change of Control, if the consideration to be received in the Change of Control by holders of Common Stock ***is other than solely cash***.

*Id.* at 8 (emphasis added).

16.     Section 5(j) of the Articles Supplementary defines when a transaction qualifies as a "Change of Control." With respect to redemption and conversion, the Articles Supplementary provides:

For the purposes of this Section 5 and Section 7 below, a "Change of Control" is when, after the original issuance of the Series C Preferred Stock, the following have occurred and are continuing (x) the acquisition by any person, including any syndicate or group deemed to be a "person" under section 13(d)(3) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of beneficial ownership, directly or indirectly, through a purchase, merger or other acquisition transaction or series of purchases, mergers or other acquisition transactions of shares of the Corporation entitling that person to exercise more than 50% of the total voting power of all shares of the Corporation entitled to vote generally in elections of directors . . . , and (y)

following the closing of any transaction referred to in clause (x), neither the Corporation nor the acquiring or surviving entity has a class of common securities (or American Depositary Receipts ("ADRs") representing such securities) listed on the New York Stock Exchange (the "NYSE"), the NYSE American, LLC exchange (the "NYSE American"), or the NASDAQ Stock Market (the "NASDAQ"), or listed or quoted on an exchange or quotation system that is successor to the NYSE, the NYSE American or NASDAQ . . .

*Id.* at 5.

## III.   Relevant Facts Concerning Defendant Wheeler

### A.   Wheeler's Equity Securities

17.     Wheeler is a REIT that focuses primarily on owning, leasing and operating grocery-anchored shopping centers. Wheeler is incorporated in Maryland and has a principal place of business at 2529 Virginia Beach Blvd., Virginia Beach, Virginia, 23452. ECF No. 11-8 at 1.

18.     Wheeler's common stock is traded on the Nasdaq under the ticker "WHLR." As of December 31, 2021, there were 9,720,532 shares of Wheeler common stock outstanding. *Id.*

19.     Wheeler also has two outstanding series of publicly-traded preferred stock: Series B Convertible Preferred Stock and Series D Cumulative Convertible Preferred Stock. ADE Ex. 9, p. 29. Wheeler's Series B Preferred Stock is publicly traded on Nasdaq under the ticker "WHRLP," and Wheeler's Series D Preferred Stock is publicly traded on Nasdaq under the ticker "WHLRD." As of December 31, 2021, there were (i) 1,872,448 shares of Wheeler's Series B Preferred Stock outstanding, and (ii) 3,152,392 shares of Wheeler's Series D Preferred Stock outstanding. *Id.* at 29.

### B.   Wheeler's Suspension of Preferred Stock Dividends

20.     In 2018, Wheeler suspended dividend payments on its common stock, as well as its Series A, Series B and Series D preferred stock. ECF No. 1 at ¶ 84.

21.     In August 2021, Wheeler announced a special meeting to eliminate the accrued unpaid dividends on two classes (A and B) of its preferred shares, worth approximately $12 million, and eliminate cumulative dividend rights. This subsequently was approved and has spawned litigation challenging the legality of the change. It appears that the only reason the third class (the D class) of preferred shares were not subject to this change is because immediately prior, Wheeler had acquired nearly 500,000 shares of the D series on favorable terms. *Id.* at ¶ 85.

22.     In addition, Wheeler also amended the articles supplementary on its remaining class of preferred stock, the D series, reducing the changing the ratio of assets to obligations that provided security for the preferred shareholders. As with the other changes, this too has spawned litigation. *Id.* at ¶ 86.

23.     Concerning its Series D Preferred Stock, Wheeler further disclosed in its 2021 Form 10-K that:

> there is a significant risk that the Company will not have sufficient cash to pay the aggregate redemption price, and would not be able to meet its redemption obligation without substantial dilution of its common stock.

ECF No. 11-8 at 17-18.

**IV.    Relevant Facts Concerning the Proposed Transactions**

**A.    Resolution of February 2021 Proxy Contest Threat**

24.     In February 2021, three investment firms—Ewing Morris, Camac Partners, LLC ("Camac"), and Barington Companies Equity Partners, L.P. ("Barington")—acquired substantial holdings of Cedar Common Stock and announced their intention to nominate directors to the Board and/or enter into discussions with Cedar to maximize shareholder value. ECF No. 1 at ¶ 93.

25.     On April 28, 2021, the Company entered into agreements with Camac, Barrington, and Ewing Morris, pursuant to which, *inter alia*, the Board agreed to expand its size

from seven members to ten members and appoint Ewing's nominees—Defendants Morris, Ross and Stern—to the Board. *Id.*

### B. The Proposed Transactions

26.    After negotiations among the parties, Cedar's Board decided to proceed with the Proposed Transactions as follows: (i) the Grocery-Anchored Purchasers agreed to purchase the Grocery-Anchored Properties for $840 million in cash (less the outstanding principal of any assumed mortgage debt) and the Mixed Use Projects for $80.5 million in cash (less the outstanding principal of any assumed mortgage debt) absent purchase of the Mixed Use Projects by another third party prior to the closing of the sale of the Grocery-Anchored Portfolio, and (ii) Wheeler agreed to the Wheeler Merger, including the purchase of the Wheeler Properties. ECF No. 11-5 at 36-38.

27.    On March 1, 2022, the Board's financial advisor, JLL Securities, rendered its opinion that the aggregate consideration to be received by common stockholders pursuant to the Proposed Transactions was fair from a financial point of view ("JLL Fairness Opinion"). *Id.* at 38.

28.    The JLL Fairness Opinion further states that "we do not express any view as to the fairness of the [Proposed Transactions] to . . . the holders of any other class of securities of the Company, including the holders of Series B Preferred Stock and Series C Preferred Stock of the Company. . ." *Id.* at 44.

29.    Following receipt of the JLL Fairness Opinion, the Board unanimously adopted resolutions which approved the Proposed Transactions and declared them in the best interests of the Company and common stockholders and resolved to recommend that common stockholders vote to approve the Proposed Transactions at a special meeting. *Id.* at 38-39.

30.     Following the announcement of the Proposed Transactions and the significant decline in the price of the Series C preferred shares, a Raymond James analyst opined that the "driving factor" of the Proposed Transactions was to send Preferred Stockholders to "purgatory," and criticized the treatment of Preferred Stockholders under the Proposed Transactions as setting a "bad precedent" for the REIT sector:

> CDR common equity shareholders are winning, but at the cost of Preferred Stockholders . . . Certainly other REIT preferred shares have been sent to purgatory in other M&A transactions, but they have been more of a byproduct of M&A, and not the driving factor behind the deal structure. CDR and its advisors may be patting themselves on the back for creative deal/legal gymnastics, but there could be other broader negative implications for the industry. If CDR can use this structure, what's to stop other REITs from structuring a similar transaction? Could that potentially hurt the investability of other outstanding REIT preferred stock? And what kind of updated language needs to be incorporated into preferred offerings to prevent this from happening again? We believe this [deal] sets a bad precedent for the sector.

ECF No. 11-17 at 1-2.

## V.     Relevant Provisions of the Wheeler Merger Agreement

31.     The Wheeler Merger is governed by an Agreement and Plan of Merger, dated March 2, 2022 (the "Wheeler Merger Agreement"). ECF No. 11-6.

32.     Under the Wheeler Merger Agreement, Cedar will merge with a newly created, wholly owned subsidiary of Wheeler called "Merger Sub." *Id.* at § 2.1(b). The "Surviving Company" of that interim transaction will be Cedar, and as a result, Cedar will become a wholly owned subsidiary of Wheeler. *Id.*

33.     To finance the acquisition of the Wheeler Properties in connection with the Wheeler Merger, Wheeler is borrowing $130 million from KeyBank ("KeyBank Loan"), repayment of which is secured by the Wheeler Properties. Under the Wheeler Merger Agreement, the $130 million in proceeds of the KeyBank Loan will be distributed exclusively to

Common Stockholders, and Cedar's Common Stock will be delisted and cancelled. *Id.* at §§ 3.1(a)(ii), (iii), (v).

34.     Section 7.3(d) of the Wheeler Merger Agreement provides that the closing of the Grocery-Anchored Sale is a condition to the closing of the Wheeler Merger. *Id.* at § 7.3(d). The Wheeler Merger Agreement further provides that, prior to the closing of the Wheeler Merger, the net proceeds of the Grocery-Anchored Sale shall be paid exclusively to Common Stockholders in an amount equal to the gross proceeds of the Grocery-Anchored Sale, minus any accrued but unpaid dividends on the Preferred Stock and Common Stock, any expenses of the Proposed Transactions, and any remaining unpaid liabilities of Cedar following consummation of the Grocery-Anchored Sale. *Id.* at §§ 1.1(a) (definition of "Closing Dividend Amount"), 3.1(d), 6.16, 7.3(e). Thus, in connection with the Proposed Transactions, Cedar is discharging all of its debts and liabilities, and then distributing all of the net proceeds from the Proposed Transactions exclusively to Common Stockholders.

35.     None of the proceeds of the KeyBank Loan or the Grocery-Anchored Sale will be paid to Preferred Stockholders. Instead, all Preferred Stock will remain outstanding, and remain an obligation of Cedar (as the "Surviving Company"). *Id.* at § 3.1(a)(iv). The Proxy states that both classes of Preferred Stock are "expected" to remain listed on the New York Stock Exchange following closing of the Wheeler Merger, and that Cedar will continue to be an independent filer of periodic reports with the SEC, but this is not provided for contractually in the Wheeler Merger Agreement. *Id.* at § 3.1(a)(iv).

36.     Under Section 6.7 of the Wheeler Merger Agreement, Cedar is terminating all of its employees in connection with the Wheeler Merger, subject to the right of Wheeler to make offers of employment to Cedar's terminated employees. *Id.* at § 6.7(a-b). In connection with such

terminations, Cedar will pay all of the severance, benefits and other obligations owed to terminated employees. *Id.*

37.     Under Section 3.3. of the Wheeler Merger Agreement, all restricted stock awards and performance restricted stock awards shall vest immediately ahead of schedule, thereby enabling the holders thereof to receive a *pro rata* share of the proceeds being paid under the Proposed Transactions. *Id.* at § 3.3.

## VI.     Relevant Facts Concerning the Wheeler Properties

38.     For the year ended December 31, 2021, the Wheeler Properties[1] generated net operating income in excess of $19 million. ECF No. 11-5 at 8, 70.

39.     Upon consummation of the Proposed Transactions, Cedar's Board will be terminated, and Cedar's officers will resign, and under Section 2.4(b) of the Wheeler Merger Agreement, the new directors and officers of Cedar will be the individuals appointed by Wheeler to serve as the directors and officers of Merger Sub. ECF No. 11-6 at § 2.4(b).

40.     Pursuant to the Articles Supplementary, Cedar's new directors will have the authority to determine whether or not to declare dividends on the Series C preferred shares. ECF No. 11-4 at § 3(a).

41.     There is no contractual protection in the Wheeler Merger Agreement or any other document obligating Cedar's new directors to declare dividends on the Preferred Stock after the Proposed Transaction closes. ECF No. 11-6.

## CONCLUSIONS OF LAW

---

[1] The Proxy dated April 21, 2022 refers to the Wheeler Properties as "Remainco."

## I.     Plaintiff Is Entitled to a Preliminary Injunction

### A.     Elements of a Preliminary Injunction

42.     To prevail on a preliminary injunction motion, the moving party must show: (1) they are likely to succeed on the merits; (2) they will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) maintaining the status quo is in the public interest. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008); *J.O.P. v. U.S. Dep't of Homeland Sec.*, 409 F. Supp. 3d 367, 375 (D. Md. 2019).

43.     The four factors must be shown by a "preponderance of the evidence." *Lonza Walkersville, Inc. v. Adva Biotechnology Ltd.*, 2022 WL 204396, at *2 (D. Md. Jan. 21, 2022).

### B.     Plaintiff Is Likely to Succeed on the Merits of Her Claim

#### 1.     Plaintiff Is Likely to Succeed on the Merits of Her Claim That The Articles Supplementary Require a Vote to Approve the Proposed Transactions

44.     The Articles Supplementary are amendments to Cedar's corporate charter and must be interpreted in accordance with Maryland corporate law and the federal securities laws. *See Impac Mortg. Holdings, Inc. v. Timm*, 255 A.3d 89, 94 (2021).

45.     Maryland law requires a Court to consider the express words of any agreement (which here would be the Articles Supplementary) along with the context in which the agreement was struck and around the words used. *See Langston v. Langston*, 366 Md. 490, 506, 784 A.2d 1086, 1095 (2001) (the terms of the contract must be interpreted in context and given their ordinary and usual meaning); *Lloyd E. Mitchell, Inc. v. Maryland Cas. Co*., 324 Md. 44, 56–57, 595 A.2d 469, 475 (1991) (the primary consideration, when interpreting a contract's terms, is the "customary, ordinary, and accepted meaning" of the language used); *Ulico Cas. Co. v. Atl. Contracting & Material Co*., 150 Md. App. 676, 692, 822 A.2d 1257, 1266 (2003), *aff'd*, 380 Md. 285, 844 A.2d 460 (2004) (contract must be interpreted in context of the deal); *Credible*

13

*Behav. Health, Inc. v. Johnson*, 466 Md. 380, 394, 220 A.3d 303 (2019) (same); *see also, Impac Mortg. Holdings, Inc. v. Timm*, 474 Md. 495, 503, 255 A.3d 89, 93 (2021) ("This case concerns the ***rights of holders of preferred stock*** of a corporation under the corporation's charter – a document that courts typically construe by reference to principles of ***contract law***.") (emphasis added).

46.     "Any rights, preferences and limitations of preferred stock that distinguish that stock from common stock must be expressly and clearly stated, as provided by statute. Therefore, these rights, preferences and limitations will not be presumed or implied." *Matulich v. Aegis Commc'ns Grp., Inc.*, 942 A.2d 596, 601 (Del.2008) (internal quotations and citations omitted). *See Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 937 (Del. 1979) ("the rights of a preferred shareholder are least affected by rules of law and most dependent on the share contract").

47.     By designating the securities at issue here as "preferred stock," Cedar has committed itself to particular obligations. *See Poling v. CapLease, Inc.*, 2016 WL 1749803, at *3 (Md. Ct. Spec. App. May 3, 2016) ("The difference between common stock and preferred stock lies in preferred stock's preferential rights, which are defined by contract (in this case the Articles) and can include a broad range of terms and conditions.").

48.     The term "preferred stock" has a customary meaning and is a widely used investment term understood to have a particular meaning. *See Oxford Dictionary of Accounting* ("The two basic types of capital stock are common stock and preferred stock."); *see also* Cook, William W., *A Treatise on the Law of Corporations Having a Capital Stock*, Sec. 267 (Little, Brown, 1913) ("preferred stock is to be understood stock which entitles the holder to receive

dividends from the earnings of the company before the common stock is paid a dividend from such earnings.").

49.     As Maryland law requires the Court to take into account the context of the investment, the terms of the Series C preferred stock would be fundamentally altered because the purpose of the company, its size, its management, and its ability to honor its obligation to pay quarterly dividends to its preferred shareholders would all change. *See Langston*, 366 Md. at 506, 784 A.2d at 1095.

50.     Under these principles, Series C preferred stock in Cedar represented an investment in an on-going concern dedicated to operating a portfolio of grocery-anchored shopping centers in high-density urban markets from Washington, D.C. to Boston. The preferred stock was backed by over $1 billion in real estate assets, according to the Company's most recent Form 10-K, "which will provide substantial cash flow, currently and in the future, taking into account an acceptable modest risk profile, and which will present opportunities for additional growth in income and capital appreciation." ECF No. 11-20 (Ex. S, Form 10-K at 4 & 45 (filed Mar. 10, 2022)).

51.     As repeatedly recognized by Cedar, these grocery-anchored properties cater to "the need of consumers to purchase food and other staple goods and services generally available at such centers, its type of 'necessities-based' properties should provide relatively stable revenue flows even during difficult economic times.*" Id.* at 4.

52.     The price of the Series C preferred shares declined precipitously upon the announcement of the Proposed Transactions. Cedar's Series C preferred shares traded at $22.85 immediately before the announcement. When the Proposed Transactions were announced, revealing a change in the makeup of Cedar and the fact that the preferred shares would not be

liquidated like the common shares, the price plummeted to $9.85, a decline of 57%. ECF No. 11-16 (Ex. O). This constitutes a material change as a matter of law.

> **2.      Plaintiff is Likely to Succeed on the Merits of Her Claim for Conversion Rights on the Basis that the Proposed Transactions Constitute a "Change in Control"**

53.      The Proposed Transactions will result in a change of control in Cedar. Prior to the consummation of the Proposed Transactions, no single entity owns 50% of the voting rights of the common shareholders. If the Proposed Transactions are closed, Wheeler will own 100% of Cedar outright.

54.      Cedar admits that the Proposed Transaction is a "change in control," as the Company defines it.  ECF No. 11-5 (Ex. D at 54-59).

55.      Under Maryland law, the express recognition of the Proposed Transactions as a change in control must translate into the context of the terms of the Articles Supplementary for the preferred shareholders, as well. *See Langston*, 366 Md. at 506, 784 A.2d at 1095.

56.      Section 7(b) of the Articles Supplementary provides, in relevant part:

(b) Conversion Right

(i) Upon the occurrence of a Change of Control (as defined m subparagraph (j) of Section 5), each holder of Series C Preferred Stock shall have the right, unless, prior to the Change of Control Conversion Date (as defined below), the Corporation has provided or provides notice of its election to redeem the Series C Preferred Stock pursuant to the Redemption Right, to convert some or all| of the Series C Preferred Stock held by such holder (the "Change of Control Conversion Right") on the Change of Control Conversion Date into a number of shares of Common Stock . . . equal to the lesser of (A) the quotient obtained by dividing (1) the sum of (x) the $25 00 liquidation preference plus (y) the amount of any accrued and unpaid dividends to, but not 1nclud1ng, the Change of Control Conversion Date . . . by (2) the Common Stock Price (as defined below) and (B) 9 8814 (the "Stock Cap"), subject to Section 7(b)(11)

ECF No. 11-4 (Ex. C).

57.      Section 5(j) defines Change of Control provides, in relevant part:

(j) For the purposes of this Section 5 and Section 7 below, a "Change of Control" is when, after the original issuance of the Series C Preferred Stock, the following have occurred and are continuing

(x) the acquisition by any person, including any syndicate or group deemed to be a "person" under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of beneficial ownership, directly or indirectly through a purchase, merger or other acquisition transaction or series of purchases, mergers or other acquisition transactions of shares of the Corporation entitling that person to exercise more than 50% of the total voting power of all shares of the Corporation entitled to vote generally in elections of directors . . . and

(y) following the closing of any transaction referred to in clause (x), neither the Corporation nor the acquiring or surviving entity has a class of common securities . . . hosted on the New York Stock Exchange (the "NYSE"), the NYSE American, LLC exchange (the "NYSE American"), or the NASDAQ Stock Market (the "NASDAQ") . . .

*Id.*

58.     The Proposed Transactions clearly satisfy the requirements of a change in control under Section 5(j), as Wheeler Merger Sub will acquire all outstanding common shares of Cedar and retire them, thereby holding 100% of Cedar's common shares. ECF No. 11-6 (Ex. E, Merger Agreement, Arts. 2.1(b) & 3.1(a).

59.     At the close of the transaction, the Corporation (*ie.* Cedar) will not have publicly traded stock. *Id.*

60.     The elimination of Cedar common shares after the merger will render superfluous the very Conversion Rights at issue if they are not allowed to be exercised here. The formula for that conversion is computed by using "the average of the closing prices per share of Common Stock on the NYSE for the end days immediately preceding."  ECF No. 11-4 (Ex. C). If there is no Cedar common stock trading, this contractual provision is meaningless. Contracts must be

read so as to give all the terms meaning. *Clancy v. King*, 405 Md. 541, 557, 954 A.2d 1092, 1101 (2008).

61.     The Court must construe any ambiguities in Section 5(j) in favor of Plaintiff. Under Maryland law, "ambiguous language in a contract that is not clarified by extrinsic evidence or interpretive aids is construed against a party to the contract when that party drafted the language in question." *Impac Mortg. Holdings, Inc.*, 474 Md. at 509, 255 A.3d at 97. The construction against the drafter is "based on elementary notions of fairness" and is "meant to discourage the drafter from including ambiguous language in order to induce another to contract with him on the supposition that the words mean one thing while he hopes the court will adopt a construction by which they will mean another thing more to his advantage." *Id*.

### C.     Absent a Preliminary Injunction, Plaintiff Will Suffer Irreparable Harm

62.     A preliminary injunction must be issued to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig*., 333 F.3d 517, 525 (4th Cir. 2003). *See Lerner v. Lerner*, 511 A.2d 501, 512 (Md. 1986) ("[C]omplications can be avoided simply by maintaining the status quo until the merits are decided.").

63.     "Courts have consistently found that corporate management subjects shareholders to irreparable harm by denying them the right to vote their shares." *Telcom–SNI Inv'rs, L.L.C. v. Sorrento Networks, Inc.*, 2001 WL 1117505, at *9 (Del. Ch. Sept. 7, 2001) (*quoting Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151 (Del. Ch. Jan. 14, 1991)), *aff'd*, 790 A.2d 477 (Del.2002). *See also Pell v. Kill*, 135 A.3d 764, 793 (Del. 2016); *Int'l Banknote Co. v. Muller*, 713 F. Supp. 612, 623 (S.D.N.Y. 1989); *Danaher Corp. v. Chicago Pneumatic Tool Co.*, No. 86 CIV. 3499 (PNL), 1986 WL 7001, at *14 (S.D.N.Y. June 19, 1986) ("It is well settled in

law that corporate management subjects shareholders to irreparable harm by denying them the right to vote their shares and to exercise their rightful control over the corporation.").

64.     Money cannot compensate shareholders for the denial of their right to vote. *Lone Star Steakhouse & Saloon, Inc. v. Adams*, 148 F. Supp. 2d 1141, 1150 (D. Kan. 2001) ("Monetary damages cannot restore the right of shareholders to effectively exercise their corporate suffrage rights.").

65.     This Court must determine whether the Proposed Transactions constitute a change in control that would permit conversion. Under the Articles Supplementary, a preferred shareholder must affirmatively exercise their conversion rights. These rights are time-sensitive:

> To exercise the Change of Control Conversion Right, a holder of Series C Preferred Stock shall be required to deliver, ***on or before the close of business on the Change of Control Conversion Date***, the certificates evidencing the Series C Preferred Stock, to the extent such shares are certified, to be converted, duly endorsed for transfer, together with a written conversion notice (the "Conversion Notice") to the Corporation's transfer agent.

ECF No. 11-4 (Ex. C at 7(f)) (emphasis added).

66.     For Plaintiff and the Series C preferred shareholders to know whether they can exercise their rights, and to comply with the delivery requirements in a timely manner, this Court should resolve this issue now, otherwise, Plaintiff and the preferred shareholders would be unlikely to act on their rights and would suffer irreparable harm.

**D.     The Balance of Equities Tips Decidedly in Favor Plaintiffs**

67.     Where a plaintiff would face substantial harm in the absence of an injunction, and entering an injunction merely poses a delay to defendant, the balance of equities tips in favor of the plaintiff. *See Wachit Techs., Inc. v. Big Apple Consulting USA, Inc*., 2008 U.S. Dist. LEXIS 34363, at *13 (D. N.C. Apr. 25, 2008) ("Plaintiff appears to be facing destruction if the preliminary injunction does not issue, whereas such an injunction would merely cause

Defendants a delay. Thus, under the sliding scale described in *Microsoft*, the balance of hardships weighs heavily in Plaintiff's favor. . . ."); *DMF Leasing, Inc. v. Budget Rent-A-Car Of Maryland, Inc*., 871 A.2d 639, 645 (Md. 2005) (balance of convenience tipped strongly in favor of plaintiff where not granting injunction will result in far greater burden to plaintiff than burden to defendant from granting injunction); *Ledo Pizza Sys. v. Singh*, 2013 U.S. Dist. LEXIS 146938, at \*14 (D. Md. Oct. 10, 2013) (granting temporary restraining order even though "defendant will suffer serious economic harm" because "defendant's hardship appears self inflicted.")

68.     The fundamental right to vote as a stockholder outweighs any other equities. "[T]he interests of corporate democracy on which [stockholders] rely have the greatest effect on the balance of the equities...." *Sherwood v. Ngon*, 2011 WL 6355209, at \*15 (Del. Ch. Dec. 20, 2011).

69.     "Shareholder voting rights are sacrosanct. The fundamental governance right possessed by shareholders is the ability to vote for the directors the shareholder wants to oversee the firm." *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012).

70.     Cedar and all the common shareholders were aware of the preferred shareholder's voting rights, and the fact that the vote may not turn out as they hope is "no harm at all." *Pell v. Kill*, 135 A.3d 764, 794 (Del. Ch. 2016)(granting injunction).

71.     The equities regarding the Proposed Transactions clearly favor the preferred shareholders because the Proposed Transactions pay Plaintiff and the Series C preferred shareholders nothing, leaving them with an interest in a company with poor performing assets, while the directors and common shareholders compensate themselves with a payment of $400 million. This unequitable result is precisely why the preferred shareholders bargained for the conversion rights protection.

### E.     The Public Interest Favors an Injunction

72.     The public interest favors class actions, which are designed to enable class representatives with small economic stakes to enforce laws against large corporations on behalf of a large group in a single forum. *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 382 (1970) ("small shareholders" should be encouraged to privately enforce the federal securities laws as a "a necessary supplement to [SEC] action."); *Califano v. Yamasaki*, 442 U.S. 682, 700–01, 99 S. Ct. 2545, 2557 (1979) ("the Rule 23 class-action device was designed to allow an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.").

73.     Here, the public interest favors the preferred shareholders because of the fundamental importance of the right to vote as a shareholder and honoring the change-in-control provision of the Articles Supplementary. If Cedar is allowed to disregard its governing documents and Maryland law, not only will investor confidence be undermined, but companies will also no longer be run by their true owners. Put another way, it is in the public's interest to hold corporations to the bargain they negotiated with their shareholders.

74.     As stated by the neutral analysist from Raymond James, "this is exactly the type of situation the change of control provisions were included to avoid in the first place." ECF No. 11-18 (Ex. P at 1).

## II.     The Defense of Laches Does Not Apply Here

75.     A laches defense requires "unreasonable" behavior, and Plaintiff has by no means acted unreasonably. To the contrary, at every step, Plaintiff has acted with care and diligence.

76.     As the U.S. Supreme Court has held, laches protects "against '***unreasonable***, prejudicial delay'" by the party against whom the defense is raised. *SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*, 137 S. Ct. 954, 960 (2017) (quoting *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1967 (2014)) (emphasis added). The Court must

conduct "a factually intensive inquiry into the reasonableness of delay." *iBio v. Fraunhofer USA, Inc.*, Case No. 10256-VCF, 2020 WL 5745541, at *16 (Del. Ch. Sept. 25, 2020).

77.     Importantly, laches has long been considered "extraordinary" relief in this Circuit. *See Phipps v. Robinson*, 858 F.2d 965, 972 (4th Cir. 1988) ("We simply do not believe that *at this stage of the proceeding* the record shows sufficient special intervening facts to demand the extraordinary relief of laches.") (emphasis in original); *See also, Pickersgill v. Neely*, No. 3:21-CV-00773-X, 2021 WL 5163197, at *2 (N.D. Tex. Nov. 5, 2021) ("Laches is valid only when 'extraordinary circumstances' demand that the court bar equitable relief for a claim made *within* the statute of limitations.") (emphasis in original); *KIC, LLC v. Zhejiang Dicastal Hongxin Tech. Co., LTD*, No. 3:19-CV-05660-RJB, 2021 WL 4860793, at *2 (W.D. Wash. Oct. 19, 2021) (the defendant "could not establish the extraordinary circumstances required to justify application of laches because there was no evidence that [the plaintiff] unreasonably delayed filing a lawsuit."); *Jo-Ann Stores, LLC v. Sound Properties, LLC*, No. C19-1831JLR, 2021 WL 2313428, at *7 (W.D. Wash. June 7, 2021), *appeal dismissed*, No. 21-35543, 2021 WL 6297945 (9th Cir. Sept. 23, 2021) (quoting *Brost v. L.A.N.D., Inc.*, 680 P.2d 453, 456 (Wash. Ct. App. 1984)) ("Laches is an 'extraordinary defense' that is 'only appropriate ... when a party, knowing his rights, takes no steps to enforce them and the condition of the other party has in good faith become so changed that he cannot be restored to his former state.'").

78.     For their laches defense to prevail, Defendants must prove both an ***unreasonable delay*** in seeking relief, and that such delay prejudiced Defendants. *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 716 (4th Cir. 2021) (emphasis in original). In setting forth the timeline of Cedar's disclosures regarding the Proposed Transaction and Plaintiff's conduct in this litigation (Resp. at 11-12), Defendants only underscore the reasonableness of Plaintiff's conduct.

Indeed, far from unreasonable delay, Plaintiff has acted with care, consideration, and an unwillingness to consume judicial resources until absolutely necessary.

79.     Defendants cannot seriously suggest that it was unreasonable for Plaintiff not to commence her lawsuit after the March 2 press release announcing the Proposed Transaction. *See* Resp. at 11. No claim had materialized at that point; it was, at best, speculative. The same is true of Plaintiff's purported failure to institute proceedings before the filing of the Definitive Proxy on April 21. To seek recourse before the terms of the Proposed Transaction had been definitively constituted and disclosed to stockholders would have been a needless waste of judicial resources. *See Lichtenberg v. Besicorp Grp. Inc.*, 43 F. Supp. 2d 376, 390 (S.D.N.Y. 1999) (holding that the filing of a complaint that challenged the disclosures in a proxy "would have been subject to dismissal as premature" had it been filed prior to the issuance of the definitive proxy).

80.     *Lichtenberg* is instructive. In that case, shareholders sued the officers and directors of a company for an allegedly false or misleading proxy statement issued in connection with a merger. *Id.* at 381. Defendants argued that the plaintiffs' preliminary injunction motion should be denied based on laches because the alleged misrepresentations were known to the plaintiffs by virtue of an earlier proxy draft. *Id.* at 390. The court rejected this argument, stating as follows:

> "To succeed on a claim of laches, the Court must find ... that the plaintiff delayed unreasonably and inexcusably in commencing the action." *Securities and Exchange Comm'n v. Willis*, 777 F. Supp. 1165, 1174 (S.D.N.Y.1991). At oral argument, defendants conceded that plaintiffs could not have instituted this action for violations of § 14(a) of the Act prior to the filing of the definitive proxy with the SEC on March 2, 1999. The complaint herein was filed on March 5, 1999. ***Any complaint filed prior to the filing and dissemination of the definitive proxy would have been subject to dismissal as premature***.

*Id.* (emphasis added).

81.     Other courts have ruled in step, holding that claims stemming from information in a proxy do not materialize until that proxy is final. For instance, in *Rosan v. Chicago Milwaukee Corp.*, the Delaware Court of Chancery held that allegations that rested on a preliminary proxy were "speculative":

> All that defendant had done was to complete a preliminary draft of the proxy statement. From this preliminary proxy statement, plaintiff derived the claims that formed the basis of his proposed amended complaint. Plaintiff's contentions were based on his allegations that defendant's final proxy statement ***might*** not comply with Delaware law and ***might*** violate the preferred shareholders' rights. At the time plaintiff made his allegations against defendant, however, no wrong had actually been committed by defendant. Thus, it is apparent that plaintiff's charges against defendant were speculative in nature.

No. CIV.A. 10526, 1994 WL 30524, at *2 (Del. Ch. Jan. 19, 1994)(emphasis in original).

82.     Likewise, in *Scattergood v. Perelman*, the Eastern District of Pennsylvania likened the preliminary proxy to a mere "draft[]," which could not form the basis for a lawsuit. The court there stated:

> it seems clear that although plaintiffs may have had preliminary proxy materials since February 1990, ***such drafts would hardly serve as a basis on which plaintiffs could file a federal securities lawsuit, as there would be no "actual case or controversy"*** as required under Article III of the Constitution until such time as the allegedly misleading proxy materials were officially issued.

No. CIV. A. 90-3451, 1990 WL 72801, at *6 (E.D. Pa. May 29, 1990)(emphasis added).

83.     Defendants' attempt to downplay the differences between the Preliminary Proxy and what they describe as the "nearly identical" Definitive Proxy is therefore irrelevant. (As the preceding law demonstrates, there is no claim until the proxy is final.) It is also inaccurate. Material facts were changed or clarified between the issuance of the Preliminary Proxy and the issuance of the Definitive Proxy. For instance, the Definitive Proxy specifically discloses that:

> On April 19, 2022, the parties to the merger agreement executed the first amendment to the merger agreement pursuant to which Section 2.4(a) of the merger agreement was amended and restated to clarify that ***the articles of***

***incorporation and bylaws of the Company immediately prior to the merger effective time will be the articles of incorporation and bylaws of the Surviving Company immediately after the merger effective time***, until thereafter amended as provided therein or by applicable law.

ECF No. 11-5 (Schedule 14A, Apr. 21, 2022).

84.    In sum, before the terms of the Proposed Transaction were settled in the final proxy, it was reasonable for Plaintiff not to sue or seek equitable relief. Because Plaintiff did not act unreasonably, Defendants have no laches defense.

## III.    No Bond is Required

85.    This Court may waive a bond so long it provides the reasons for waiver. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp*., 174 F.3d 411, 421 n.3 (4th Cir. 1999) (citing case approving bond fixed at zero); *see also Defy Ventures, Inc. v. U.S. Small Bus. Admin*., 469 F. Supp. 3d 459, 481 (D. Md. 2020) (waiving a bond); *Coreas v. Bounds*, 458 F. Supp. 3d 352, 362 (D. Md. 2020) (same).

86.    Here, as a threshold matter, Defendants' request for a bond to protect the common stockholders is at odds with the federal rules, which plainly state that a bond should be posted for "the costs and damages sustained by ***any party*** found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added). The common stockholders are not "parties" to this litigation, and so Plaintiffs cannot be forced to post a bond for them under the plain language of the Rule. *MCI Commc'ns Servs., Inc. v. Am. Infrastructure-MD, Inc*., 2013 WL 4086401, at *19 (D. Md. Aug. 12, 2013) (Russell, J.) (court should look to statute's plain language, and the "analysis ends if the statute's language is clear and unambiguous.").

87.    Moreover, the only possible damage to common stockholders is the time value of money because, if an injunction issues, any potential "damage" will be mitigated by holding the $396 million in an interest-bearing account pending a determination on the merits. *See Morgan*

*Keegan & Co. v. Louise Silverman Tr.*, 2012 WL 113400, at *6 n.9 (D. Md. Jan. 12, 2012) (interest compensates for time value of money), *aff'd*, 706 F.3d 562 (4th Cir. 2013).

88.     Moreover, the equity in the Wheeler Properties provides ample additional security in the event the Court finds that any further security is needed.

89.     Finally, a bond waiver is appropriate if the movant has a strong likelihood of success, as Plaintiff does here. *See George Sink PA Inj. Laws. v. George Sink II L. Firm LLC*, 2019 WL 6318778, at *6 (D.S.C. Nov. 26, 2019); *Arkansas Best Corp. v. Carolina Freight Corp.*, 60 F. Supp. 2d 517, 521 (W.D.N.C. 1999).

Respectfully submitted,

/S/   Thomas J. Minton

Thomas J. Minton – No. 03370
Goldman & Minton, P.C.
3600 Clipper Mill Rd., Suite 201
Baltimore, MD 21211
Tel (410) 783-7575
Fax (410) 783-1711
tminton@charmcitylegal.com

Of counsel:
**HEFFNER HURST**
Matthew T. Hurst
30 North LaSalle Street
Suite 1210
Chicago, Illinois 60602
Phone: (312) 346-3466, Ext. 2
mhurst@heffnerhurst.com

**BERGER MONTAGUE PC**
Michael Dell'Angelo
Lawrence Deutsch
Andrew Abramowitz
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: ldeutsch@bm.net
aabramowitz@bm.net