**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| IN RE CEDAR REALTY TRUST, INC. PREFERRED SHAREHOLDER LITIGATION | Case No.: 8:22-cv-1103-GLR<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

PARTIES ........................................................................................................................... 9

   Plaintiffs ....................................................................................................................... 9

   Defendants .................................................................................................................. 10

JURISDICTION ............................................................................................................. 14

FACTUAL ALLEGATIONS ......................................................................................... 16

I.     Relevant Facts Concerning Defendant Cedar ...................................................... 16

  A.    Cedar's Equity Securities ................................................................................ 16

  B.    The Contractual Rights of Cedar's Preferred Stockholders .......................... 17

     1.     Preferred Stock Ranks Above Common Stock ....................................... 17

     2.     Preferred Stockholders Are Entitled to a Liquidation Preference ........... 17

     3.     Preferred Stockholders Are Entitled to a Conversion Right .................... 19

     4.     Preferred Stockholders Do Not Enjoy a Mandatory Redemption Right ... 23

     5.     Declaration of Preferred Dividends is at the Discretion of the Cedar Board ............ 23

II.    Relevant Facts Concerning Defendant Wheeler .................................................. 24

  A.    Wheeler's Equity Securities ............................................................................ 24

  B.    Cedar Rejects Wheeler's November 2017 Merger Proposal ......................... 24

  C.    Wheeler's Suspension of Preferred Stock Dividends .................................... 27

  D.    Wheeler's History of Litigation With Its Preferred Stockholders ................. 29

  E.    Wheeler's History of Management Drama and Dysfunction .......................... 30

III.   Relevant Facts Concerning the Transactions ....................................................... 33

  A.    Resolution of the February 2021 Proxy Threat .............................................. 33

  B.    Board Discussions and Negotiations Leading to the Transactions ................ 33

  C.    The Material Terms of the KeyBank Loan ..................................................... 39

  D.    The Material Terms of the Wheeler Merger Agreement................................. 40

  E.    The Prices of the Series B and Series C Preferred Stock Plummet After Defendants Announce the Transactions .......................................................... 43

  F.    The Cedar Defendants Seek to Conceal Their Malign Intent by Misrepresenting the Value and Cash Flow of the Wheeler Properties ........................................ 45

CLASS ACTION ALLEGATIONS ............................................................................... 50

COUNT I ........................................................................................................................ 52

COUNT II ....................................................................................................................... 58

COUNT III...................................................................................................................... 59

COUNT IV ............................................................................................................... 60

PRAYER FOR RELIEF ........................................................................................... 60

### INTRODUCTION

1.      This case concerns a series of carefully sequenced transactions ("Transactions") orchestrated by Defendants to enrich themselves at the expense of the Preferred Stockholders of Defendant Cedar Realty Trust, Inc. ("Cedar"). To date, the Transactions have caused Cedar's Preferred Stockholders nearly $100 million in losses, while (i) generating over $46 million in proceeds for the Defendant Cedar board members ("Cedar Board"), and (ii) positioning Defendant Wheeler Real Estate Investment Trust, Inc. ("Wheeler") to acquire control over a portfolio of shopping centers at a substantial discount to their fair market value.

2.      Defendants recently closed the Transactions. *First*, Cedar sold a portfolio of 33 grocery-anchored shopping centers ("Grocery-Anchored Properties"), plus two mixed-use redevelopment projects ("Mixed Use Projects"), to certain third parties for $913 million in cash (less assumed mortgage debt) ("Grocery-Anchored Sale").

3.      *Second*, after closing the Grocery-Anchored Sale, Cedar entered into a merger under which it became a wholly-owned subsidiary of Wheeler ("Wheeler Merger"). Under the Wheeler Merger, Wheeler gained control of a portfolio of shopping centers still nominally owned by Cedar ("Wheeler Properties"), which Wheeler used to collateralize a $130 million loan from KeyBank ("KeyBank Loan"). Wheeler then distributed the KeyBank Loan proceeds exclusively to Cedar Board members and other Cedar Common Stockholders in exchange for all of their shares of publicly-traded Cedar Common Stock (which shares were then delisted and cancelled) ("$130 Million Distribution"). Finally, after satisfying all of its remaining liabilities, Cedar distributed the proceeds from the Grocery-Anchored Sale—approximately $266 million—exclusively to Cedar Board members and other Cedar Common Stockholders as a dividend ("$266 Million Dividend"). (*See* slides annexed as Exhibit A).

4.      Thus, as a result of the Transactions, Cedar Common Stockholders received $396 million (i.e., $266 Million Dividend and $130 Million Distribution), or $29 per common share (based on 13,640,067 shares of Common Stock outstanding as of April 18, 2022). From that total, over $46 million was pocketed by Cedar Board members, all of whom directly or indirectly beneficially owned material amounts of Common Stock, but *no* Preferred Stock (with one *de minimis* exception).

5.      By contrast—and tellingly, given the Board's lack of ownership of Preferred Stock—Cedar's Preferred Stockholders did not receive any payout from the Transactions.  That outcome violated the Articles Supplementary governing Cedar's Preferred Stock for two reasons. *First*, viewed collectively—as they must be, since the Grocery-Anchored Sale was linked to the Wheeler Merger—the Transactions bear all the hallmarks of a liquidation; namely, Cedar (i) terminated its Board, and all of its executives and other employees; (ii) accelerated all unvested equity awards; (iii) paid severance to its terminated employees; (iv) delisted and cancelled its Common Stock; (v) discharged all of its debts and liabilities; and (vi) distributed all of the $396 million in net proceeds ("Net Proceeds") from the Transactions exclusively to Cedar Common Stockholders. Since the Transactions constituted a liquidation of Cedar—even if not formally labeled as such—the Articles Supplementary entitled Cedar's Preferred Stockholders to priority payment of a liquidation preference ("Liquidation Preference") from the Net Proceeds equal to at least $25.00 per share (presently totaling $161.3 million based on 6,450,000 shares of Preferred Stock outstanding). Notwithstanding what was clearly a liquidation, Defendants deprived Cedar's Preferred Stockholders of the Liquidation Preference.

6.      *Second*, because the Transactions caused Cedar's Common Stock to be delisted, the Articles Supplementary also entitled Cedar's Preferred Stockholders to convert their Preferred

Stock into Common Stock, and share in the Net Proceeds *pro rata* with existing Cedar Common Stockholders ("Conversion Right," and together with the Liquidation Preference, the "Contractual Rights"). Defendants deprived Preferred Stockholders of the opportunity to exercise the Conversion Right.

7.    Defendants *could* have structured the Transactions in a manner that honored the Contractual Rights. But sharing the Net Proceeds with Cedar Preferred Stockholders would have reduced by 40% the more than $46 million realized by Cedar Board members from the Transactions. To avoid that dilution and maximize their own gain, the Cedar Board purported to circumvent the Contractual Rights by leaving the Preferred Stock outstanding, and structuring the Transactions so that, *inter alia*, Wheeler acquired control over Cedar and the Wheeler Properties, and assumed the obligations owed to Cedar's Preferred Stockholders (i.e., payment of future dividends and any future Liquidation Preference) ("Preferred Stock Obligations"). In substance, however, this convoluted structure produced the *same* economic result as the liquidation yielding "$28 or $29" per common share envisioned by the Cedar Board in June 2021 when it first began analyzing strategic alternatives. As such, the Transactions triggered the Contractual Rights.

8.    Beyond depriving Preferred Stockholders of their Contractual Rights, Defendants breached the duty of good faith and fair dealing implied in the Articles Supplementary under Maryland law by structuring the Transactions with the intent of injuring Preferred Stockholders. As the Cedar Board well knew, Wheeler is a distressed real estate investment trust ("REIT") with a history of management dysfunction and poor performance that has not paid *any* dividends to its own preferred shareholders *for nearly four years*. Thus, Defendants plainly anticipated that once the Transactions were announced—and Preferred Stockholders learned that authority to declare future preferred dividends had shifted to Wheeler (with its recent history of suspending

dividends)—the market cap of the Preferred Stock would crash. And that is exactly what happened, with the value of the Preferred Stock plunging nearly 55% from $151 million to $68 million on March 3, 2022, the day after the Transactions were announced. As of August 12, 2022, the market cap of the Preferred Stock had fallen further to $52 million, resulting in nearly $100 million in losses for Preferred Stockholders since Defendants announced the Transactions:





9.    The carnage in the Preferred Stock benefitted Wheeler immensely—"a home run/grand slam deal for them," as one Preferred Stockholder put it—and thus provided Wheeler with a strong motive to cooperate with the Cedar Board to structure a transaction that enriched Defendants but devastated Preferred Stockholders. Specifically, the sharp drop in the market cap of the Preferred Stock positions Wheeler to acquire Preferred Stock at depressed prices through future tender offers and/or open market purchases should funds become available (e.g., through a refinance of the KeyBank Loan), and thereby dramatically reduce the "cost" of the Preferred Stock Obligations that it assumed in exchange for the Wheeler Properties. Indeed, at market prices as of August 12, 2022, Wheeler could acquire all of the Preferred Stock—and eliminate the entire $161.3 million Liquidation Preference and any future dividends—for just $52 million, and effectively pay only $182 million for the Wheeler Properties (i.e., $130 million KeyBank Loan + $52 million). That is $48 million *below* the fair market value of the Wheeler Properties (as per the evidence discussed below).

10.    Alternatively, if Wheeler cannot secure funds to acquire the Preferred Stock in whole or in part at current market prices, Wheeler can simply let the Preferred Stock languish since Cedar's Preferred Stockholders do not enjoy a mandatory redemption right, and thus cannot compel Wheeler to redeem their shares at par (or declare dividends if the newly constituted Cedar Board—populated with current and former Wheeler officers and directors—decides there are insufficient funds to do so). This is precisely the *modus operandi* by which Wheeler has avoided paying dividends to its own preferred shareholders for nearly four years.

11.    Given the foreseeability of these consequences, Defendants clearly structured the Transactions with the intent of injuring Preferred Stockholders and enriching themselves. In an effort to conceal this malign intent, Cedar and its Board repeatedly misrepresented in public filings

that the Wheeler Properties were "valued at" $291.3 million (the "Value Misrepresentation"). After deducting the $130 million KeyBank Loan, this purportedly left $161.3 million in equity in the Wheeler Properties to cover the Liquidation Preference.

12.    But Defendants knew the Value Misrepresentation was false. Under Section 5.6 of the agreement governing the Wheeler Merger ("Wheeler Merger Agreement"), Wheeler provided Cedar with an executed copy of the loan commitment letter from KeyBank, dated March 2, 2022, and all exhibits and schedules thereto ("KeyBank Commitment Letter"). Exhibit A to the KeyBank Commitment Letter was a term sheet ("Term Sheet") limiting the size of the KeyBank Loan to 55% of the value of the Wheeler Properties, as appraised by KeyBank. Since the Cedar Board's stated goal—indeed, duty—was to maximize the proceeds from the Transactions, and the $130 million in KeyBank Loan proceeds distributed to Common Stockholders was part of the agreed upon payout, Wheeler undoubtedly borrowed the maximum against the Wheeler Properties that KeyBank was willing to lend based on its appraisals. Therefore, the Term Sheet indicates that, as of March 2, 2022, KeyBank valued the Wheeler Properties at only $236.4 million (i.e., $130 million/55%). That valuation is corroborated by the $240 million all-cash bid for the Wheeler Properties submitted by Party C in January 2022—the only all-cash bid that Cedar received for those properties. Thus, as of March 2, 2022, the equity remaining in the Wheeler Properties was not $161.3 million, but only about $110 million (i.e., $240 million - $130 million KeyBank Loan), which was *insufficient* to cover the $161.3 million Liquidation Preference.[1]

---

[1] As discussed below, leaving an entity with insufficient assets to pay a liquidation constitutes evidence of bad faith under Maryland law. Here, Cedar Board members maximized their own payout from the Wheeler Merger by leaving insufficient equity in the Wheeler Properties to pay a Liquidation Preference to Cedar Preferred Stockholders.

13.    Cedar and its Board also repeatedly misrepresented in public filings that the operating income from the Wheeler Properties—purportedly $19.1 million in 2021—was adequate to facilitate the "undisrupted" payment of dividends to Preferred Stockholders ("Preferred Dividends") totaling $10.75 million per year. The issue with this representation was that under the Term Sheet, the $130 million KeyBank Loan principal must be repaid in full within 12-months after closing ("Maturity"). Annual operating income of $19.1 million is plainly insufficient to repay $130 million—plus approximately $6.0-$6.5 million in interest—at Maturity. Thus, if Wheeler cannot refinance the KeyBank Loan at Maturity, it will default and KeyBank will foreclose since neither Wheeler nor Cedar have $130 million in spare cash available to repay the KeyBank Loan at Maturity. Accordingly, the representation that the operating income from the Wheeler Properties was adequate to ensure "undisrupted" payment of Preferred Dividends omitted a material fact, i.e., that the full $130 million was due in 12 months, thereby thrusting the risk of default entirely onto Preferred Stockholders.[2]

14.    In sum, since the Transactions constituted a liquidation in economic substance, Cedar and the Board (the "Cedar Defendants") breached the Articles Supplementary by failing to honor the Liquidation Preference. Additionally, since the Transactions left Cedar without any publicly-traded stock, the Cedar Defendants also breached the Articles Supplementary by failing to honor the Conversion Right.

---

[2] The Transactions put Preferred Stockholders in a "heads I win, tails you lose" position. If Wheeler secures funding to refinance the KeyBank Loan and acquire some or all of the outstanding Preferred Stock at depressed prices, it will have acquired the Wheeler Properties at a substantial discount to their fair market value. If Wheeler cannot refinance at Maturity and defaults, the resulting loss of equity in the Wheeler Properties will be borne entirely by Preferred Stockholders (since there is enough equity in the Wheeler Properties to repay the KeyBank Loan in full).

15.     Moreover, the Cedar Defendants breached the duty of good faith and fair dealing implied in the Articles Supplementary under Maryland law by structuring the Transactions in bad faith with the intent of injuring Preferred Stockholders, including without limitation by (i) deliberately selecting Wheeler as Cedar's merger partner, which—given Wheeler's long history of preferred shareholder oppression, management dysfunction, poor performance and declining market cap—predictably crashed the price of the Preferred Stock and positioned Wheeler to acquire the Wheeler Properties at a substantial discount (as explained above), (ii) misrepresenting the value of the Wheeler Properties, (iii) omitting material facts concerning the maturity of the KeyBank Loan, and (iv) leaving Wheeler with insufficient assets to pay the Liquidation Preference.[3]

16.     Furthermore, under Maryland law, Cedar Defendants owed fiduciary duties to Preferred Stockholders, and breached those duties when they deliberately structured the Transactions in bad faith with the intent of injuring Preferred Stockholders.

17.     Finally, Plaintiffs assert claims against Wheeler for tortiously interfering with the contractual rights of Preferred Stockholders, and aiding and abetting the breaches of fiduciary duty by the Cedar Board. These claims are also well-plead since Wheeler was aware of the Contractual

---

[3] The Cedar Board was well aware of Wheeler's troubled history and dismal track record. In November 2017, Wheeler proposed to merge with Cedar. The Cedar Board declined on the grounds that Wheeler was performing poorly, had cut its dividend, was overleveraged, owned lower quality properties, and had a market cap that was about 17% of Cedar's market cap. Since November 2017, Wheeler's financial condition has only further deteriorated, and its market cap fell to less than 6% of Cedar's market cap on the date the Transactions were announced. Yet, in connection with the Transactions, the Cedar Board resolved that merging with Wheeler was in "the best interests of Cedar and its shareholders." The only reasonable explanation for this hypocrisy is simple: in November 2017, Wheeler's poor performance might diminish the value of the Common Stock held by Cedar Board members after any merger, and thus the Cedar Board had no interest in harming themselves by merging with Wheeler. In contrast, in 2022, the Transactions cashed Cedar Board members and affiliated entities out of all their Common Stock (to the tune of over $46 million), and thus Wheeler's financial condition was no longer of any concern to them.

Rights of the Preferred Stockholders, actively cooperated with the Cedar Board to structure the Transactions with the intent of enriching Defendants and injuring Preferred Stockholders (including but not limited to by arranging  the KeyBank Loan that financed the $130 Million Distribution to Cedar Board members and other Common Stockholders), and benefitted from its misconduct by positioning itself to acquire the Wheeler Properties at a substantial discount after a sharp selloff in the Preferred Stock (as explained above).

**PARTIES**

**Plaintiffs**

18.    Plaintiff Julia Kim is a current Preferred Stockholder of Cedar Series C Preferred Stock and has been a continuous stockholder of such Preferred Stock at all relevant times. Plaintiff Julia Kim is a practicing attorney and citizen of Florida.

19.    Plaintiff David Sydney is a current Preferred Stockholder of Cedar Series C Preferred Stock and has been a continuous stockholder of such Preferred Stock at all relevant times. Plaintiff David Sydney is a retiree and citizen of California.

20.    Plaintiff Martin Novick is a current Preferred Stockholder of Cedar Series C Preferred Stock and Series B Preferred Stock and has been a continuous stockholder of such Preferred Stock at all relevant times. Plaintiff Martin Novick is a retiree and citizen of New York.

21.    Plaintiff J Renee Brennan Living Trust is a current Preferred Stockholder of Cedar Series C Preferred Stock and has been a continuous stockholder of such Preferred Stock at all relevant times. Plaintiff J Renee Brennan Living Trust is domiciled in Columbus, Indiana.

22.    Plaintiff Scott Schroepfer is a current Preferred Stockholder of Cedar Series C Preferred Stock and has been a continuous stockholder of such Preferred Stock at all relevant times. Plaintiff Scott Schroepfer is a retiree and citizen of Minnesota.

23.     Plaintiff Kenneth Kamholz is a current Preferred Stockholder of Cedar Series B Preferred Stock and has been a continuous stockholder of such Preferred Stock at all relevant times. Plaintiff Kenneth Kamholz is a retiree and citizen of New Jersey.

24.     The individuals identified in paragraphs 18-23 above are collectively referred to herein as the "Plaintiffs."

**Defendants**

25.     Defendant Cedar is a REIT that focuses primarily on ownership, operation and redevelopment of grocery-anchored shopping centers in high-density urban markets from Washington, D.C. to Boston. Cedar is incorporated in Maryland and has a principal place of business at 928 Carmans Road, Massapequa, New York 11758.

26.     Defendant Cedar Realty Trust Partnership, L.P. ("Cedar Operating Partnership") is a Delaware limited partnership. Cedar employs an umbrella partnership structure under which it has contributed substantially all of its assets to Cedar Operating Partnership, and conducts substantially all of its business through Cedar Operating Partnership.[4]

27.     Defendant Wheeler is a REIT that focuses primarily on owning, leasing and operating grocery-anchored shopping centers. Wheeler is incorporated in Maryland and has a principal place of business at 2529 Virginia Beach Blvd., Virginia Beach, Virginia, 23452.

---

[4] As of December 31, 2021, Cedar owned a 99.4% general and limited partnership interest in, and was the sole general partner of, the Cedar Operating Partnership. The limited partners' interest in the Cedar Operating Partnership (0.6% as of December 31, 2021) is represented by Operating Partnership Units ("OP Units"). The 81,000 OP Units outstanding as of December 31, 2021 are economically equivalent to shares of the Company's Common Stock. The holders of OP Units have the right to exchange their OP Units for the same number of shares of Cedar's Common Stock or, at the Cedar's option, for cash. For purposes of this Complaint, the defined term "Cedar" shall be deemed to include the Cedar Operating Partnership.

28.    Defendant Bruce Schanzer ("Schanzer") has been the President and Chief Executive Officer, and a member of the Board, since 2011. The definitive proxy ("Proxy") for the Transactions filed by Cedar with the Securities and Exchange Commission ("SEC") on April 21, 2022, discloses that Schanzer stood to earn approximately $30.9 million from cash severance payments, deferred compensation, and accelerated equity awards (covering 265,150 common shares), upon consummation of the Transactions. Additionally, the Proxy discloses that Schanzer beneficially owns 380,687 shares of Common Stock, which represents an additional 115,537 common shares owned outright by Schanzer (over and above the 265,150 common shares underlying his equity awards), worth an additional $3.35 million in proceeds to Schanzer upon consummation of the Transactions (for a total payout of about $34.25 million, of which approximately $11 million is attributable to Schanzer's beneficial ownership of Common Stock). The Proxy does not disclose that Schanzer owns any Preferred Stock, and thus Schanzer was not motivated to look out for the interests of Preferred Stockholders in connection with structuring the Transactions.

29.    Defendant Gregg Gonsalves ("Gonsalves") has been a member of the Board since 2017 and became Chairman of the Board in 2021. The Proxy discloses that Gonsalves beneficially owns 18,626 shares of Common Stock, including 12,577 restricted stock units that accelerated upon consummation of the Transactions. Thus, Gonsalves earned approximately $540,752 from the Transactions on his Common Stock based on the estimated $29 per common share in Net Proceeds. The Proxy does not disclose that Gonsalves owns any Preferred Stock, and thus Gonsalves was not motivated to look out for the interests of Preferred Stockholders in connection with structuring the Transactions.

30.    Defendant Abe Eisenstat ("Eisenstat") has been a member of the Board since 2015. The Proxy discloses that Eisenstat beneficially owns 41,829 shares of Common Stock, including 12,577 restricted stock units that accelerated upon consummation of the Transactions. Thus, Eisenstat earned $1.21 million on his Common Stock from the Transactions. The Proxy does not disclose that Eisenstat owns any Preferred Stock, and thus Eisenstat was not motivated to look out for the interests of Preferred Stockholders in connection with structuring the Transactions.

31.    Defendant Sabrina Kanner ("Kanner") has been a member of the Board since 2018. The Proxy discloses that Kanner beneficially owns 16,897 shares of Common Stock, including 12,577 restricted stock units that accelerated upon consummation of the Proposed Transactions. Thus, Kanner earned $493,168 on her Common Stock from the Transactions. The Proxy does not disclose that Kanner owns any Preferred Stock, and thus Kanner was not motivated to look out for the interests of Preferred Stockholders in connection with structuring the Transactions.

32.    Defendant Darcy Morris ("Morris") was appointed to the Board in 2021 in connection with resolution of an activist campaign against Cedar ("2021 Activist Campaign") launched by his firm, Ewing Morris & Co. Investment Partners Ltd. ("EM Partners"), in early 2021. The Proxy discloses that Morris beneficially owned 2,493 restricted stock units that accelerated upon consummation of the Transactions (resulting in a gain of $72,377). Additionally, EM Partners beneficially owned 1,103,277 shares of Common Stock as of April 18, 2022 (equal to 8.09% of Cedar's outstanding Common Stock), and thus stood to earn over $32 million from the Transactions. Morris and his partner, John Ewing, reported shared voting and dispositive power with respect EM Partners' shares. The Proxy does not disclose that Morris or EM Partners own any Preferred Stock, and thus Morris was not motivated to look out for the interests of Preferred Stockholders in connection with structuring the Transactions.

12

33.    Defendant Richard Ross ("Ross") was appointed to the Board in 2021 as a nominee of EM Partners in connection with resolution of the 2021 Activist Campaign. The Proxy discloses that Ross beneficially owns 2,493 restricted stock units that accelerated upon consummation of the Transactions (resulting in a gain of $72,377). The Proxy does not disclose that Ross owns any Preferred Stock, and thus Ross was not motivated to look out for the interests of Preferred Stockholders in connection with structuring the Transactions.

34.    Defendant Sharon Stern ("Stern") was appointed to the Board in 2021 as a nominee of EM Partners in connection with resolution of the 2021 Activist Campaigns 2021.The Proxy discloses that Stern beneficially owns 6,093 shares of Common Stock, including 2,493 restricted stock units that accelerated upon consummation of the Transactions. Thus, Stern earned $176,892 on her Common Stock from the Transactions. The Proxy does not disclose that Stern owns any Preferred Stock, and thus Stern was not motivated to look out for the interests of Preferred Stockholders in connection with structuring the Transactions.

35.    Defendant Steven G. Rogers ("Rogers") has been a member of the Board since 2016. The Proxy discloses that Rogers beneficially owns 19,746 shares of Common Stock, including 12,577 restricted stock units that accelerated upon consummation of the Transactions. Thus, Rogers earned $573,268 on his Common Stock from the Transactions. The Proxy does not disclose that Rogers owns any Preferred Stock, but in connection with Defendants' opposition to Plaintiffs' motion for a preliminary injunction in this action, Rogers revealed that he owns 449 shares of Cedar Series B Preferred Stock (worth $4,826.75 as of August 12, 2022). Rogers' ownership of Series B Preferred Stock is *de minimis*, however, as compared to his beneficial ownership of Common Stock, and thus Rogers was not motivated to look out for the interests of Preferred Stockholders in connection with structuring the Transactions.

13

36.     The individuals identified in paragraphs 28-35 above are collectively referred to herein as the "Board Defendants." In the aggregate, the Transactions generated over $46 million in proceeds for the Board Defendants based on their direct or indirect beneficial ownership of Common Stock.

37.     Cedar, Cedar Operating Partnership, and the Board Defendants are collectively referred to herein as the "Cedar Defendants."

38.     Wheeler and the Cedar Defendants are collectively referred to herein as the "Defendants."

### JURISDICTION

39.     This Court has subject matter jurisdiction under the provisions of 28 U.S.C. § 1332(d). As Defendants conceded in their Notice of Removal (Dkt. No. 1), (i) the putative class contains at least one hundred class members; (ii) members of the putative class are citizens of States different from the Defendants; and (iii) and the matter in controversy exceeds the sum or value of five million dollars ($5,000,000), exclusive of interest and costs.

40.     Venue is proper with this Court because Defendants removed the state court action initially filed by Plaintiffs in the Circuit Court for Montgomery County, Maryland ("Maryland Action"), to this District, and this District encompasses the state court where the Maryland Action was filed. *See Tinoco v. Thesis Painting, Inc.*, No. GJH-16-752, 2017 WL 52554, at *2 (D. Md. Jan. 3, 2017) (where a state action is removed to federal court, venue is governed exclusively by the federal removal statute, 28 U.S.C. § 1441(a), rather than the general venue statute, 28 U.S.C. § 1391, and the only question that must be answered to determine the propriety of venue is whether removal was effectuated to the district court for the district and division embracing the place where the suit was filed originally) (cleaned up).

14

41.     The Court has personal jurisdiction over Cedar, Cedar Operating Partnership, and Wheeler under Section 6-103(b)(5) of Maryland's long-arm statute, which provides that a "court may exercise personal jurisdiction over a person, who directly or by an agent . . . [h]as an interest in, uses, or possesses real property in the State." At the time the initial complaints were filed, Cedar and Cedar Operating Partnership had interests in multiple properties located in Maryland which they sold to third parties in connection with the Grocery-Anchored Sale, and retained nominal ownership of at least one property in Maryland after consummation of the Wheeler Merger (i.e., Patuxent Crossing (f/k/a San Souci Plaza) in California, Maryland ("Patuxent Property")). Moreover, upon consummation of the Wheeler Merger, Wheeler acquired an interest in the Patuxent Property through its 100% ownership of Cedar.

42.     The Court also has personal jurisdiction over the Board Defendants (as well as over Cedar, Cedar Operating Partnership, and Wheeler) under Section 6-103(b)(1) of Maryland's long-arm statute, which provides that a "court may exercise personal jurisdiction over a person, who directly or by an agent . . . [t]ransacts any business or performs any character of work or service in the State." All of the Board Defendants accepted directorships of a Maryland corporation and exercised the rights of a director of a Maryland corporation. Moreover, by their various acts in connection with the Transactions, the Board Defendants (as well as Cedar, Cedar Operating Partnership and Wheeler) established sufficient contacts with Maryland and availed themselves of Maryland law so that they should have reasonably expected to be sued in courts located in Maryland to defend their conduct in connection with the Transactions. In particular (i) the Transactions involved the sale of properties located in Maryland and corporate parties incorporated in Maryland; (ii) the Articles Supplementary governing the rights of Preferred Stockholders were filed with the State Department of Assessments and Taxation of Maryland; (iii) Section 8.5 of the

agreement governing the Grocery-Anchored Sale provides that it is governed by Maryland law, and contains a forum-selection clause establishing the exclusive jurisdiction of courts in Maryland over any disputes arising under such agreement; (iv) Section 9.5 of the Wheeler Merger Agreement provides that it is governed by Maryland law, and contains a forum-selection clause establishing the exclusive jurisdiction of courts in Maryland over any disputes arising out of such agreement; and (v) given the large number of Preferred Stockholders, there are undoubtedly members of the putative class who reside in Maryland.

## FACTUAL ALLEGATIONS

### I.   Relevant Facts Concerning Defendant Cedar

#### A.   Cedar's Equity Securities

43.     Cedar Common Stock is publicly-traded on the New York Stock Exchange ("NYSE") under the ticker "CDR."  According to the Proxy, as of April 18, 2022, there were 13,640,067 shares of Common Stock outstanding.

44.     Cedar also has two outstanding series of Preferred Stock: 7.25% Series B Preferred Stock and 6.50% Series C Preferred Stock. The Series B Preferred Stock publicly trades on the NYSE under the ticker "CDR.PB," and the Series C Preferred Stock publicly trades on the NYSE under the ticker "CDR.PC." There are (i) 1,450,000 shares of Series B Preferred Stock outstanding, and (ii) 5,000,000 shares of Series C Preferred Stock outstanding.

45.     The Preferred Dividends payable on the Preferred Stock total $10,752,000 per year.

## B. **The Contractual Rights of Cedar's Preferred Stockholders**

46.    The contractual rights of the Preferred Stock are governed by Articles Supplementary filed with the State of Maryland.[5]

### 1. **Preferred Stock Ranks Above Common Stock**

47.    Under Section 2 of the Articles Supplementary, Preferred Stock ranks above Common Stock with respect to dividend rights and rights upon liquidation or winding up. For example, Section 2 of Series C Articles Supplementary provides:

> (2) Rank. The Series C Preferred Stock will, with respect to dividend rights and rights upon liquidation, dissolution or winding up of the Corporation, rank (a) senior to all classes or series of Common Stock (as defined in the Charter), and to all equity securities the terms of which provide that such equity securities shall rank junior to the Series C Preferred Stock; (b) on parity with the Series B Preferred Stock (as defined in the Charter) and with all equity securities issued by the Corporation the terms of which specifically provide that such equity securities rank on parity with the Series C Preferred Stock; and (c) junior to all equity securities issued by the Corporation the terms of which specifically provide that such equity securities rank senior to the Series C Preferred Stock. The term "equity securities" shall not include convertible debt securities.

### 2. **Preferred Stockholders Are Entitled to a Liquidation Preference**

48.    Under Section 4(a) of the Articles Supplementary, Preferred Stockholders are entitled to priority payment of the Liquidation Preference of $25.00 per share (plus any accrued but unpaid dividends) in the event of "any" liquidation or winding up. For example, Section 4(a) of the Series C Articles Supplementary provides:

> (a) In the event of *any* voluntary or involuntary liquidation, dissolution or winding up of the Corporation (referred to herein sometimes as a "liquidation"), the holders of Series C Preferred Stock then outstanding shall be entitled to receive out of the assets of the Corporation legally available for distribution to stockholders (after payment or provision for payment of all debts and other liabilities of the Corporation) the sum of (i) the liquidation preference of $25.00 per share and (ii) an amount equal to any

---

[5] The terms of the Series B Articles Supplementary are substantively identical to the terms of the Series C Articles Supplementary. Therefore, key contractual provisions of the Articles Supplementary are illustrated with language from the Series C Articles Supplementary.

accrued and unpaid dividends (whether or not declared) to the date of payment, **before any distribution of assets is made to holders of Common Stock (as defined in the Charter)** or any equity securities that the Corporation may issue that rank junior to the Series C Preferred Stock as to liquidation rights.[6]

49.    Section 4(e) of the Articles Supplementary provides that a merger or asset sale does not constitute a liquidation or winding up. For example, Section 4(e) of the Series C Articles Supplementary provides:

> (e) None of a consolidation or merger of the Corporation with or into another entity, the merger of another entity with or into the Corporation, a statutory share exchange by the Corporation or a sale, lease, transfer or conveyance of all or substantially all of the Corporation's assets or business shall be considered a liquidation, dissolution or winding up of the Corporation.

50.    The Articles Supplementary do not define the meaning of the term "liquidation." As such, there is ambiguity as to what transactions qualify as a "liquidation" pursuant to Section 4(a) and what transactions will not qualify as a "liquidation" pursuant to Section 4(e). More specifically, when read not in isolation but together—as they must be under Maryland law—it is unclear whether Section 4(e) carves out **all** mergers and asset sales from the scope of Section 4(a) when it states that "none" of a merger or a sale of assets "shall be considered a liquidation" ("Total Carveout"), **or** whether because Section 4(a) applies to "any" liquidation, Section 4(e) only carves out mergers or asset sales from Section 4(a) that do not feature characteristics of a liquidation such as a discharge of all debts, distribution of all net proceeds, termination of all employees, and cancellation of equity securities ("Partial Carveout"). If the Total Carveout interpretation applies, then the Transactions did not constitute a "liquidation" under Section 4(a) since they were comprised of an asset sale and merger, and therefore excluded from the scope of "liquidation" by Section 4(e). But if the Partial Carveout interpretation applies, then the Transactions qualified as

---

[6] All emphasis in any direct quotations is added unless otherwise noted.

a "liquidation" under Section 4(a) since, despite featuring a merger and asset sale, they also featured numerous characteristics of a liquidation.

51.     In the absence of a definition of "liquidation," Sections 4(a) and 4(e)—when read together—are susceptible to either interpretation, and therefore ambiguous. As such, they must be construed against the party that drafted them (i.e., the Cedar Defendants) under the doctrine of *contra proferentem*, and Section 4(e) must be interpreted as only a Partial Carveout. Therefore, because the Grocery-Anchored Sale and Wheeler Merger were not simply an "asset sale" and a "merger" *without more*, but also featured multiple characteristics of a liquidation—i.e., termination of all officers and other employees, termination of the Board, payment of severance, cancellation of all Common Stock, discharge of all debts and liabilities, and distribution of all net proceeds to Common Stockholders—the Transactions qualified as a "liquidation" and "winding up" under Section 4(a) of the Articles Supplementary, and triggered the Cedar Defendants' obligation to pay the Liquidation Preference in full to Preferred Stockholders before distributing any of the Net Proceeds from the Transactions to Common Stockholders.[7]

### 3.   Preferred Stockholders Are Entitled to a Conversion Right

52.     The Articles Supplementary also entitle Preferred Stockholders to a Conversion Right upon a Change of Control of Cedar, unless Cedar chooses to exercise its right to redeem the Preferred Stock for a $25.00 cash payment. A corporate transaction qualifying as a Change of

---

[7] If anything, interpreting Section 4(e) as a Partial Carveout is the more reasonable construction. Specifically, had the drafters intended Section 4(e) to be a Total Carveout from Section 4(a), then logically they should have added the following language to the beginning of Section 4(a): "***Subject to Section 4(e) below***, in the event of any voluntary or involuntary liquidation. . ." But they did not, which suggests that Section 4(e) is only a Partial Carveout. Moreover, if Section 4(e) is interpreted as a Total Carveout from Section 4(a), Section 4(e) would effectively swallow up Section 4(a) since, by definition, any liquidation will always involve a sale of assets. Therefore, interpreting Section 4(e) as a Total Carveout from Section 4(a) is less reasonable than interpreting it as a Partial Carveout.

Control triggers the Conversion Right, which entitles a Preferred Stockholder to convert Preferred Stock into Common Stock pursuant to a prescribed ratio that, subject to a cap, seeks to give Preferred Stockholders the number of shares of Common Stock equivalent to $25.00. For instance, if Cedar's Common Stock was worth $50.00 per share, the formula would dictate that each share of Preferred Stock would be exchanged for 0.50 shares of Common Stock.

53.    Section 7(b)(i) of the Series C Articles Supplementary provides:

> **Upon the occurrence of a Change of Control (*as defined in subparagraph (j) of Section 5*)**, each holder of Series C Preferred stock shall have the right, unless, prior to the Change of Control Conversion Date (as defined below), the Corporation has provided or provides notice of its election to redeem the Series C Preferred Stock pursuant to the Redemption Right, to convert some or all of the Series C Preferred Stock held by such holder (the "Change of Control Conversion Right") on the Change of Control Conversion Date into a number of shares of Common Stock per share of Series C Preferred Stock to be converted (the "Common Stock Conversion Consideration") equal to the lesser of (A) the quotient obtained by dividing (1) the sum of (x) the $25.00 liquidation preference plus (y) the amount of any accrued and unpaid dividends to, but not including, the Change of Control Conversion Date . . . by (2) **the Common Stock Price** (as defined below) and (B) 9.8814 (the "Stock Cap"), subject to Section 7(b)(ii).[8]

---

[8] The Stock Cap referenced in Section 7(b)(i) limits the number of shares of Common Stock that a Preferred Stockholder may receive upon exercising the Conversion Right. The Series C Articles Supplementary originally set the Stock Cap at 9.8814 shares, but provide in Section 7(b)(ii) that "[t]he Stock Cap is subject to pro rata adjustments for any stock splits . . . subdivisions or combinations." On or about November 27, 2020, Cedar effected a reverse common stock split of 6.6 to 1—i.e., holders of Common Stock received 1 share of Common Stock for every 6.6 shares of Common Stock they held, reducing the number of shares of Common Stock that were issued and publicly trading. As a result, the Stock Cap for the Series C Preferred Stock was reduced pro rata to 1.4972 shares (9.8814/6.6), and the maximum Common Shares that would be issuable to Series C Preferred Stockholders in connection with a Change of Control given the 5,000,000 of Series C Preferred Stock shares currently outstanding would be: 1.4972 x 5,000,000, or 7,485,909. The Stock Cap for the Series B Preferred Stock was set at 10.2041. Adjusted for the stock split, that number would be reduced to 1.5461. As a result, the maximum Common Shares that would be issuable to Series B Preferred Stockholders in connection with a Change of Control given the 1,450,000 of Series B Preferred Stock shares currently outstanding would be: 1.5461 x 1,450,000, or 2,241,810.

54.     As highlighted in the passage quoted above, Section 7(b)(i) of the Articles Supplementary uses the defined term "Common Stock Price" to determine the applicable conversion ratio. In turn, the definition of "Common Stock Price" in Section 7(b)(vii) contemplates that Cedar must have publicly traded shares of Common Stock, without which it would be impossible to calculate the conversion ratio in connection with a Change of Control (unless the consideration paid was solely cash):

> The "Common Stock Price" shall be (i) the amount of cash consideration per share of Common Stock, if the consideration to be received in the Change of Control by holders of Common Stock is solely cash, or (ii) *the average of the closing prices per share of Common Stock on the NYSE for the ten consecutive trading days immediately preceding*, but not including, the effective date of the Change of Control, if the consideration to be received in the Change of Control by holders of Common Stock *is other than solely cash*.

55.     Section 5(j) of the Articles Supplementary defines when a transaction qualifies as a "Change of Control." Section 5(j) of the Series C Articles Supplementary provides:

> For the purposes of this Section 5 [Redemption] and Section 7 [Conversion] below, *a "Change of Control" is when*, after the original issuance of the Series C Preferred Stock, the following have occurred and are continuing (x) the acquisition by any person, including any syndicate or group deemed to be a "person" under section 13(d)(3) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of beneficial ownership, directly or indirectly, through a purchase, merger or other acquisition transaction or series of purchases, mergers or other acquisition transactions of shares of the Corporation *entitling that person to exercise more than 50% of the total voting power of all shares of the Corporation entitled to vote generally in elections of directors* . . . , and (y) *following the closing of any transaction referred to in clause (x)*, *neither the Corporation nor the acquiring or surviving entity has a class of common securities* (or American Depositary Receipts ("ADRs") representing such securities) *listed on the New York Stock Exchange (the "NYSE"), the NYSE American, LLC exchange (the "NYSE American"), or the NASDAQ Stock Market (the "NASDAQ"), or listed or quoted on an exchange or quotation system that is successor to the NYSE, the NYSE American or NASDAQ* . . .

56.     The Transactions triggered subsection (x) of Section 5(j) because Wheeler is acquiring 100% of Cedar's shares. The question, however, is whether the Transactions satisfy subsection (y) of Section 5(j), which provides that a transaction qualifies as a "Change of Control"

where following the closing of such transaction "**neither** the Corporation **nor** the acquiring **or** surviving entity **has** a class of [publicly-traded] common securities" (the "Neither/Nor Clause"). Specifically, it is unclear whether a "Change of Control" is triggered so long as the "surviving entity" (here, Cedar) does not have publicly-traded common stock after the transaction closes even if the "acquiring entity" that owns the surviving entity (here, Wheeler) still has publicly-traded stock after closing ("Surviving Entity interpretation"), **or** a "Change of Control" is *not* triggered unless *both* the "surviving entity" (Cedar) *and* the "acquiring entity" (Wheeler) do *not* have publicly-traded common stock after the transaction closes ("Both Entity interpretation").

57.    Since the "Neither/Nor Clause" in subsection (y) of Section 5(j) is ambiguous, it must be construed against the party that drafted it (i.e., the Cedar Defendants) under the doctrine of *contra proferentem*, and the "Neither/Nor Clause" must be interpreted as triggering the "Change of Control" so long as the "surviving entity" does not have publicly-traded common stock after the transaction closes (even if the "acquiring entity" still has publicly-traded stock after closing). In other words, the "Surviving Entity" interpretation prevails. Therefore, since under the terms of the Wheeler Merger Agreement, Cedar Common Stock will be delisted, and Cedar will not have any publicly-traded common stock after the Transactions close, the Transactions qualified as a "Change of Control" under Section 5(j) of the Articles Supplementary, and triggered the Conversion Right.[9]

---

[9] The prospectus ("Series C Prospectus") pursuant to which Cedar sold Series C Preferred Stock to the public warned investors that "*[o]ther than in connection with a Change of Control*, the Series C Preferred Stock does not contain provisions that are intended to protect you if our common stock is delisted from the NYSE." This language indicates that the definition of "Change of Control" in Section 5(j) of the Articles Supplementary was intended to protect Preferred Stockholders against a delisting of Common Stock, and therefore so long as Cedar Common Stock is being delisted in connection with the Transactions, the "Change of Control" is triggered (even if Wheeler continues to have publicly-traded stock).

**4.** **Preferred Stockholders Do Not Enjoy a Mandatory Redemption Right**

58.     The Articles Supplementary do not provide Preferred Stockholders with a mandatory redemption right; that is, there is no provision allowing Preferred Stockholders to *demand* redemption of their Preferred Stock at par (i.e., $25.00 per share) at any point. Instead, Cedar has the *option* to redeem the Series B and C Preferred Stock at par after certain dates. Section 5(b) of the Series C Articles Supplementary provides:

> ***On or after August 24, 2022*** the Corporation, ***at its option***, upon giving notice as provided below, may redeem the Series C Preferred Stock, in whole or from time to time in part, for cash, at a redemption price of $25.00 per share, plus all accrued and unpaid dividends on such Series C Preferred Stock to, but not including, the date of redemption, whether or not declared (the "Optional Redemption Right").[10]

59.     Because there is no mandatory redemption right in the Articles Supplementary, all of the Preferred Stock will remain outstanding indefinitely following consummation of the Transactions unless and until Wheeler acquires Preferred Stock via tender offers or open market purchases (i.e., Wheeler will certainly not redeem the Preferred Stock for $25.00 per share when it can acquire shares at such depressed prices).

**5.** **Declaration of Preferred Dividends is at the Discretion of the Cedar Board**

60.     Under the Articles Supplementary, declaration of Preferred Dividends on the Preferred Stock is at the discretion of the Cedar Board. For example, Section 3(a) of the Series C Articles Supplementary provides:

> Holders of Series C Preferred Stock shall be entitled to receive, ***when and as authorized by the Board of Directors***, out of funds legally available for payment of dividends, cumulative preferential cash dividends at the rate of 6.50% of the liquidation preference per annum (which is equivalent to a fixed annual amount of $1.625 per share of Series C Preferred Stock).

---

[10] The Optional Redemption Right for the Series B Preferred Stock commenced on May 22, 2017.

61.    Thus, the new director(s) appointed by Wheeler to the Cedar Board after consummation of the Wheeler Merger can elect to suspend payment of Preferred Dividends on the ground—however flimsy and unjustified—that there are not "funds legally available for payment of dividends"—*as Wheeler has done since late 2018 with respect to its own preferred shareholders*. (*See* Section II.C below).

## II.    **Relevant Facts Concerning Defendant Wheeler**

### A.    **Wheeler's Equity Securities**

62.    Wheeler's common stock is publicly-traded on Nasdaq under the ticker "WHLR." As of December 31, 2021, there were 9,720,532 shares of Wheeler common stock outstanding. Wheeler's common stock closed at $1.94 per share on December 31, 2021 (representing a market cap of approximately $18.9 million).[11]

63.    Wheeler also has two outstanding series of publicly-traded preferred stock: Series B Convertible Preferred Stock and Series D Cumulative Convertible Preferred Stock. Wheeler's Series B Preferred Stock is publicly traded on Nasdaq under the ticker "WHRLP," and Wheeler's Series D Preferred Stock is publicly traded on Nasdaq under the ticker "WHLRD." As of December 31, 2021, there were (i) 1,872,448 shares of Wheeler's Series B Preferred Stock outstanding, and (ii) 3,152,392 shares of Wheeler's Series D Preferred Stock outstanding.

64.    Wheeler also has a series of non-publicly traded preferred stock outstanding— Series A Preferred Stock—of which there was 562 shares outstanding as of December 31, 2021.

### B.    **Cedar Rejects Wheeler's November 2017 Merger Proposal**

65.    In the late fall of 2017, Wheeler sent Cedar an unsolicited merger proposal. On November 27, 2017, Cedar responded with a press release incorporating a letter ("November 2017

---

[11] *See* Nasdaq, Historical Data (https://www.nasdaq.com/market-activity/stocks/whlr/historical)

Letter") from the Chairman of the Cedar Board. The November 2017 Letter relayed the Board's *unanimous* conclusion that a merger with Wheeler was *not* in the best interest of Cedar shareholders because of Wheeler's poor financial performance, recent dividend cuts, lower quality real estate portfolio, excessive leverage, and much smaller market cap:

> Cedar . . . today announced that its Board of Directors has received and ***unanimously rejected*** an unsolicited and ***unrealistic*** proposal from Wheeler . . . to evaluate opportunities to combine the two companies. The Cedar Board of Directors fully reviewed Wheeler's unsolicited proposal in consultation with its advisors and unanimously concluded that it is not in the best interest of shareholders for Cedar to enter into discussions with Wheeler.

> The Board of Directors communicated its response to Wheeler in a letter sent to its Chairman of the Board on November 26, 2017, the full text of which follows:

> November 26, 2017

> Jon S. Wheeler
> Wheeler REIT, Inc.
> Riversedge North
> 2529 Virginia Beach Boulevard
> Virginia Beach, VA  23452

> Re: Response to Proposal for Strategic Transaction

> Dear Mr. Wheeler:

> We thank you for your interest in exploring a strategic transaction with Cedar, an overture which we understand is encouraged by Snow Park Capital, one of our newer shareholders. ***For the reasons noted below, Cedar's Board of Directors has determined that it would not be in the best interest of Cedar and its shareholders to pursue your proposal***.

> Cedar routinely evaluates strategic options to enhance long-term value.  To this end, Cedar's Board of Directors is committed to considering any credible strategic alternative that would maximize value for our shareholders. ***We have sincere reservations, however, as to how an acquisition of Cedar by Wheeler could possibly create value for Cedar shareholders.  Of particular concern are the following factors***:

> **Poor Returns and Financial Performance**: Wheeler's total shareholder returns have significantly underperformed both Cedar and relevant indices. In addition,

Wheeler has regularly missed analyst estimates, including for the third quarter 2017.

**Dividend Sustainability**: In May 2017, Wheeler cut its quarterly dividend by 19 percent, reportedly due to its inability to generate sufficient cash flows.

**Lower Quality Portfolio**: Wheeler's portfolio comprises class B and C assets in smaller, less attractive markets, which do not fit with Cedar in terms of quality and geographic positioning.  Cedar has substantially repositioned its portfolio – and continues to do so – by acquiring and redeveloping high-quality core assets in high-density markets in the attractive D.C. to Boston corridor.

**Over-leveraged**: Despite recent efforts to stabilize its balance sheet, Wheeler remains highly leveraged with debt to EBITDA of nearly 10 times.

**Incompatible Size**:  Cedar is a $1.35 billion company, with a current equity market capitalization of approximately $550 million.  Wheeler is a $375 million company with a current equity market capitalization of approximately $95 million.  ***While there are instances where relative size differences may not matter, the above factors demonstrate that in the instant case, the size differences would be adversely consequential***.

These are some, but certainly not all, of the reasons why the Cedar Board of Directors has determined not to pursue your proposal.  ***Indeed, we wonder how Snow Park or any well-intentioned Cedar shareholder could possibly think that a transaction of this nature would be in the long-term best interest of Cedar and its shareholders***.

The Cedar Board and management team are committed to creating and protecting value for all shareholders, and will continue to take action to achieve that objective.

Sincerely,

Board of Directors of Cedar Realty Trust, Inc.
/s/
By:  Roger M. Widmann, Chairman

66.    Since November 2017, Wheeler's financial condition has sharply deteriorated. For example, when the Cedar Board announced its *unanimous <u>rejection</u>* of Wheeler's merger proposal in November 2017 as "adverse consequential" because of Wheeler's "incompatible size," Wheeler's market cap was 17% of Cedar's market cap ($95 million/$550 million). In contrast, at the close of trading on March 2, 2022—immediately before the Cedar Board announced its

*unanimous approval* of the Wheeler Merger—Wheeler's market cap was *less than 6%* of Cedar's market cap ($19.3 million/$339.4 million).

67.    The Cedar Board also rejected Wheeler's merger proposal in November 2017, because Wheeler had recently cut its quarterly dividend by 19%. In contrast, as discussed further in Section II.C below, when the Cedar Board announced its approval of the Wheeler Merger on March 2, 2022, Wheeler had not paid *any* dividends to its common *or* preferred shareholders *for nearly four years* (since late 2018), and had, in fact, *eliminated* the accrued dividends owed to its Series A and Series B preferred shareholders.

68.    When structuring the Transactions, the Cedar Board conveniently ignored that recent history. Despite the substantial deterioration in Wheeler's financial condition since November 2017, the Proxy repeatedly states that the Cedar Board *unanimously approves* the Wheeler Merger as in "*the best interests of Cedar and its stockholders*." This 180-degree reversal in the Board's attitude towards Wheeler as a merger partner—at a time when Wheeler's financial condition has only gotten much worse—can only be reasonably construed as evidence of bad faith. In particular, it is obvious that the members of the Cedar Board only approved the Wheeler Merger because Wheeler's poor financial condition no longer mattered to them—as Common Stockholders, they were all getting cashed out. Instead, going forward, Wheeler's poor financial condition will only impact Preferred Stockholder because only the Preferred Stock remains outstanding. But that didn't trouble the members of the Cedar Board because—except for one *de minimis* exception—none of them owned any Preferred Stock. The Board's hypocrisy regarding the suitability of Wheeler as a merger partner is evidence of bad faith.

## C.  Wheeler's Suspension of Preferred Stock Dividends

69.    In March 2018—just a few months after its November 2017 merger proposal to Cedar—Wheeler suspended dividend payments on its common stock. Beginning with the three

months ended December 31, 2018, Wheeler also suspended dividend payments on Wheeler's Series A, Series B and Series D preferred stock.

70.    As of December 31, 2020, Wheeler had accumulated dividend arrears of $30.51 million to holders of its Series A, Series B and Series D preferred stock.

71.    In December 2020, Wheeler announced a tender offer for its Series D Preferred stock, and accepted for purchase the following number of shares at the following prices below par: (i) 387,097 shares at a purchase price of $15.50 per share on March 12, 2021, and (ii) 103,513 shares at a purchase price of $18.00 per share on May 15, 2021.

72.    In late 2021, Wheeler's common stockholders approved an amendment of the terms of the Company's Series A and B Preferred Stock eliminating all of their accumulated and unpaid dividends (totaling nearly $12 million), and removing their cumulative dividend rights so that no further dividends would accumulate on the Series A and B Preferred Stock. The dividend arrears on the Series D Preferred Stock continued to accumulate, however, and as of December 31, 2021, the outstanding Series D Preferred Stock had dividend arrears of approximately $26.16 million (which exceeded the market cap of Wheeler's common stock of $18.9 million as of December 31, 2021).

73.    Wheeler further disclosed in its 2021 Form 10-K filed with the SEC on February 28, 2022—just days before entering into Wheeler Merger Agreement with Cedar on March 2, 2022—that it faces a looming liquidity crisis with respect to the mandatory redemption right granted to its Series D preferred shareholders:

> *[B]eginning on September 21, 2023, holders of the Series D Preferred will have the right to cause the Company to redeem their Series D Preferred at a price of $25.00 per share plus the amount of all accrued but unpaid dividends*. This redemption price is payable by the Company, at the Company's election, in cash or shares of the Company's stock common stock, or a combination of cash and shares of the Company's common stock. Since January 2019, the Company's Series D

Preferred (of which there are currently approximately 3.15 million shares outstanding at December 31, 2021) have been accruing unpaid dividends at a rate of 10.75% per annum of the $25.00 liquidation preference per share of Series D Preferred, or at $2.6875 per share per annum. *As of December 31, 2021, the outstanding Series D Preferred had a liquidation preference of approximately $78.81 million, with aggregate accrued and unpaid dividends in the amount of approximately $26.16 million.* Furthermore, based upon the closing price of the Company's common stock on February 24, 2022 of $1.97 per share, the Company believes it is unlikely that holders of the Series D Preferred would convert their shares into common stock at the current conversion price of $16.96 per share of common stock. *As such, there is a significant risk that the Company will not have sufficient cash to pay the aggregate redemption price, and would not be able to meet its redemption obligation without substantial dilution of its common stock*.

74.    Wheeler's 2021 Form 10-K also disclosed just $22.9 million in unrestricted cash on Wheeler's balance sheet as of December 31, 2021.

### D.  Wheeler's History of Litigation With Its Preferred Stockholders

75.    Wheeler's oppression of its preferred stockholders has spawned at least two litigations. First, on March 22, 2021, certain Wheeler preferred stockholders sued Wheeler and various individual defendants in the United States District Court for the District of Maryland alleging that Wheeler improperly amended provisions of its Articles Supplementary in 2018 governing the issuance of the Company's Series D Preferred in violation of Maryland corporate law and without obtaining the consent of preferred stockholders. The action seeks to declare the amendment invalid, enjoin further unauthorized amendments, and either compel the Company to redeem the plaintiffs' shares or award damages. As per Wheeler's Form 10-Q filed on August 9, 2022, the court denied the individual defendants' motion to dismiss, denied the plaintiffs' motion for partial summary judgment, and directed the parties to commence discovery. A mediation is scheduled for August 30, 2022.

76.    Second, on October 25, 2021, certain Wheeler preferred stockholders sued Wheeler in the Circuit Court for Baltimore County, Maryland, alleging, *inter alia*, that Wheeler's amendment of its charter to remove the cumulative nature of dividends from the Series B Preferred

Stock could not be applied retroactively. The action seeks, *inter alia*, an order requiring Wheeler to pay all dividends accrued on the Series B and D Preferred. Dispositive motions are pending, and a trial date has been set for May 2023.

77.    These lawsuits only underscore the precarious position of the Preferred Stockholders after the closing of the Wheeler Merger.

**E.    Wheeler's History of Management Drama and Dysfunction**

78.    In the last four years, Wheeler has cycled through four different CEO's, while enduring a proxy contest that featured extensive mudslinging.

79.    On January 30, 2018, Wheeler announced that it had terminated Jon Wheeler ("Mr. Wheeler") as the company's chairman, CEO and president. Mr. Wheeler also resigned from the Wheeler board. Effective immediately, David Kelly ("Kelly") was appointed CEO and president. Mr. Wheeler later sued Wheeler for breach of his employment contract and alleged that he was owed severance and bonus payments. The Wheeler 2021 10-K discloses that Mr. Wheeler's suit was ultimately settled for $685,000 after the trial court found that Mr. Wheeler's contract had been terminated without cause, and awarded him $520,000 in damages, but no attorneys' fees or prejudgment interest (which Mr. Wheeler appealed).

80.    On October 29, 2019, entities ("Stilwell Entities") affiliated with Joseph Stilwell ("Stilwell") issued a proxy statement advising that they owned securities representing approximately 9.8% of Wheeler's common stock, and seeking stockholder support to change the composition of the Wheeler Board to "ensure that the Company is being run in a manner consistent with the best interests of all stockholders." The Stilwell Entities nominated three individuals to stand for election to the Wheeler Board at the upcoming annual meeting: Stilwell, Paula J. Poskon ("Poskon") and Kerry G. Campbell ("Campbell").

81.    During the ensuing proxy fight, the existing Wheeler Board disclosed a March 16, 2015 order of the SEC (i) finding that Stilwell had failed to adequately disclose conflicts of interest presented by inter-fund loans made between certain funds managed by Stilwell; (ii) suspending Stilwell from various investment and securities-related positions and affiliations for twelve (12) months; and (iii) fining Stilwell $100,000. The Stilwell Entities retaliated for this disclosure by, among other things, filing a lawsuit against Wheeler in connection with a related party loan to a real estate project in which the former CEO, Mr. Wheeler, had an interest. Stilwell, Poskon and Campbell ultimately prevailed in the proxy fight, and were elected to the Wheeler Board at the next annual meeting.

82.    In April 2020, Wheeler terminated the employment of Kelly as Wheeler's CEO and president, with immediate effect and without severance, and in May 2020, Kelly sued Wheeler alleging breach of his employment contract, and claiming that he is owed severance pay and related benefits. On March 15, 2022, the Court awarded Kelly $340,000 in damages (plus interest), and $311,000 in attorneys' fees and costs. On March 31, 2022, Wheeler paid $691,000 to Kelly to satisfy its obligations under the Court's order.

83.    In April 2020, after Kelly's termination, the Wheeler Board appointed Daniel Khoshaba ("Khoshaba"), a Wheeler director since February 2020, as Wheeler's CEO. Khoshaba agreed to serve without cash compensation, and instead received an incentive-based compensation package which would begin to vest when the common stock price hit $10 per share.

84.    On July 5, 2021, Wheeler terminated Khoshaba as Wheeler's CEO, and replaced him with Andrew Franklin.

85.    During Khoshaba's tenure as CEO, Wheeler's common stock price rose from $1.15 per share on April 14, 2020, to $5.10 per share on July 2, 2021 (the last trading day before

Khoshaba's resignation). The next trading day after Wheeler announced Khoshaba's resignation, Wheeler stock dropped 19.61% to close at $4.10 per share.

86.    On December 14, 2021, Khoshaba filed a Schedule 13D disclosing ownership of 1,105,924 shares of Wheeler common stock, constituting an 11.4% stake in Wheeler. Attached to the filing is a letter from Khoshaba to the Wheeler Board accusing it of forcing him to resign on pretextual grounds ten (10) days before the annual stockholder meeting to renege on his compensation package. Khoshaba further observed that since his departure, the stock price had dropped by over 60% (to $1.88 per share as of December 14, 2021), while corporate, general and administrative expenses had increased by 62% in 3Q 2021 (as compared to 3Q 2020 when Khoshaba was CEO).

* * *

87.    In sum, given Wheeler's declining market cap, deteriorating financial condition, and history of cutting and then suspending or eliminating dividends and cycling through multiple CEO's, it was foreseeable that tying the fate of Preferred Stockholders to Wheeler via the Wheeler Merger would immediately crash the price of the Preferred Stock. Moreover, since Cedar's Preferred Stockholders do not enjoy a mandatory redemption right, the price of the Preferred Stock will remain depressed indefinitely, thereby positioning Wheeler to either let the Preferred Stock languish, or acquire the Preferred Stock at depressed prices through future tender offers and/or open market purchases should funds become available (for example, through a refinance of the KeyBank Loan). This is precisely how Wheeler has mistreated its own preferred shareholders for years.

III.    **Relevant Facts Concerning the Transactions**

A.    **Resolution of the February 2021 Proxy Threat**

88.    In February 2021, three investment firms—EM Partners, Camac Partners, LLC ("Camac"), and Barington Companies Equity Partners, L.P. ("Barington")—acquired substantial holdings of Cedar Common Stock, and announced their intention to nominate directors to the Board and/or enter into discussions with Cedar to maximize shareholder value.

89.    On April 28, 2021, the Company entered into agreements with Camac, Barrington, and EM Partners, pursuant to which, *inter alia*, the Board agreed to expand its size from seven members to ten members and appoint EM Partners' nominees to the Board—Defendants Morris, Ross and Stern.

B.    **Board Discussions and Negotiations Leading to the Transactions**

90.    The Proxy describes the negotiations and other events leading up to the announcement of the Transactions.

91.    On June 3, 2021, at the newly reconstituted Board's Q1 2021 meeting, Cedar's management suggested that, with the Cedar's common stock then trading for approximately $14 per share, "the *liquidation value* of the Company, if successfully executed, might be as high as $28 or $29 per share."

92.    On June 9, 2021, Defendants Schanzer and Gonsalves met with representatives of a previously retained financial advisor, BofA Securities, to discuss a "potential *liquidation* strategy versus a whole-company sale alternative."

93.    On July 15, 2021, Defendants Schanzer and Gonsalves reported to the Board the results of their conversations with BofA Securities and other market observations, and Schanzer presented a proposed dual-track strategic process that would include pursuing a so-called "'asset sale/remainco' strategy in tandem with a traditional whole-company sale process." While the

33

alternative to a "whole-company sale" was thus relabeled an "asset sale/remainco" strategy, it remained in substance a liquidation.

94.     During subsequent meetings, the Board explored the option of a sale or merger of the entire company versus splitting up Cedar's assets into multiple portfolios consisting of the Grocery-Anchored Properties, Mixed-Use Projects, and the Wheeler Properties (the latter referred to in the Proxy as the "Remainco" assets).[12]

95.     On September 9, 2021, Cedar issued a press release ("September 2021 Press Release") announcing that the Board had initiated a dual-track process to review Cedar's strategic alternatives in order "to maximize shareholder value." The September 2021 Press Release quoted Schanzer as committed to maximizing value for *all* shareholders (which would include Preferred Stockholders):

> We believe there is a profound disconnect between Cedar's share price and the underlying value of our real estate, as evidenced by recent transaction activity both within our portfolio and in our markets. ***The Board is committed to maximizing value for <u>all</u> our shareholders*** and, accordingly, we believe that this dual-track strategic review process will enable us to achieve that.

96.     On October 26, 2021, the ultimate purchasers of the Grocery-Anchored Properties ("Grocery-Anchored Purchasers") submitted their initial bid.

97.     On January 19, 2022, representatives of Wheeler met with Schanzer to discuss a potential transaction with respect to the Wheeler Properties.

---

[12] The Proxy represented that the Wheeler Properties (a/k/a "Remainco" assets) consisted of 19 "shopping center assets." On August 4, 2022, Cedar filed a Form 10-Q with the SEC disclosing that, after the Grocery-Anchored Sale closed, Cedar only continued to own 17 "operating" properties, and that one of the Wheeler Properties (i.e., Carll's Corner) identified in the Proxy was classified as "held for sale." Plaintiffs have been unable to identify the "missing" property that was included in the original list of 19 Wheeler Properties in the Proxy, but excluded from the 18 Wheeler Properties referenced in the August 4, 2022 Form 10-Q.

98.    On January 21, 2022, the Company received a bid from Party C, which proposed to acquire all of the Company's assets other than the Mixed-Use Projects for an aggregate cash purchase price of $1.05 billion ("January 2022 Party C Bid"). The January 2022 Party C Bid valued the (i) Grocery-Anchored Properties at $810.0 million and (ii) the Wheeler Properties (a/k/a "Remainco assets") at $240.0 million. The January 2022 Party C Bid also conveyed Party C's willingness to acquire either the Grocery-Anchored Properties or the Wheeler Properties at their stated valuations.

99.    On January 27, 2022, Wheeler submitted its initial bid with respect to the Wheeler Properties, proposing to (i) acquire the Wheeler Properties for $284 million, less the then liquidation preference of $160.1 million, and (ii) leave the Preferred Stock outstanding.

100.    After additional rounds of negotiations with and due diligence by the various bidders, the Board elected to proceed with the Transactions pursuant to which (i) the Grocery-Anchored Purchasers agreed to purchase the Grocery-Anchored Properties for $840 million in cash (less any assumed mortgage debt), as well as the Mixed Use Projects for $80.5 million in cash (less any assumed mortgage debt) if another third party failed to purchase the Mixed Use Projects before the closing of the Grocery-Anchored Sale, and (ii) Wheeler agreed to the Wheeler Merger, including the purchase of the Wheeler Properties and assumption of the Preferred Stock Obligations.

101.    Simultaneously, Wheeler arranged the KeyBank Loan. According to their SEC filings, Cedar and Wheeler both have longstanding borrower relationships with KeyBank.

102.    Under the Wheeler Merger Agreement (*see* Section III.D below), the proceeds of the Grocery-Anchored Sale were first used to discharge all of Cedar's remaining liabilities, leaving approximately $266 million. Together with the $130 million proceeds of the KeyBank Loan, the

Transactions generated Net Proceeds of $396 million, all of which was distributed to Common Stockholders (equal to $29 per common share based on 13,640,067 shares of Common Stock outstanding as of April 18, 2022).

103.    The Board could have honored the Liquidation Preference, and allocated $161.3 million from the Net Proceeds to Preferred Stockholders. But doing so would have reduced the distribution to Common Stockholders by about 40% (i.e., ($396 million-$161.3 million = $234.7 million)/$396 million), and as holders exclusively of Common Stock (with the exception of Rogers' *de minimis* Series B Preferred Stock holdings), the Board was not economically motivated to decrease their payout by 40% to honor the Liquidation Preference. Accordingly, the Board structured the Wheeler Merger in bad faith to try and avoid paying the Liquidation Preference, and thereby maximize the payout to the Board Defendants and other Common Stockholders.

104.    Alternatively, instead of approving the Wheeler Merger, the Board could have approved a sale of the Wheeler Properties to Party C for $240 million in cash, and generated Net Proceeds of $506 million (i.e., $240 million from Party C + $266 million from the Grocery-Anchored Sale). From the $506 million, the Board could have paid $161.3 million to Preferred Stockholders as the Liquidation Preference, leaving $344.7 million for Common Stockholders. But this would have left Common Stockholders with $51.3 million less than the $396 million distributed to Common Stockholders under the Transactions (i.e., $396 million - $51.3 million = $344.7 million). Accordingly, instead of selling the Wheeler Properties to Party C for $240 million in cash, the Board structured the Wheeler Merger in bad faith to try and avoid paying the Liquidation Preference, and thereby maximize the payout to the Board Defendants and other Common Stockholders.

105.    On March 1, 2022, the Board's financial advisor, JLL Securities, rendered its oral opinion (subsequently confirmed in writing) that the aggregate consideration to be received by Common Stockholders pursuant to the Transactions was fair from a financial point of view to such holders ("JLL Fairness Opinion"). With respect to Preferred Stockholders, the JLL Fairness Opinion states that "we do ***not*** express ***any*** view as to the fairness of the [Transactions] to . . . the holders of any other class of securities of the Company, ***including the holders of Series B Preferred Stock and Series C Preferred Stock of the Company*** . . ."

106.    Following receipt of the JLL Fairness Opinion, the Board unanimously adopted resolutions which, among other things, (i) approved the Transactions and declared them "in the best interests of the Company and the ***common stockholders***," and (ii) resolved to recommend that Common Stockholders vote to approve the Transactions at a special meeting to be held for such purpose.

107.    Neither the Board nor its financial advisor ever considered whether the Transactions were fair to Preferred Stockholders, and concluded only that it was "fair" and "in the best interests of" Common Stockholders. Indeed, the Proxy does not indicate that the Board ever appointed an independent representative to advocate for the interests of Preferred Stockholders in connection with the Board's evaluation of strategic alternatives. Nor did the Proxy provide Preferred Stockholders with the right to vote on the Transactions; only Common Stockholders were given the right to vote.

108.    On July 8, 2022, Cedar announced that it had closed the Grocery-Anchored Sale and the sale of the Mixed Used Projects for total gross proceeds of $913 million, including assumed debt.

109.    On August 9, 2022, Cedar and Wheeler jointly confirmed that the Transactions would generate Net Proceeds of $29.00 per common share to Cedar's Common Stockholders ($19.52 per share from the Grocery-Anchored Sale, and $9.48 per share payable from the KeyBank Loan proceeds under the Wheeler Merger):

> Cedar Realty Trust (CDR) ("Cedar") today announced that Cedar and Wheeler Real Estate Investment Trust, Inc. (WHLR) ("Wheeler") *have jointly determined* that the proceeds to Cedar common shareholders from the sale of Cedar's assets and subsequent merger in a series of related all-cash transactions will total $29.00 per share.
>
> Accordingly, Cedar's Board of Directors today declared a special dividend on shares of Cedar's outstanding common stock of $19.52 per share, payable to shareholders of record at the close of business on August 19, 2022. Payment of the special dividend is contingent upon the closing of Cedar's previously announced cash merger transaction with a subsidiary of Wheeler – the final step of the sale process – which is expected to be consummated on or about August 22, 2022. Assuming the merger transaction is consummated on August 22, 2022, payment of the dividend will be made to eligible shareholders on August 26, 2022. Shareholders as of the merger closing date will also be entitled to receive merger consideration of $9.48 per share, payable on or about the same date as the special dividend.

110.    On August 22, 2022, Cedar and Wheeler issued a press release announcing the closing of the Wheeler Merger under which Wheeler acquired all of the outstanding shares of Cedar's Common Stock. The press release also confirmed that Cedar's Common Stockholders would receive $29 in cash per share of Common Stock on or about August 26, 2022, as result of the Transactions.

111.    On August 22, 2022, Cedar also disclosed its new officers and directors in Form 3 filings with the SEC. Cedar's new CEO and President is Michael Andrew Franklin (the current CEO of Wheeler), and Cedar's new CFO and Treasurer is Crystal Plum (the current CFO of Wheeler). Cedar's new directors are: Mr. Franklin, Ms. Plum, E.J. Borrack (an existing Wheeler

director), Kerry G. Campbell (an existing Wheeler director), and Paula Poskon (who served as a Wheeler director until June 16, 2022).

112.    On August 23, 2022, Cedar's Common Stock was delisted. Cedar's Preferred Stock remains outstanding.

### C. **The Material Terms of the KeyBank Loan**

113.    On March 2, 2022, KeyBank issued the Term Sheet for the KeyBank Loan to Wheeler. Under Section 5.6 of the Wheeler Merger Agreement (*see* Section III.D below), Wheeler provided Cedar with a copy of the executed KeyBank Commitment Letter, including the Term Sheet attached as Exhibit A. As the Proxy states outright:

> ***Wheeler has delivered to the Company copies of an executed debt commitment letter*** pursuant to which the lenders party thereto have committed, subject to the terms and conditions contained in such letter, to provide debt financing in an aggregate amount up to $130.0 million to enable Wheeler to consummate the Mergers and make payments required under and in connection with the merger agreement."[13]

114.    The Term Sheet contained the following material terms:

- The "borrower" of the KeyBank Loan is Cedar Operating Partnership, and the "guarantors" are Cedar, Wheeler, and any subsidiaries of Cedar Operating Partnership holding title to any of the Wheeler Properties (collectively, the "Borrowers").

- **Amount:** "up to" $130 million, which shall be "fully funded" at closing.

- **Maturity:** 12-months from closing

- **Repayment**: interest-only "with all amounts due at maturity."

- **Prepayment**: in whole or in part at any time without fees or penalty

- **Interest:** for the first six months, at the Borrowers' election: (i) the Secured Overnight Financing Rate (SOFR) rate (2.29% as of August 9, 2022) + 2.50% (i.e., 4.79% as of August 9, 2022), or (ii) the Base Rate (which is the highest of KeyBank's prime rate (4.75%

---

[13] Indeed, the Proxy relates that Cedar and its advisors participated in the drafting of the KeyBank Commitment Letter.

as of June 16, 2022), the Federal Funds Effective Rate (1.58% as of July 4, 2022), or the SOFR rate) + 1.50% (i.e., 3.79% as of August 9, 2022)

Interest after the first six months, at the Borrowers' election: (i) the Secured Overnight Financing Rate (SOFR) rate (2.29% as of August 9, 2022) + 4.00% (i.e., 6.29% as of August 9, 2022), or (ii) the Base Rate (which is the highest of KeyBank's prime rate (4.75% as of June 16, 2022), the Federal Funds Effective Rate (1.58% as of July 4, 2022), or the SOFR rate) + 3.00% (i.e., 5.29% as of August 9, 2022)

Based on the foregoing interest rate terms, and assuming the Borrowers will elect to pay the lower interest rate, Plaintiffs estimate that the interest payable over the 12-month term of the KeyBank Loan will be approximately $6.0-$6.5 million.

- **Collateral:** the Wheeler Properties.

- **Escrow Account:** at closing, the Borrowers are "required to establish and fund an escrow account ("Escrow Account") with amounts sufficient to fund all tenant improvements and leasing commissions, capital expenditures, and taxes and insurance for a forward 12-month period." The expected amount of the escrow at closing is $7.1 million.

- **Operating Account:** an operating account ("Operating Account") shall be established to collect the cash flow from the Wheeler Properties, which may be used to pay (i) amounts owed on the KeyBank Loan, (ii) property operating expenses, (iii) property management fees and G&A/overhead expenses (subject to a KeyBank approved budget), and (iv) Preferred Dividends. Any excess cash flow remaining in the Operating Account above a minimum to be determined shall be swept into the Escrow Account.

- **Collateral Coverage:** the amount of the loan shall be *equal to or less than 55% of the value of the Collateral* "based on KeyBank ordered and approved as-is appraised values."

Since the Board was committed to "maximizing value" from the Transactions, it is plain that the Borrowers borrowed as much from KeyBank as KeyBank was willing to lend based on the appraised value of the Collateral. As such, the Collateral Pool Leverage provision indicates that, as of March 2, 2022, KeyBank valued the Wheeler Properties at $236.4 million (i.e., $130 million/0.55) ("March 2022 KeyBank Valuation).

- **Distributions:** the Term Sheet forbids any distributions other than the Preferred Dividends.

### D. <u>The Material Terms of the Wheeler Merger Agreement</u>

115.    The Wheeler Merger is governed by an Agreement and Plan of Merger, dated March 2, 2022 (the "Wheeler Merger Agreement"). The terms thereof demonstrate that the Transactions constituted a liquidation in substance.

116.    Section 2.1(b) of the Wheeler Merger Agreement provides that Cedar will merge with a newly created, wholly owned subsidiary of Wheeler called "Merger Sub." The "Surviving Company" of that interim transaction was Cedar, and as a result, Cedar will become a wholly owned subsidiary of Wheeler.

117.    Section 3.1(a) of the Wheeler Merger Agreement provides that, at closing, the $130 million in proceeds from the KeyBank Loan will be distributed exclusively to Common Stockholders, and Cedar's Common Stock will be delisted and cancelled.

118.    Section 7.3(d) of the Wheeler Merger Agreement provides that the closing of the Grocery-Anchored Sale is a condition to the closing of the Wheeler Merger. The Wheeler Merger Agreement further provides that, prior to the closing of the Wheeler Merger, the net proceeds of the Grocery-Anchored Sale shall be paid exclusively to Common Stockholders in an amount equal to the gross proceeds of the Grocery-Anchored Sale, minus any remaining unpaid liabilities of Cedar following consummation of the Grocery-Anchored Sale. Wheeler Merger Agreement at §§ 1.1(a) (definition of "Closing Dividend Amount"), 3.1(d), 6.16, 7.3(e). Thus, in connection with the Transactions, Cedar is discharging all of its liabilities, and then distributing all of the Net Proceeds exclusively to Common Stockholders.

119.    Section 3.1(a)(iv) of the Wheeler Merger Agreement provides that all Preferred Stock will remain outstanding as a nominal obligation of Cedar, as the "Surviving Company." But while the Proxy states that both classes of Preferred Stock are "expected" to remain listed on the New York Stock Exchange following closing of the Wheeler Merger, and that Cedar will continue to be an independent filer of periodic reports with the SEC, there is no provision in the Wheeler Merger Agreement obligating either Cedar or Wheeler to keep the Preferred Stock publicly-traded.

120.    Section 2.4(b) of the Wheeler Merger Agreement provides that, upon consummation of the Wheeler Merger, all of the directors and officers of Merger Sub appointed by Wheeler shall become the directors and officers of Cedar. Thus, under the Wheeler Merger Agreement, all of Cedar's current officers and directors will be terminated. To that end, under Section 6.14 of the Wheeler Merger Agreement, at or prior to the closing of the Wheeler Merger, all of Cedar's executives shall resign.

121.    Under Section 6.7 of the Wheeler Merger Agreement, Cedar is terminating all of its employees in connection with the Wheeler Merger, subject to the right of Wheeler to make offers of employment to Cedar's terminated employees. In connection with such terminations, Cedar will pay all of the severance, benefits and other obligations owed to terminated employees.

122.    Under Section 3.3. of the Wheeler Merger Agreement, all restricted stock awards and performance restricted stock awards shall vest immediately ahead of schedule, thereby enabling the Board Defendants and other holders thereof to receive a pro rata share of the proceeds being paid under the Transactions.

123.    In sum, the terms of the Wheeler Merger Agreement demonstrate that the Transactions constitute a liquidation triggering payment of the Liquidation Preference since, in connection with the Transactions, Cedar terminated all of its executives and other employees (as well as the Board); accelerated all unvested equity awards; paid severance to its terminated employees; delisted and cancelled its Common Stock; discharged all of its debts and liabilities; and distributed all of the Net Proceeds of the Transactions to Common Stockholders. While Cedar still nominally owns the Wheeler Properties (as a wholly owned subsidiary of Wheeler), $130 million of the equity in the Wheeler Properties was distributed to Cedar Board members and other Common Stockholders via the KeyBank Loan proceeds, leaving only $110 million in equity left

to cover the outstanding $161.3 million Liquidation Preference. The fact that Defendants funded a portion of the $130 Million Distribution with equity in the Wheeler Properties that should have been preserved to cover the Liquidation Preference, further corroborates that the Transactions constituted a liquidation.

**E. The Prices of the Series B and Series C Preferred Stock Plummet After Defendants Announce the Transactions**

124.    Before the Defendants announced the Transactions, the Preferred Stock was deemed a secure investment. For example, on January 12, 2021, a former CPA and investment banker published an article on SeekingAlpha.com entitled "*Check Out These +7% Yield Preferred Stock: Cedar Realty*" in which he opined that the Series B and C Preferred Stock were "highly attractive" investments due to the quality of Cedar's properties and Cedar's track record for paying dividends.[14]

125.    On March 2, 2022, the Common Stock closed at $24.88 per share, the Series C Preferred Stock closed at $22.85 per share, and the Series B Preferred Stock closed at $25.61 per share.

126.    On March 2, 2022, after the markets closed, Cedar announced the Transactions in a Form 8-K filed with the SEC ("March 2022 Announcement").

127.    On March 3, 2022—the next trading day following the March 2022 Announcement—the Common Stock jumped 14.55% to close at $28.50 per share. In contrast— after Preferred Stockholders learned that payment of their future dividends now depended on Wheeler (with its history of suspending dividends)—the Series C Preferred Stock plummeted

---

[14] *See* https://seekingalpha.com/article/4398269-check-out-plus-7-percent-yield-preferred-stocks-cedar-realty

56.89% to close at $9.85 per share, and the Series B Preferred Stock tanked 49.44% to close at $12.95 per share.[15]

128.    As a result of the sharp drops in the prices of the Series B and Series C Preferred Stock following announcement of the Transactions, the combined market cap of the Preferred Stock tanked nearly 55% from approximately $151.4 million at the close on March 2, 2022, to $68.0 million at the close on March 3, 2022, nearly $100 million lower than the Liquidation Preference of $161.3 million.

129.    In the wake of the carnage experienced by Preferred Stockholders after the Transactions were announced, a REIT analyst at Raymond James opined that the "driving factor" of the Transactions was to send Preferred Stockholders to "purgatory," and criticized the treatment of Preferred Stockholders under the Transactions as setting a "bad precedent" for the REIT sector:

> CDR common equity shareholders are winning, but at the cost of Preferred Stockholders . . . ***Certainly other REIT preferred shares have been sent to purgatory in other M&A transactions, but they have been more of a byproduct of M&A, and not the driving factor behind the deal structure***. CDR and its advisors may be patting themselves on the back for creative deal/legal gymnastics, but there could be other broader negative implications for the industry. If CDR can use this structure, what's to stop other REITs from structuring a similar transaction? Could that potentially hurt the investability of other outstanding REIT preferred stock? And what kind of updated language needs to be incorporated into preferred offerings to prevent this from happening again? ***We believe this [deal] sets a bad precedent for the sector***.[16]

---

[15] *See* https://seekingalpha.com/symbol/CDR/historical-price-quotes; https://seekingalpha.com/symbol/CDR.PC/historical-price-quotes; https://seekingalpha.com/symbol/CDR.PB/historical-price-quotes.

[16] Notably, Raymond James underwrote the offering of Series C Preferred Stock to the public. This means that Cedar was Raymond James' client. Nevertheless, the Raymond James analyst was prepared to criticize Cedar for structuring the Transactions in bad faith.

**F. The Cedar Defendants Seek to Conceal Their Malign Intent by Misrepresenting the Value and Cash Flow of the Wheeler Properties**

130.    In a press release accompanying the March 2022 Announcement, Schanzer conceded that—contrary to his promise in the September 2021 Press Release to maximize value for "***all*** our shareholders"—the Transactions were the best outcome *only* for Common Stockholders:

> We believe this combination of transactions represents ***the best possible outcome for our <u>common</u> shareholders*** and we are very pleased with the progress thus far of our dual-track review of strategic alternatives.

131.    Aware that the Transactions represented a terrible outcome for Preferred Stockholders, the Cedar Defendants attempted to conceal their malign intent by misrepresenting the value of the Wheeler Properties in the March 2022 Announcement as $291.3 million ("Value Misrepresentation"):

> On March 2, 2022, the Company entered into an agreement with Wheeler Real Estate Investment Trust, Inc. ("Wheeler") and certain of its affiliates pursuant to which, following closing of the Grocery-Anchored Portfolio Sale, Wheeler will acquire the balance of the Company's shopping center assets by way of an all-cash merger transaction ***that <u>values</u> the remaining portfolio at $291.3 million***.

132.    In a press release accompanying the March 2022 Announcement, the Cedar Defendants further stated:

> An agreement to sell the Company and its remaining assets to Wheeler Real Estate Investment Trust, Inc. (NASDAQ: WHLR), after completion of the above-described transactions, in an all-cash merger transaction that ***<u>values</u> the assets at $291.3 million***.

133.    Likewise, the Proxy signed by Defendant Schanzer stated at least three times (at pages 4, 12, and 68) that "Wheeler will acquire the Company and the remainder of the

Company's shopping center assets by way of an all-cash merger transaction that ***values the***
***remaining portfolio at $291.3 million***."[17]

134.    When the Cedar Defendants made the Value Misrepresentation, they knew it was
false since, as noted: (1) the all-cash Party C bid only two months prior in January 2022 valued
the Wheeler Properties at $240 million (as reported in the Proxy), and (2) KeyBank appraised the
Wheeler Properties at $236.4 million as of March 2, 2022. In contrast, the $291.3 million "value"
that the Cedar Defendants attributed to the Wheeler Properties was not based on any appraisal, but
simple arithmetic, i.e., the Liquidation Preference of $161.3 million was artificially tacked on to
the $130 million KeyBank Loan encumbering the Wheeler Properties to derive $291.3 million.

135.    In fact, Wheeler did not actually "pay" $291.3 million for the Wheeler Properties
since $161.3 million does not now and will *never* equal the additional amount over $130 million
that Wheeler will actually pay in cash to extinguish the Preferred Stock Obligations it assumed in
connection with the Wheeler Merger. Indeed, since Preferred Stockholders do not enjoy a
mandatory redemption right under the Articles Supplementary, Wheeler has no obligation to ever
pay the Liquidation Preference.

136.    Moreover, as Defendants plainly foresaw and intended, when Preferred
Stockholders learned that to the authority to declare future Preferred Dividends had shifted to
Wheeler, the market cap of the Preferred Stock plunged from approximately $151.4 million to
$68.0 million, thereby positioning Wheeler to acquire Preferred Stock at depressed prices through
future tender offers and/or open market purchases (e.g., through a refinance of the KeyBank
Loan)—as Wheeler has previously done with respect to its own preferred shareholders. In other

---

[17] The March 2022 Announcement stated that "CDR and its directors and executive officers may
be deemed to be participants in the solicitation of proxies from CDR's stockholders in connection
with the proposed merger."

words, by the simple expedient of presenting itself as Cedar's merger partner, Wheeler was able to immediately crash the price of the Preferred Stock and reduce the "cost" of the Preferred Stock Obligations it assumed in exchange for the Wheeler Properties to $68 million, and thereby position itself to acquire the Wheeler Properties for $198 million (i.e., $130 million KeyBank Loan + $68 million market price of Preferred Stock)—a price $42 million below their fair market value (as indicated by the January 2022 Party C Bid and March 2022 KeyBank Valuation).

137.    The market cap of the Preferred Stock has further dropped to $52 million (as of August 12, 2022). This means that Wheeler could presently acquire all of the Preferred Stock for $52 million, and pay only $192 million for the Wheeler Properties (i.e., $130 million KeyBank Loan + $52 million)—a price $48 million below their fair market value.

138.    Preferred Stockholders perceived that the Cedar Defendants structured the Transactions to massively benefit Wheeler. As one investor (Rob G. in Vegas) remarked on SeekingAlpha.com on July 1, 2022:

> **This deal is a home run for the WHLR OpCo**. If WHLR OpCo finds a way to buy back even a portion of the CDR preferreds near the current depressed prices, **banks will be lining up to lend them money on these assets**. Big margin of safety here.[18]

139.    The same investor later observed on SeekingAlpha.com on July 8, 2022 (when the aggregate market cap of the Preferred Stock had fallen below $50 million):

> 'an all-cash transaction valuing remaining assets at $291.3M.' That is funny, seeing how the $161M in preferred obligations being "assumed" by the WHLR OpCo are now valued at less than $50M. If WHLR found a way to buy back the CDR preferreds at current prices, they get the 19 remaining centers for $110M less. **A home run/grand slam deal for them**.[19]

---

[18] https://seekingalpha.com/article/4495571-take-a-shower-after-reading-the-wheelercedar-merger#comments

[19] https://seekingalpha.com/news/3855386-cedar-realty-trust-closes-sale-of-grocery-anchored-portfolio#comments

140.    In short, Wheeler's assumption of the Preferred Stock Obligations as "consideration" for the Wheeler Properties was *not* the equivalent of a buyer assuming a mortgage in connection with a real estate acquisition. When assuming a mortgage, a real estate buyer understands that the lender expects the mortgage to be paid in full with interest. In contrast, when Wheeler assumed the Preferred Stock Obligations as consideration for the Wheeler Properties, Wheeler understood that (i) in the absence of a mandatory redemption right, it never had to pay the Liquidation Preference except at its option, (ii) by controlling the reconstituted Cedar Board following the closing of the Wheeler Merger it could exercise control over whether to declare Preferred Dividends going forward, and (iii) most importantly, announcing itself as Cedar's merger partner would crash the market price of the Preferred Stock, and position it to acquire the Preferred Stock at depressed prices in future tender offers and/or open market purchases. Therefore, the "$291.3 million" figured touted by Defendants was nothing more than a fiction derived by adding $161.3 million to $130 million to conceal that the economic interests of the Preferred Stockholders were not protected by sufficient equity in the Wheeler Properties. Indeed, Cedar Board members were only able to maximize their own payout from the Wheeler Merger (via distribution of the $130 million in KeyBank Loan proceeds) by leaving insufficient equity in the Wheeler Properties to pay the Liquidation Preference.[20]

141.    In a further attempt to conceal their malign intent, the Cedar Defendants made the following misrepresentation concerning the sufficiency of the income from the Wheeler Properties to support "undisrupted" payment of the Preferred Dividends:

---

[20] If Defendants had truly wanted to protect the interests of Preferred Stockholders, they would have reduced the size of the KeyBank Loan to $78.7 million, which would have left $161.3 million of equity in the Wheeler Properties equal to the value of the Liquidation Preference (i.e., $240 million - $78.7 million = $161.3 million).

*Company Preferred Stock*. Pursuant to the terms of the Merger Agreement, the Company's currently outstanding 7.25% Series B Preferred Stock and 6.50% Series C Preferred Stock (collectively, the "Company Preferred Stock") will remain outstanding as shares of preferred stock in the Surviving Company following the Mergers . . . This post-closing structure whereby the Company Preferred Stock will remain outstanding preferred securities of an independent public reporting entity that ***holds a significant retained portfolio of income-producing assets*** is intended to facilitate ***the undisrupted ability*** of the Surviving Company ***to pay all required dividends on the Company Preferred Stock*** in accordance with the articles supplementary governing the terms of the Company Preferred Stock and applicable law.

142.    In the Proxy, the Cedar Defendants elaborated that the Wheeler Properties "generated aggregate cash net operating income of approximately $19.1 million in 2021," which they claimed would "be exceeded for full year 2022," and therefore would purportedly be adequate to cover the Preferred Dividends of approximately $10.8 million per year.[21]

143.    The issue with the above representations, however, is that under the KeyBank Term Sheet, the full $130 million must be repaid in full at Maturity, which is 12-months from the closing of the KeyBank Loan. Even at $19.1 million, the operating income of the Wheeler Properties is plainly insufficient to pay $130 million—plus $6.0-$6.5 million in interest—at Maturity. Thus, unless Wheeler can refinance the KeyBank Loan, it will default and KeyBank will foreclose since neither Wheeler nor Cedar have $130 million in spare cash available to repay the KeyBank Loan in full with interest at Maturity. In that scenario, the loss of equity in the Wheeler Properties will be borne entirely by Preferred Stockholders (since there is more than sufficient value in the Wheeler Properties to repay the KeyBank Loan in full). Accordingly, the Cedar Defendants' representation that the operating income from the Wheeler Properties was adequate to facilitate

---

[21] As mentioned in note 12 above, the Form 10-Q filed by Cedar on August 4, 2022, indicates that the number of Wheeler Properties has apparently been reduced from 19 to 18. This would reduce the annual operating income from the Wheeler Properties below the $19.1 million represented in the Proxy.

"undisrupted" payment of Preferred Dividends omitted a material fact from the Proxy, i.e., that the full $130 million was due in 12 months, thereby thrusting the risk of default on to Preferred Stockholders.

144.    Finally, it should be noted that the Defendants also represented in various SEC filings that the Preferred Stock shares "are *expected* to remain listed on the New York Stock Exchange following closing of the [Wheeler Merger]." As noted, there is no provision in the Wheeler Merger Agreement obligating Cedar or Wheeler to fulfill this "expectation" and keep the Preferred Stock publicly-traded. As such, the Preferred Stock may yet be delisted following consummation of the Wheeler Merger, which would further devastate the value of the Preferred Stock.

## CLASS ACTION ALLEGATIONS

145.    Plaintiff brings this class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure ("Rules") on behalf of a class ("Class") consisting of all Series B and Series C Cedar Preferred Stockholders, except Defendants herein and any persons, firm, trust, corporation, or other entity related to or affiliated with them and their successors in interest. This action is properly maintainable as a class action under Rule 23(b)(3) for the reasons below.

146.    Numerosity: The Class is so numerous that joinder of all members is impracticable. As of December 31, 2021, there were 6.45 million shares outstanding of Cedar Preferred Stock comprised of 1.45 million shares of Series B Preferred Stock outstanding and 5 million shares of Series C Preferred Stock outstanding. Upon information and belief, Cedar Series B and Series C Preferred Stock is owned by thousands of shareholders of record nationwide.

147.    Typicality: Plaintiffs' claims are typical of the claims of the other members of the Class insofar as the claims of Plaintiffs and other members of the Class arise out of the same course of wrongful conduct by Defendants.

148.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel highly experienced in class actions of this nature, and Plaintiffs intend to vigorously prosecute this action. Plaintiffs have no interests that are antagonistic to those of the other members of the Classes.

149.    <u>Superiority</u>: A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be involved in individual litigation of their claims against Defendants. It would, thus, be virtually impossible for Class members, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single United States District Court, and presents no unusual management difficulties under the circumstances presented in this case.

150.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member. The common questions include, *inter alia*, the following:

- Whether the Transactions triggered the Liquidation Preference payable under the Articles Supplementary

- Whether the Transactions triggered the Conversion Right under the Articles Supplementary

- Whether Cedar Defendants breached the Articles Supplementary by failing to pay the Liquidation Preference and/or by failing to allow Preferred Stockholders to exercise the Conversion Right

- Whether Cedar Defendants breached the duty of good faith and fair dealing implied in the Articles Supplementary under Maryland law

- Whether the Cedar Defendants breached their fiduciary duties to Preferred Stockholders

- Whether Wheeler tortiously interfered with the Contractual Rights of Preferred Stockholders

- Whether Wheeler aided and abetted the breaches of fiduciary duty by the Cedar Defendants

- The damages to which Class members are entitled due to the misconduct alleged herein.

## COUNT I

### Breach of Contract
### (Against the Cedar Defendants)

151.    Plaintiffs reallege all of the preceding paragraphs as if fully set forth herein.

152.    Under Maryland law, the Articles Supplementary are a contract between Cedar and its Preferred Stockholders. In conceiving, structuring and consummating the Transactions, the Cedar Defendants breached the Articles Supplementary in at least three ways.

**Breach of Sections 2 and 4(a) of the Articles Supplementary**

153.    The Transactions constituted a "liquidation" and "winding up" of Cedar under Section 4(a) of the Articles Supplementary even if not formally labeled as such since, in connection with the Transactions, Cedar terminated the Board and all of its executives and other employees; accelerated all unvested equity awards; paid severance to its terminated employees; delisted and cancelled its Common Stock; discharged all of its debts and liabilities; and distributed all of the Net Proceeds from the Transactions exclusively to Common Stockholders.

154.    Consequently, Sections 2 and 4(a) of the Articles Supplementary of the Series B and Series C Preferred Stock entitled Preferred Stockholders to priority payment of a Liquidation Preference from the Net Proceeds equal to at least $25.00 per share of Preferred Stock (totaling approximately $161.3 million in the aggregate based on 6,450,000 shares of Preferred Stock outstanding).

155.    The Cedar Defendants breached Sections 2 and 4(a) of the Articles Supplementary of the Series B and Series C Preferred Stock when they failed to pay the Liquidation Preference to Preferred Stockholders before making distributions to Common Stockholders from the Net Proceeds of the Transactions.

**Breach of Section 7 of the Articles Supplementary**

156.    Because the Transactions delisted Cedar's Common Stock, the Transactions qualified as a "Change of Control" under Section 5(j) of the Articles Supplementary, and Preferred Stockholders became entitled under Section 7 the Articles Supplementary to convert their Preferred Stock into Common Stock, and share the Net Proceeds of the Transactions *pro rata* with existing Common Stockholders.

157.    The Cedar Defendants breached Section 7 of the Articles Supplementary of the Series B and Series C Preferred Stock when they failed to provide Preferred Stockholders with the opportunity to convert their Preferred Stock into Common Stock in connection with the Transactions and share the Net Proceeds *pro rata* with existing Common Stockholders.

**Breach of the Duty of Good Faith and Fair Dealing Implied Under Maryland Law**

158.    The Cedar Defendants breached the duty of good faith and fair dealing implied in the Articles Supplementary under Maryland law by exercising their discretion in bad faith and

deliberately structuring the Transactions with the intent of injuring Preferred Stockholders and depriving them of the fruits of the Articles Supplementary.

159.    The evidence of the Cedar Defendants' bad faith and intent to injure Preferred Stockholders is overwhelming. *First*, the Cedar Defendants knew that selecting Wheeler as their merger partner would crash the price of the Preferred Stock given Wheeler's long history of suspending preferred dividends, as well as management dysfunction, poor performance and declining stock price. Defendant also knew that crashing the prices of the Preferred Stock would position Wheeler to acquire the Preferred Stock at depressed values, and thereby dramatically reduce the cost to Wheeler of acquiring the Wheeler Properties at the expense of Preferred Stockholders (as explained in paragraphs 0 and 137-34 above).

160.    *Second*, in an attempt to conceal their malign intent, the Cedar Defendants repeatedly misrepresented the value of the Wheeler Properties at $291.3 million, even though they knew that KeyBank had valued the Wheeler Properties, as of March 2, 2022, at $236.4 million, and that Party C's all-cash bid had valued the Wheeler Properties at $240 million in January 2022.

161.    *Third*, because the Wheeler Properties were only worth $240 million as of March 2, 2022, distribution of the $130 million in KeyBank Loan proceeds to Cedar Board members and other Common Stockholders left only $110 million of equity remaining in the Wheeler Properties to pay the $161.3 million Liquidation Preference. The Transactions thus left Cedar and Wheeler with insufficient assets to pay the Liquidation Preference if ordered to do so by the Court, which constitutes evidence of bad faith under Maryland law. *See Jolly Roger Fund, LP v. Prime Group Realty Trs,* 2007 Md. Cir. Ct. Lexis 10, at *10, 13 (Md. Cir. Ct. Aug 16, 2007).

162.    *Fourth*, Cedar Board members maximized their own payout from the Transactions at the expense of Preferred Stockholders by leaving insufficient equity in the Wheeler Properties

to pay the Liquidation Preference. Since the Wheeler Properties were only worth $240 million, had the Defendants left $161.3 million of equity in the Wheeler Properties to cover the Liquidation Preference (and protect the interests of Preferred Stockholders), the amount of the KeyBank Loan proceeds payable to Cedar Board members and other Common Stockholders would have been reduced to $78.7 million (i.e., $240 million - $161.3 million = $78.7 million). Instead, Defendants "raided" a portion of the equity in the Wheeler Properties that rightfully belonged to Preferred Stockholders in order to boost the KeyBank Loan proceeds paid to Cedar Board members and other Common Stockholders to $130 million (and reduce the remaining equity in the Wheeler Properties to $110 million). In other words, to maximize the Cedar Board's gain, the Defendants extracted as much equity from the Wheeler Properties as KeyBank was willing to lend without regard to the interests of Preferred Stockholders.

163.    *Fifth*, when representing that the income from the Wheeler Properties was adequate to facilitate "undisrupted" payment of the Preferred Dividends, the Cedar Defendants omitted a material fact from the Proxy, i.e., that the $130 million KeyBank Loan needs to be repaid in full with $6.0-$6.5 million in interest 12 months after closing. With approximately $136 million falling due within 12 months of closing of the KeyBank Loan, it was misleading for the Cedar Defendants to project "undisrupted" payment of the Preferred Dividends when Preferred Stockholders faced a risk of default within one year.

164.    *Sixth*, in November 2017, the Cedar Defendants rejected Wheeler's merger proposal on the grounds that Wheeler was performing poorly, had cut its dividend, was overleveraged, owned lower quality properties, and had a market cap that was about 17% of Cedar's market cap. Since November 2017, Wheeler's financial condition has further deteriorated, and its market cap was less than 6% of Cedar's market cap on the date the Transactions were

announced. Yet, in connection with the Transactions, the Cedar Board resolved that merging with Wheeler was in "the best interests of Cedar and its shareholders." The explanation for this hypocrisy is simple: in November 2017, Wheeler's poor performance might diminish the value of the Common Stock held by Cedar Board members after any merger, and thus the Cedar Board had no interest in merging with Wheeler. In contrast, in 2022, the Transactions cashed Cedar Board members out of all their Common Stock (to the tune of over $46 million), and thus Wheeler's financial condition was no longer of any concern to them. The Cedar Board's disregard for the interests of Preferred Stockholders once their own personal interests were protected, is further evidence of bad faith.

165.    *Seventh*, in September 2021, Defendant Schanzer stated that, in connection with pursuing a strategic transaction, the "Board is committed to maximizing value for ***all*** our shareholders," which statement can reasonably be construed to include preferred shareholders (since preferred shareholders are shareholders entitled to all rights and privileges under Maryland law). In contrast, on March 2, 2022, Schanzer conceded that the Transactions represent only "the best possible outcome for our ***common*** shareholders," conspicuously omitting Preferred Stockholders (because Schanzer understood at that point that the Transactions represented a terrible outcome for Preferred Stockholders). Promising to maximize value for "all" shareholders, and then structuring transactions several months later that only protect the interests of Common Stockholders (and devastate Preferred Stockholders) is further evidence of bad faith.

166.    *Eighth*, during the strategic review process, the Board never appointed an independent representative to advocate for the Preferred Stockholders in connection with its consideration of various transactions even though it was aware, or should have been aware that the interests of Common Stockholders and Preferred Stockholders conflicted, and none of the Board

members owned any Preferred Stock (with the exception of Defendant Rogers who owned a *de minimis* number of shares of Series B Preferred Stock that were dwarfed by his holdings of Common Stock).

167.    *Ninth*, on June 3, 2021, Cedar management reported that "the liquidation value of [Cedar], if successfully executed, might be as high as $28 or $29 per share." That range matches the $29 per common share generated from the Transactions. Thus, in *substance*, the Transactions announced in March 2022 constitute the liquidation envisioned by Defendants in June 2021, and the Cedar Defendants only changed the *form* of the Transactions to an asset sale and merger to try and avoid triggering the Liquidation Preference and Conversion Right while still achieving the same payout to Common Stockholders envisioned in June 2021. In other words, at some point the Cedar Board realized that they would not hit their target payout of $29 per share if they also paid the Liquidation Preference or honored the Conversion Right, and therefore sought to structure a transaction that would purport to avoid payment of the Liquidation Preference and avoid triggering the Conversion Right while still ensuring a payout of $29 per common share to Cedar Board members and other Common Stockholders.

168.    *Tenth*, the Cedar Defendants allocated an inferior portfolio of properties to Wheeler in connection with the Wheeler Merger in terms of occupancy rates and base rents per square foot. Specifically, as of December 31, 2021, the Grocery-Anchored Properties had an (i) average occupancy rate of 88.9%, and (ii) average base rent of $15.19 per square foot, while the Wheeler Properties had (i) an average occupancy rate of only 83.7% (approximately 6% lower than the Grocery-Anchored Properties), and (ii) average base rent of only $10.70 per square foot (approximately 30% lower than the Grocery-Anchored Properties). (*See* spreadsheets annexed as Exhibit B).

169.    *Eleventh*, at least one REIT analyst at Raymond James has concurred with the allegations of bad faith herein and opined that the "driving factor" of the Transactions was to send Preferred Stockholders to "purgatory."

170.    *Twelfth*, based on the 10-Q filed by Cedar on August 4, 2022, it appears that the Cedar Defendants have without notice reduced the number of Wheeler Properties to 18 from the 19 identified in the Proxy, which would obviously reduce the purported $19.1 million in net operating income that the Proxy represented was available from the Wheeler Properties to pay Preferred Dividends.

171.    As a direct result of the Cedar Defendants' multiple breaches of contract, Plaintiffs and the Class have suffered damages and other losses in an amount to be proven at trial.

## COUNT II

### Breach of Fiduciary Duty
### (Against the Cedar Defendants)

172.    Plaintiffs reallege all of the preceding paragraphs as if fully set forth herein.

173.    The Cedar Defendants owed fiduciary duties to Preferred Stockholders under Maryland law, including without limitation, a duty to act in good faith and to maximize value for Preferred Stockholders when selling the company.

174.    The Cedar Defendants breached their fiduciary duties to Preferred Stockholders by exercising their discretion in bad faith and deliberately structuring the Transactions with the intent of injuring Preferred Stockholders and depriving them of the fruits of the Articles Supplementary. As noted above, the evidence of the Cedar Defendants' bad faith and intent to injure Preferred Stockholders is overwhelming.

175.    As a direct result of the Cedar Defendants' breaches of fiduciary duty, Plaintiffs and the Class have suffered damages and other losses in an amount to be proven at trial.

## COUNT III

### Tortious Interference With Contractual Rights
### (Against Wheeler)

176.    Plaintiffs reallege all of the preceding paragraphs as if fully set forth herein.

177.    The Articles Supplementary are a contract between Cedar and its Preferred Stockholders.

178.    As alleged above, the Cedar Defendant have breached express provisions of the Articles Supplementary and the implied duty of good faith and fair dealing in connection with structuring and consummating the Transactions.

179.    Wheeler had knowledge of the contractual rights of Preferred Stockholders under the Articles Supplementary, and cooperated with the Cedar Defendants to structure the Transactions with the intent of interfering with those contractual rights, and enriching itself and the Cedar Defendants at the expense of Preferred Stockholders. Specifically, as a result of the Transactions, Wheeler positioned itself to acquire the Wheeler Properties at a price well below their fair market value (since, as noted, the anticipated crash in the market cap of Cedar's Preferred Stock positioned Wheeler to acquire the Preferred Stock at depressed prices in future tender offers and/or open market purchases, and thereby dramatically reduce the "cost" of the Preferred Stock Obligations it assumed in exchange for the Wheeler Properties). In exchange for this economic benefit, Wheeler agreed to participate in the Transactions, and to help the Board Defendants maximize their own payout from the Transactions.

180.    As a direct result of Wheeler's tortious interference with the contractual rights of Preferred Stockholders under the Articles Supplementary, Plaintiffs and the Class have suffered damages and other losses in an amount to be proven at trial.

## COUNT IV

**Aiding and Abetting Breaches of Fiduciary Duty
(Against Wheeler)**

181.    Plaintiffs reallege all of the preceding paragraphs as if fully set forth herein.

182.    As alleged above, the Cedar Defendants breached fiduciary duties owed to Preferred Stockholders.

183.    Wheeler actively participated and cooperated with the Cedar Defendants in structuring the Transactions with the intent of enriching Defendants at the expense of Preferred Stockholders. Specifically, as a result of the Transactions, Wheeler positioned itself to acquire the Wheeler Properties at a price well below their fair market value (since, as noted, the anticipated crash in the market cap of Cedar's Preferred Stock positioned Wheeler to acquire the Preferred Stock at depressed prices in future tender offers and/or open market purchases, and thereby dramatically reduce the "cost" of the Preferred Stock Obligations it assumed in exchange for the Wheeler Properties). In exchange for this economic benefit, Wheeler agreed to participate in the Transactions, and to help the Board Defendants maximize their own payout from the Transactions.

184.    Wheeler knew that its misconduct would harm Preferred Stockholders.

185.    As a direct result of Wheeler's aiding and abetting the Cedar Defendants' breaches of fiduciary duty, Plaintiffs and the Class have suffered damages and other losses in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment in their favor and in favor of the Class as follows:

A.  Certifying the Class as defined herein under Rule 23(b)(3), appointing the Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

B.  Awarding Plaintiffs and other members of the Class damages and/or such other forms of monetary relief as may be applicable on account of the losses suffered by Plaintiffs and other members of the Class as a result of Defendants' misconduct;

C.  Awarding Plaintiffs and other members of the Class reasonable attorneys' fees and costs and expenses;

D.  Awarding Plaintiffs and other members of the Class prejudgment and post-judgment interest; and

E.  Providing any and all such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs request a trial by jury of all claims that can be so tried.

Dated:  September 9, 2022                    Respectfully submitted,


/s/ Donald J. Enright

**LEVI & KORSINSKY LLP**
Donald J. Enright
Bar Number: 13551
1101 30th Street, NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
denright@zlk.com

**WOHL & FRUCHTER LLP**
Joshua E. Fruchter (*admitted pro hac vice*)
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Tel: (845) 290-6818
jfruchter@wohlfruchter.com

**HEFFNER HURST**
Matthew Heffner
Matthew Hurst
30 North LaSalle Street, Suite 1210
Chicago, Illinois 60602
Tel: (312) 346-3466

mheffner@heffnerhurst.com
mhurst@heffnerhurst.com

**BERGER MONTAGUE PC**
Lawrence Deutsch
Andrew Abramowitz
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3062
ldeutsch@bm.net
aabramowitz@bm.net

*Counsel for Plaintiffs and [Proposed] Lead
Counsel for Putative Class*

## CERTIFICATE OF SERVICE

     I hereby certify that on September 9, 2022 service required by Fed. R. Civ. P. 5(a) has been made of the foregoing Plaintiffs' Consolidated Amended Class Action Complaint via ECF.

*/s/ Donald J. Enright*

(Bar. No. 13551)