**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | | |
|---|---|---|
| IN RE CEDAR REALTY TRUST, INC. | ) | |
| REFERRED SHAREHOLDER LITIGATION | ) | Case No.:  8:22-cv-1103-GLR |
| | ) | |
| | ) | **HEARING REQUESTED** |
| | ) | |
| | ) | |
| _____ | ) | |

## MEMORANDUM OF DEFENDANTS CEDAR REALTY TRUST, INC., CEDAR REALTY TRUST PARTNERSHIP, L.P.  AND WHEELER REAL ESTATE INVESTMENT TRUST, INC. IN SUPPORT OF THEIR MOTION TO DISMISS

Jerrold A. Thrope (Bar No. 01376)
Gordon Feinblatt LLC
1001 Fleet Street, Suite 700
Baltimore, Maryland  21202
(410) 576-4295 (Phone/Fax)
jthrope@gfrlaw.com

Elizabeth G. Clark
Alston & Bird
90 Park Avenue
15th Floor
New York, NY  10016-1387
(212) 210-9400 (Phone)
(212) 210-9444 (Fax)
Elizabeth.Clark@alston.com
*admitted pro hac vice*

*Attorneys for Defendants Cedar Realty Trust, Inc.,
Cedar Realty Trust Partnership, L.P., and
Wheeler Real Estate Investment Trust, Inc.*

TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

FACTUAL ALLEGATIONS ...............................................................................................3

LEGAL STANDARD...........................................................................................................7

ARGUMENT .......................................................................................................................8

I.      THE BREACH OF CONTRACT CLAIMS IN COUNT I SHOULD BE
        DISMISSED ............................................................................................................8

        A.      The Plaintiffs Are Not Entitled To Their Liquidation Preference As Cedar
                Remains An Operating Real Estate Company ...........................................9

        B.      The Plaintiffs Are Not Entitled To Exercise Their Limited Conversion
                Right Because Wheeler's Stock Remains Publicly Traded After The
                Merger.......................................................................................................14

        C.      The Complaint Fails To State A Claim For Breach Of The Covenant Of
                Good Faith And Fair Dealing ...................................................................15

II.     THE CLAIM AGAINST WHEELER IN COUNT III FOR INTENTIONALLY
        INTERFERING WITH THE CONTRACT BETWEEN THE PREFERRED
        STOCKHOLDERS AND CEDAR SHOULD BE DISMISSED .....................................19

        A.      The Plaintiffs Have Not Alleged A Breach Of Contract .......................20

        B.      The Plaintiffs Have Failed To Allege Facts Sufficient To State A Claim
                That Wheeler Intentionally Interfered With Their Contract...................20

        C.      The Alleged Claim For Intentional Interference With Contract Is Not
                Plausible....................................................................................................22

III.    THE CLAIM AGAINST WHEELER IN COUNT IV FOR AIDING AND
        ABETTING A BREACH OF FIDUCIARY DUTY SHOULD BE DISMISSED............24

        A.      A Claim for Aiding And Abetting A Breach Of Fiduciary Duty Does Not
                Exist Absent A Cognizable Claim That There Was A Breach of Fiduciary
                Duty...........................................................................................................25

        B.      The Plaintiffs Have Failed To Allege Facts Sufficient To State A Claim
                That Wheeler Aided And Abetted A Breach of Fiduciary Duty .............25

        C.      The Alleged Claim For Aiding And Abetting A Breach Of Fiduciary Duty
                Is Not Plausible ........................................................................................27

CONCLUSION...................................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron v. La Moderna*,
No. C 97-0233 FMS, 1997 WL 564064 (N.D. Cal. Aug. 27, 1997)........................................13

*Acme Markets, Inc. v. Dawson Enterprises, Inc.*,
253 Md. 76 (1969) ................................................................................................................12

*Alleco, Inc. v. Harry & Jeanette Weinberg Foundation, Inc.*,
340 Md. 176 (1995) ..............................................................................................................25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................................24, 27

*Blondell v. Littlepage*,
413 Md. 96 (2010) ...........................................................................................................15, 16

*Calomiris v. Woods*,
353 Md. 425 (1999) ................................................................................................................9

*Clancy v. King*,
405 Md. 541 (2008) ..............................................................................................................17

*Eastern Shore Markets, Inc. v. J.D. Associates Limited Partnership*,
213 F.3d 175 (4th Cir. 2000) ...............................................................................................15

*Edell & Associates, P.C. v. Law Offices of Peter G, Angelos*,
264 F.3d 424 (4th Cir. 2001) ...............................................................................................16

*Fowler v. Printers II, Inc.*,
89 Md. App. 448 (1991) .......................................................................................................19

*Gephardt v. Mortg. Consultants, Inc.*,
No. JFM-10-1537, 2011 WL 531976 (D. Md. Feb. 8, 2011) ................................................18

*Impac Mortg. Holdings, Inc. v. Timm*,
474 Md. 495 (2021) ..............................................................................................................11

*Impac Mortg. Holdings, Inc. v. Timm*,
245 Md. App. 84 (2020), *aff'd* 474 Md. 495 (2021)..................................................................9

*Jacobs v. Meghji*,
2019-1022-MTZ, 2020 WL 5951410 (Del. Ch. Oct. 8, 2020) ..............................................26

*Johnson Sewer and Drain Contractors, Inc. v. Nationwide Prop. & Cas. Ins. Co.*,
  No. CCB-18-1623, 2018 WL 6727086 (D. Md. Dec. 21, 2018) ...........................................18

*Jolly Roger Fund, LP v. Prime Group Realty Trust*,
  No. 24-C-06-010433, 2007 WL 3237447 (Md. Cir. Ct. Aug. 16, 2007) .........................12, 13

*Kimeldorf v. First Union Real Estate Equity and Mortgage Investments*,
  309 A.D.2d 151 (N.Y. App. Div. 2003) .............................................................................13

*Kuei-I Wu v. Mamsi Life & Health Ins. Co.*,
  No. RDB-07-1170, 2011 WL 3022571 (D. Md. July 22, 2011)...........................................17

*Macklin v. Robert Logan Associates*,
  334 Md. 287 (1994) ..........................................................................................................19

*Malpiede v. Townson*,
  780 A.2d 1075 (Del. 2001) ................................................................................................26

*Morgan v. Cash*,
  CA. No. 5053-VCS, 2010 WL 2803746 (Del. Ch. July 16, 2010).........................................26

*Mount Vernon Properties, LLC v. Branch Banking and Trust Co.*,
  170 Md.App. 457 (2006) ....................................................................................................15

*Painters' Mill Grille, LLC v. Brown*,
  716 F.3d 342 (4th Cir. 2013) .........................................................................................21, 22

*Phillips v. LCI Int'l, Inc.*,
  190 F.3d 609 (4th Cir.1999) ...............................................................................................4

*Pillar to Post, Inc. v. Maryland Home Inspectors, Inc.*,
  No. DKC-18-3761, 2020 WL 1158583 (D. Md. March 10, 2020).........................................19

*Rothschild International Corp. v. Liggett Group, Inc.* ..............................................................10
  463 A.2d 642 (Del. Ch. 1983)

*Russell v. Ethicon, Inc.*,
  No. GLR-20-1968, 2021 WL 1530086 (April 19, 2021).....................................................7, 8

*Scott v. Balto. & Ohio R.R. Co.*,
  93 Md. 475 (1901) ..........................................................................................................8,9

*Shenker v. Laureate Educ., Inc.*,
  411 Md. 317 (2009) ..........................................................................................................25

*Solid Concepts, LLC v. Fallen Soldiers, Inc.*,
  No. DKC-09-2377, 2010 WL 3123269 (D. Md. Aug. 9, 2010) ............................................18

iv

*Sutton v. FedFirst Financial Corp.*,
    226 Md. App. 46 (2015) ..................................................................................25

*Tate v. Am. Gen. Life Ins. Co.*,
    No. RDB-21-02726, 2022 WL 4225485 (D. Md. Sept. 13, 2022) ..........................................18

*Van Leer v. Deutsche Bank Secs., Inc.*,
    479 Fed. App'x 475 (4th Cir. 2012) ....................................................................18

*Wells v. Chevy Chase Bank, F.S.B.*,
    363 Md. 232 (2001) .....................................................................................9

*Williams v. Fed. Home Loan Mortg. Corp.*,
    No. PWG-13-2453, 2013 WL 6713278 (D. Md. Dec. 18, 2013) ...........................................18

*Willis v. Bank of Am. Corp.*,
    No. ELH-13-02615, 2014 WL 3829520 (D. Md. Aug. 1, 2014)...........................................18

**Other Authorities**

Chicago Manual of Style, Section 5.67 .............................................................14, 15

Fed.R.Civ.P. 12(b)(6).......................................................................... *passim*

Restatement (Second) of Torts § 766 .................................................................19

Restatement (Second) of Torts § 767 and comment a .................................................19

Restatement (Third) of Torts § 17 ..................................................................21

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | | |
|---|---|---|
| IN RE CEDAR REALTY TRUST, INC. | ) | |
| PREFERRED SHAREHOLDER LITIGATION | ) | |
| | ) | **CONSOLIDATED** |
| | ) | |
| | ) | Case No.:  8:22-cv-1103-GLR |
| | ) | |
| | ) | |

Defendants Cedar Realty Trust, Inc. ("Cedar"), Cedar Realty Trust Partnership, L.P. ("Cedar LP") and Wheeler Real Estate Investment Trust, Inc. ("Wheeler") offer this memorandum in support of their motion to dismiss Counts I, III and IV of the Consolidated Amended Class Action Complaint (the "Complaint") pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

## INTRODUCTION

Plaintiffs own preferred stock in Cedar.  When plaintiffs purchased shares of Cedar's preferred stock, they knew that, if Cedar merged into another public company, they would not be entitled to (i) receive a liquidation preference or (ii) convert their preferred stock into shares of Cedar's common stock.  Plaintiffs knew this because their rights as owners of Cedar's preferred stock are set forth in Cedar's Articles Supplementary which clearly state that neither liquidation nor conversion rights are triggered if Cedar merges into another public company.  Nevertheless, after Cedar announced it would merge into Wheeler (a public company), plaintiffs filed this lawsuit alleging that they were entitled to receive a liquidation preference and to convert their preferred stock into shares of Cedar's common stock.  As this Court recognized when it denied plaintiffs' motions to enjoin that merger, Cedar's Articles Supplementary "clearly provides" the

- 1 -

merger does not trigger plaintiffs' liquidation or conversion rights.  (06/23/22 Tr. at 8:11-12, 9:10-13).  For the same reason, the Court should now dismiss plaintiffs' claims against Cedar, Cedar LP and Wheeler, with prejudice.

The Complaint is based on two transactions.  Before the transactions, Cedar's common stock was publicly traded.  In the first transaction, Cedar sold certain of its real estate assets to a non-party and distributed the net proceeds from the sale to its common stockholders.  In the second transaction, Cedar completed a merger with a subsidiary of Wheeler.  In the merger transaction, Cedar's common stockholders were cashed out and Wheeler became the owner of Cedar. Following the merger, the preferred stockholders of Cedar remain the preferred stockholders of Cedar, retaining the same contractual rights, including contractual dividend and liquidation rights, they have always had under Cedar's Articles Supplementary.  The Cedar preferred stock also continues to be publicly traded on the New York Stock Exchange.

As set forth below, the Complaint does not state a cognizable legal claim.  In Count I, the plaintiffs allege that Cedar breached the Cedar preferred stockholders' contract rights because the transactions triggered their liquidation preference or conversion rights.  The unambiguous language of the contract – Cedar's Articles Supplementary – precludes those claims.  The plaintiffs further allege in Count I that Cedar breached the covenant of good faith and fair dealing implied into contractual obligations under Maryland law by allegedly structuring the transactions as it did.  That claim also fails because under Maryland law, the implied covenant does not expand the obligations of a party to a contract, nor does it allow a court to probe the mindset of the decision makers.  The implied covenant is limited to preventing a party to a contract from impeding another party's performance of the contract, which the Complaint does not allege occurred here.

In Count III, the plaintiffs allege that Wheeler intentionally interfered with the plaintiffs' contractual rights under Cedar's Articles Supplementary. The plaintiffs fail to state a cause of action because there was no breach, and/or because the Complaint fails to allege any actions by Wheeler from which it could be found that Wheeler intentionally interfered with the plaintiffs' contract rights.

In Count IV, the plaintiffs allege that Wheeler aided and abetted a breach of fiduciary duty by the former members of Cedar's Board of Directors (the "Cedar Board Defendants"). The Cedar Board Defendants are filing a separate motion to dismiss plaintiffs' claim for breach of a purported fiduciary duty in Count II. The plaintiffs fail to state a cause of action because there was no fiduciary duty breach, and/or because the Complaint fails to allege any actions by Wheeler from which it could be found that Wheeler aided and abetted the Cedar Board Defendants.

The plaintiffs have already had an opportunity to amend the complaint with the benefit of this Court's reasoning after their motion for a preliminary injunction was denied. Accordingly, the Complaint should be dismissed with prejudice, as the legal deficiencies cannot be cured.

## **FACTUAL ALLEGATIONS**

The factual allegations that bear on the legal claims against Cedar and Wheeler are relatively few and straightforward.

*The Articles Supplementary*

The plaintiffs own shares of Cedar's Series B or Series C Preferred Stock. As plaintiffs acknowledge: "[t]he contractual rights of the Preferred Stock are governed by [Cedar's] Articles

- 3 -

Supplementary...."[1] (¶ 46)[2]. Cedar (prior to the merger) had outstanding publicly traded common stock and publicly traded Series B and Series C preferred stock. The Cedar preferred stock remains publicly traded. (¶¶ 43-44).

The Articles Supplementary provide for the preferred stockholders to receive a liquidation preference of $25 per share only "in the event of any voluntary or involuntary liquidation, dissolution or winding up" of Cedar. (¶ 48). The Articles Supplementary expressly state that the liquidation preference is not payable (*i.e.*, there is no liquidation) upon, among other transactions: "a sale, lease, transfer or conveyance of all or substantially all of the Corporation's assets or business" or "a consolidation or merger of the Corporation with or into another entity." (¶ 49). The Articles Supplementary also provide the preferred stockholders with the right to convert their stock to Cedar common stock in certain change of control transactions. The Articles Supplementary expressly state that such a transaction triggering conversion rights occurs only where common stock does not remain publicly traded, *i.e.*, only if "neither the Corporation nor the acquiring or surviving entity has a class of common securities" publicly traded. (¶ 55). Here, the common stock of the acquiring entity, Wheeler, was publicly traded before the merger and remains publicly traded after the merger. The preferences accorded Cedar's preferred stockholders in the Articles Supplementary have not changed and cannot be changed without a two-thirds vote of the preferred stockholders. (Ex. 1, Articles, Section 6(e)).

---

[1]     A copy of the Articles Supplementary is appended hereto as Exhibit 1 (cited to as "Ex. 1, Articles"). A court may consider a document not attached to the complaint in ruling on a Rule 12(b)(6) motion where the document is explicitly relied on in the complaint and where the plaintiffs do not challenge its authenticity. *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir.1999). Here, the Articles Supplementary are quoted extensively throughout the Complaint. The Articles Supplementary for each of the two series of Cedar Preferred Stock (again, Series B and Series C) are substantively identical. (Complaint, p.17 n.5).

[2]     A cite in the form "(¶__)" is to paragraph(s) in the Complaint.

*The Merger*

Cedar agreed to sell thirty-three grocery anchored properties to a non-party for $840 million (less any mortgage debt) and to sell two mixed use projects to the same purchaser for an additional $80.5 million in cash if they had not otherwise been sold (the "Grocery Anchored Sale"). (¶ 100). Cedar distributed the net proceeds (less an amount needed to satisfy any liabilities) from the Grocery Anchored Sale to its common stockholders. (¶ 118).

Separately, Cedar entered into a merger agreement with Wheeler, by which Wheeler (after completion of the Grocery Anchored Sale) would acquire Cedar and became the owner of its common stock (the "Merger"). Post-Merger Cedar would continue to own the nineteen Cedar shopping center properties (the "Remaining Cedar Properties"), which Cedar retained – *i.e.*, that it did not sell in the Grovery Anchored Sale. (¶ 99 -100). Cedar's preferred stock would remain outstanding and publicly traded on the NYSE. (¶¶ 112, 119).

The Merger Agreement provides that Cedar's common stockholders would receive $130 million at the closing of the Merger. (¶ 117). The term sheet for a loan from Key Bank National Association ("Key Bank Term Sheet") provided the borrower would be Cedar Realty Trust, L.P. with the loan guaranteed by Cedar and Wheeler. (Ex.2, Key Bank Term Sheet).[3] Post-Merger Cedar (now owned by Wheeler) remains liable for the payment of the existing liquidation preference to Cedar's preferred stockholders should Cedar ever be liquidated.[4] (¶¶ 99-100).

---

[3]     The plaintiffs quote selectively from the Key Bank Term Sheet. (¶ 113). A copy of the Key Bank Term Sheet is appended as Exhibit 2 (cited to as "Ex.2, Key Bank Term Sheet").

[4]     While the plaintiffs continue to assert Cedar misrepresented the value of the transaction at $291.3 million, that is exactly the consideration for the transaction. Wheeler paid $130 million in cash, and post-Merger Cedar remains liable for the $161.3 liquidation preference (¶¶ 100-117), should Cedar ever be liquidated, for a total of $291.3 million.

- 5 -

The plaintiffs allege that the KeyBank Term Sheet reflects that Key Bank valued the Remaining Cedar Properties at $236.4 million.  (¶ 114).  It does not. First, Key Bank Term Sheet does not reflect the bank had obtained appraisals at the time it was issued.  Second, while the Collateral Pool Leverage required that the Remaining Cedar Properties had to be valued *at least at* $236.4 million to reach the requisite loan to value ratio for the bank to lend $130 million (*i.e.*, < 55%), the bank could have appraised the Remaining Cedar Properties for any amount greater than $236.4 million. (¶ 114). (Ex. 2, Term Sheet, Collateral Pool Covenants).  In any event, Key Bank's valuation of the Remaining Cedar Properties does not impact the legal theories against Cedar or Wheeler.

The plaintiffs further allege, based on their faulty assumption as to the value of the Remaining Cedar Properties, that the distribution of the loan proceeds left insufficient equity in Cedar and the Remaining Cedar Properties to satisfy their liquidation preference.  But even assuming this unfounded allegation were true for the purposes of this motion, it does not help the plaintiffs because Section 4(f) of the Articles Supplementary expressly provides that retaining sufficient equity to satisfy the liquidation preference is *not a factor* in determining whether a dividend or distribution by Cedar is permitted under Maryland law.

The Key Bank loan also required that the cash flow from the Remaining Cedar Properties would be at least 1.2 times the debt service and dividend preference, thereby assuring the Cedar preferred stockholders sufficient cash flow to pay their dividends.

On July 8, 2022, Cedar closed on the Grocery Anchored Sale for gross proceeds of $913 million including assumed debt. (¶ 108).  On August 22, 2022, the Merger closed. Cedar's

common stockholders received $29 cash per share as a result of the two transactions.[5] (¶ 110). Cedar's common stock has been delisted.  The Cedar preferred stock remains outstanding and listed on the New York Stock Exchange.  (¶ 112).  Cedar remains an operating real estate company.

Cedar's preferred stockholders retain their shares, as well as the liquidation and dividend preference.  Wheeler cannot profit from its acquisition of Cedar (*i.e.*, money cannot be up-streamed from Cedar to Wheeler) unless the dividends accruing to Cedar's preferred stockholders have been paid in full by Cedar. (Ex. 1, Articles, Sections 3(c) and (d)).

## LEGAL STANDARD

This Court has frequently recited the standard for addressing a Rule 12(b)(6) motion to dismiss:

> The purpose of a Rule 12(b)(6) motion is to "test[ ] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). . . . Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. *Goss v. Bank of Am., N.A.*, 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd, 546 F.App'x 165 (4th Cir. 2013). In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs*, 407 F.3d 266, 268 (4th Cir. 2005) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). But, the court need not accept unsupported or conclusory factual allegations devoid of any reference

---

[5]     While plaintiffs assert the market price for Cedar preferred stock dropped as a result of the Merger (¶¶ 124-128), they have not asserted any claim that could entitle the Cedar preferred stockholders to damages for the drop in market price of their investment.

to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

*Russell v. Ethicon, Inc.*, No. GLR-20-1968, 2021 WL 1530086 *1 - *2 (D. Md. April 19, 2021).

## ARGUMENT

## I.     THE BREACH OF CONTRACT CLAIMS IN COUNT I SHOULD BE DISMISSED

The claims against Cedar in Count I are based on an alleged breach by Cedar of its Articles Supplementary.[6]  The claims that either the liquidation preference or limited conversion right held by Cedar's preferred stockholders was triggered by the two transactions are precluded as a matter of law by the unambiguous language of the Articles Supplementary.  The claim that Cedar breached the covenant of good faith and fair dealing is precluded by the limited scope accorded that covenant as a matter of law.

The plaintiffs seek throughout the Complaint to portray the Cedar preferred stockholders as victims of alleged unfair treatment.  They ignore the fact that the Cedar preferred stockholders entered into an enforceable and beneficial contract with Cedar – one that paid them annual dividends of 7.25% or 6.5% in market conditions when interest rates approached 0%. (¶ 44).  In return for that reward, there were trade-offs.  Among the trade-offs was the express right of Cedar to enter into a merger transaction or sell its assets without triggering the preferred stockholders' liquidation preference or conversion rights. Among those trade-offs was the possibility that such a transaction might not be beneficial to the preferred stockholders or to the market for the preferred stock.  But what the plaintiffs ask the Court to ignore is that a contract is a contract.  And a preferred stockholder's rights are contractual.  S*ee Scott v. Balto. & Ohio R.R.*

---

[6]     The Cedar Board Defendants are erroneously included as defendants in the Count I breach of contract claims as they are not parties to Cedar's Articles Supplementary.

*Co.,* 93 Md. 475, 497 (1901) (preferred stock "has about it no elements or rights other than those that are conferred upon it by the statute or contract to the authority of which it owes its existence"), cited approvingly in *Impac Mortgage Holdings, Inc. v. Timm*, 245 Md. App. 84, 108-09 (2020) ("the rights of preferred stockholders are defined by contract . . ."), *aff'd* 474 Md. 495 (2021).  There is nothing untoward about holding parties to their contract, or entering into transactions that scrupulously comply with the terms of the contract.

A.     The Plaintiffs Are Not Entitled To Their Liquidation Preference As Cedar
Remains An Operating Real Estate Company

The preferred stockholders have not alleged facts from which it could be found that their liquidation preference was triggered.  Simply, Cedar remains in existence, still owns and operates nearly twenty shopping centers, and the Cedar preferred stock remains outstanding.  So Cedar obviously was not liquidated.

Maryland adheres to the objective interpretation of contracts pursuant to which words are given their ordinary meaning:

> In determining whether a writing is ambiguous, Maryland has long adhered to the law of the objective interpretation of contracts. . . . Under the objective view, a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning. . . .  *The determination of whether language is susceptible of more than one meaning includes a consideration of "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution,"* Pacific Indem. v. Interstate Fire & Cas.,* 302 Md. 383, 388, 488 A.2d 486, 488 (1985).

*Calomiris v. Woods*, 353 Md. 425, 435-36 (1999) (emphasis added) (citations omitted).  "The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed."  *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 251 (2001).  A court determines whether a contract is ambiguous.  *Id.* at 250.

The Articles Supplementary are not ambiguous.  The transactions are plainly not a liquidation because Cedar continues to exist and operate as a real estate business. Section 4(e) of the Articles Supplementary provides that "[n]one of a consolidation or merger of the Corporation with or into another entity . . . or a sale, lease, transfer or conveyance of all or substantially all of the Corporation's assets or business shall be considered a liquidation, dissolution or winding up of the corporation." (¶ 49).  The Merger is such a "merger of the Corporation [Cedar] with or into another entity."  Following the Merger, Cedar exists today as a subsidiary of Wheeler.  The preferred stockholders retain their interests in Cedar, including their rights to receive dividends and a liquidation preference in the event of a future liquidation.  Cedar's preferred stock remains publicly traded. Even under plaintiffs' alleged (but incorrect) scenario, the real estate assets of Cedar are worth over $236 million. (¶ 114).  It defies reason to state that a company with that magnitude of assets has been liquidated. Thus, the transactions plainly are not a liquidation of Cedar.  Because, as this Court recognized in its Preliminary Injunction decision, the language of the Articles Supplementary is clear and unambiguous that Cedar's preferred stockholders are not entitled to a liquidation preference in connection with either the asset sale or the merger (06/23/22 Tr. At 8:11-12), this Court need not go any further and should dismiss the plaintiffs' claim that the liquidation preference was triggered.

Plaintiffs argue that the Articles Supplementary only exclude from a liquidation mergers "that do not feature characteristics of a liquidation."[7]  However, there is no language in the

---

[7]      A merger is not a liquidation.  The preferred stockholders in *Rothschild International Corp. v. Liggett Group, Inc.*, 463 A.2d 642, 646-47 (Del. Ch. 1983), aff'd 474 A.2d 133 (Del. 1984), asserted that a tender offer followed by a merger amounted to a liquidation.  The Chancery Court disagreed, flatly stating that "[t]he Delaware General Corporation law recognizes the concept of a merger. It is separate and distinct from a liquidation or a sale of assets.".  In affirming, the Delaware Supreme Court observed that a reverse cash out merger

- 10 -

Articles Supplementary to suggest such an interpretation.  So, the plaintiffs try to manufacture an ambiguity as to the meaning of the term liquidation based on two provisions in Cedar's Articles Supplementary.  (Complaint ¶¶ 48-51).  An "[a]mbiguity arises when a term of a contract, as viewed in the context of the entire contract and from the perspective of a reasonable person in the position of the parties, is susceptible of more than one meaning."  *Impac Mortg. Holdings, Inc. v. Timm*, 474 Md. 495, 507 (2021).  There is no such ambiguity here.

The plaintiffs assert that an ambiguity arises when Section 4(a) and 4(e) of Cedar's Articles Supplementary are read together:

> . . . it is unclear whether Section 4(e) carves out all mergers and asset sales from the scope of Section 4(a) when it states that "none" of a merger or a sale of assets "shall be considered a liquidation" . . . or whether because Section 4(a) applies to "any" liquidation, Section 4(e) only carves out mergers or asset sales from Section 4(a) that do not feature characteristics of liquidation such as a discharge of all debts, distribution of all net proceeds, termination of all employees, and cancellation of equity securities...

(¶ 50).

Plaintiffs are mistaken.  Section 4(a) of Cedar's Articles Supplementary state that a liquidation preference is payable "[i]n the event of any voluntary or involuntary liquidation, dissolution or winding up."  Section 4(e) states that "[n]one of a consolidation or merger of the Corporation with or into another entity, the merger of another entity with or into the Corporation, a statutory share exchange by the Corporation or a sale, lease, transfer or conveyance of all or substantially all of the Corporation's assets or business shall be considered a liquidation, dissolution or winding up of the corporation."   There is no limiting language to suggest that only a subset of those strategic transactions is excluded from the meaning of a liquidation.  Nor

---

where the entity has retained its identity (like the Merger here) is not a liquidation. 474 A.2d at 136.

are the payment of debts or laying off employees inconsistent with a corporate merger as plaintiffs imply.  By the express terms of Section 4(e), neither the sale of Cedar's assets on the Grocery Anchored Sale nor its Merger trigger the liquidation preference in Section 4(a), either alone or taken together. The plaintiffs may not now be happy that the liquidation preference cannot be triggered by the transactions set forth in Section 4(e), but those are the terms that they agreed to when they purchased Cedar's preferred stock, and the Court cannot rewrite their contract. [8]

The plaintiffs also seek to evade the plain language of the Articles Supplementary by arguing that the Grocery Anchored Sale and the Merger, taken together, constitute a *de facto* or constructive liquidation.  The argument must be rejected because it conflicts with the clearly stated provision in the Articles Supplementary that neither an asset sale nor a merger is a liquidation.  The courts have rejected attempts to decide whether a *de facto* liquidation has occurred so as to trigger the liquidation preference where to do so would contradict the express language in the contract.  In *Jolly Roger Fund, LP v. Prime Group Realty Trust*, No. 24-C-06-010433, 2007 WL 3237447 (Md. Cir. Ct. Aug. 16, 2007) (Berger, J.), the preferred stockholders of a REIT claimed that a series of asset sales and distributions combined with the acquisition of all of the outstanding common stock by a single company constituted a constructive liquidation sufficient to trigger payment of their contractual liquidation preference.  *Id*. at *2.  The court found, however, that the provision's language excluding from the definition of "liquidation" both "a sale, lease or conveyance of all or substantially all of the Trust's property or business" and "a

---

[8]     Plaintiffs seek to invoke the doctrine of *contra proferentem* in support of their argument that any ambiguity should be construed against Cedar as the drafter of the Articles Supplementary. (¶ 51). As plaintiffs recognize, the doctrine may only come into play when the language is ambiguous, a situation not present here. *See Acme Markets, Inc. v. Dawson Enterprises, Inc.*, 253 Md. 76, 89 (1969) ("[T]he rule [construction against the drafter] is applicable only if the language to be construed is ambiguous. . .").

consolidation or merger of the Trust with one or more corporations, real estate investment trusts, or other entities" doomed the preferred stockholders' claim. *Id.* at *4. The court reasoned that this language—which is the same as the language here—left no room for it "to give the parties' agreement any greater meaning than that which is plainly evident" or to "add terms or clauses to the parties' agreement" by recognizing a contractual right to a liquidation preference based on a *de facto* liquidation. *Id.* at *4. Similarly, in *Kimeldorf v. First Union Real Estate Equity and Mortgage Investments*, 309 A.D.2d 151 (N.Y. App. Div. 2003), a New York court dismissed a preferred stockholders' breach of contract claim based on an alleged *de facto* liquidation arising from the merger of one REIT into another. The preferred stockholders claimed that the merger, combined with the "systematic liquidation of [the REIT's] property holdings" prior to the merger, constituted a *de facto* liquidation that triggered their liquidation preference. *Id.* at 155-56. The court rejected this argument because the liquidation preference provision—like the one in the Articles Supplementary here—expressly excluded both "a sale, lease or conveyance of all or substantially all of the Trust's property or business" and "a consolidation or merger of the Trust with one or more corporations, real estate investment trusts or other entities." *Id.* at 153. *See also Aaron v. La Moderna*, No. C 97-0233 FMS, 1997 WL 564064, at *7 (N.D. Cal. Aug. 27, 1997) (concluding that the liquidation preference was not triggered because the charter stated that a sale of assets was not a dissolution, liquidation, and/or winding up.) Here, as in *Jolly Roger* and *Kimeldorf*, "the clarifying and limiting language of [Section 4(e)] of the Articles Supplementary controls the outcome of this question, and precludes, as a matter of law" plaintiffs' breach of contract claim based on the purported *de facto* liquidation of Cedar. *See Jolly Roger*, 2007 WL 3237447 at *4.

For the forgoing reasons, the claim that Cedar breached the Articles Supplementary

- 13 -

9686325.

because there was a liquidation should be dismissed for failure to state a claim.

      B.      **The Plaintiffs Are Not Entitled To Exercise Their Limited Conversion Right Because Wheeler's Stock Remains Publicly Traded After The Merger**

The plaintiffs also allege that the limited right in the Articles Supplementary to convert their preferred shares to common stock is ambiguous and should be construed against Wheeler. (¶¶ 52-57).  As previously found by this Court in denying the motions to enjoin the Merger (06/23/22 Tr. At 9:10-13), the Cedar Articles Supplementary unambiguously provide there is no conversion right: "***the [] Preferred Stock is not convertible into or exchangeable for any property or other securities of the Corporation.***"  (Articles, Ex. 1, Section 7(a)).  The only exception is where there is a Change of Control, which is defined as acquisitions of Cedar in which, following the closing of the transaction, "***neither the Corporation nor the acquiring or surviving entity has a class of [publicly traded] common securities...***" (Articles, Ex. 1, Section 5(j)).  (¶ 55).  The Merger does not fit this exception because Wheeler's (*i.e.*, the acquiring entity's) common stock remains publicly traded.  (¶ 62) Therefore, the limited contractual conversion right was not triggered by the Merger.

Plaintiffs allege the "neither/nor" clause on Section 7(a) is ambiguous because it could be read to mean that the conversion right is triggered (i) only if neither the "acquiring entity" nor the "surviving corporation" has a class of publicly traded stock (which is what the language says) or (ii) whenever the "surviving entity" does not have a class of publicly traded stock (which is what the plaintiffs would like it to say).  (¶ 56).  Any objective reading of the phrase "neither the Corporation nor the acquiring or surviving entity has a class of publicly traded stock" would lead to only one conclusion – the conversion right would have been triggered only if neither corporation had a class of publicly traded stock outstanding after the transaction.  In other words, the conversion right would only be triggered if "neither the corporation [Cedar] nor the acquiring

- 14 -

[Wheeler] nor surviving [Cedar] entity has a class of publicly traded stock." [9]

Accordingly, the court should dismiss that portion of Count I alleging a trigger of the preferred stockholder's conversion right for failure to state a claim.

C.    The Complaint Fails To State A Claim For Breach Of The Covenant Of Good Faith And Fair Dealing

The third prong of plaintiffs' contract Count is that the contractual covenant of good faith and fair dealing implied in the Articles Supplementary was breached. [10]

The contractual covenant of good faith and fair dealing under Maryland law does not impose additional contractual obligations on a party.  In *Eastern Shore Markets, Inc. v. J.D. Associates Limited Partnership*, 213 F.3d 175, 182-83 (4th Cir. 2000), the Fourth Circuit described the limited scope of the implied covenant under Maryland law:

> But the covenant of good faith and fair dealing "does not obligate a [party] to take affirmative actions that the [party] is clearly not required to take under [the contract]."   *Parker v. Columbia Bank*, 91 Md.App. 346, 604 A.2d 521, 531 (1992). [parenthetical omitted].  Rather, the duty "simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract."  *Id.*
>
> . . .
>
> In short, while the implied duty of good faith and fair dealing recognized in Maryland requires that one party to a contract not frustrate the other party's performance, it is not understood to interpose new obligations about which the contract is silent, even if inclusion of the obligation is thought to be logical and wise.  An implied duty is simply a recognition of conditions inherent in expressed promises.

*Id.* at 184.  Maryland's highest Court has approved *Eastern Shores'* statement of the limited

---

[9]      The use of the verb "has" is properly singular as it relates back to the "neither" clause, both parts of which are singular ("the Corporation nor the acquiring or surviving entity"). Further, as a matter of colloquial usage, a "neither" clause can be followed by either "has" or "have" with no impact on meaning.  *See* Chicago Manual of Style Section 5.67.

[10]      As the plaintiffs recognize, there is no independent claim for breach of the implied covenant of good faith and fair dealing under Maryland law. *Mount Vernon Properties, LLC v. Branch Banking and Trust Co.*, 170 Md. App. 457, 471 – 72 (2006).

- 15 -

scope of the implied covenant of good faith and fair dealing in Maryland. *Blondell v. Littlepage,* 413 Md. 96, 113 – 14 (2010).

The Fourth Circuit again affirmed the dismissal of a claim alleging a breach of the covenant in *Edell & Associates, P.C. v. Law Offices of Peter G. Angelos,* 264 F.3d 424, 444 (4th Cir. 2001):

> Maryland law recognizes an implied covenant of good faith and fair dealing in contracts. *Eastern Shore Mkts., Inc. v. J.D. Assocs., Ltd. P'ship,* 213 F.3d 175, 182–83 (4th Cir. 2000). However, the covenant *is limited to* prohibiting one party from acting in such a manner as to prevent the other party from performing his obligations under the contract. *Id.* The covenant does not extend to imply a general duty of good faith and fair dealing in the performance of obligations under the contract that do not implicate or impair another party's performance under the contract. *See id.*
>
> Here, Edell and his law firm do not allege that the Angelos Firm prevented them from performing their obligations under the alleged contract at issue. Rather, their claim seeks redress for the Angelos Firm's alleged lack of good faith and fair dealing in performing its obligations under the alleged contract. Accordingly, the claim is not cognizable under Maryland law.

*Id.*

The plaintiffs rely on twelve alleged factors supporting their belief that the Merger was structured to be unfavorable to the preferred stockholders and therefore violated the covenant of good faith and fair dealing. (¶¶ 158-170). The plaintiffs' claim, however, is based on the faulty premise that Cedar was obligated to structure the transactions in a way that assures that its preferred stockholders would be able to take advantage of the liquidation preference or conversion right. But the Articles Supplementary do not contain any such requirement and as set forth above "the covenant of good faith and fair dealing 'does not obligate a [party] to take affirmative actions that the [party] is clearly not required to take under [the contract].'" *Blondell v. Littlepage,* 413 Md. at 114 (citation omitted). There is nothing in the Articles Supplementary that required Cedar to structure the transaction in a way that would have been favorable to its

- 16 -

preferred stockholders and, the implied covenant of good faith and fair dealing does not impose obligations on Cedar that are not part of the Articles Supplementary.

The plaintiffs also assert (based on an incorrect assumption as to the value of the Remaining Cedar Properties) that as a result of the Merger, Cedar lacks sufficient equity to fully satisfy their liquidation preference should Cedar ever be liquidated.   (¶161). The Articles Supplementary do not require that Cedar retain sufficient equity to satisfy the liquidation preference.  In fact, Section 4(f) of the Articles Supplementary provides to the contrary – *i.e.*, that Cedar can make distributions or dividends *without* regard to whether the value left in the company is sufficient to satisfy the liquidation preference.

The plaintiffs allege Cedar and Wheeler helped each other achieve their respective purported goals.  But doing so does not breach the covenant.  In *Kuei-I Wu v. Mamsi Life & Health Ins. Co.,* No. RDB-07-1170, 2011 WL 3022571 (D. Md. July 22, 2011) at *7-*8, the plaintiff contended that her automobile and health insurers breached the covenant of good faith and fair dealing by coordinating benefits and dictating the order in which those benefits were to be paid.  The Court entered judgment against the plaintiff, explaining that the defendants had not acted in a way so as to prohibit *Wu* from performing her duties under her contract. *Id.* at *8. Similarly, the plaintiffs' claims must fail here as there are no allegations that the plaintiffs were in any way prevented from performing any contractual obligations they may have had as preferred stockholders.

Notwithstanding the mountain of case law limiting the scope of the contractual covenant of good faith and fair dealing, the plaintiffs previously argued, based on inapposite cases that deal with obligations under partnership or joint venture agreements where a fiduciary duty exists, that the Articles Supplementary include an overarching contractual requirement that

- 17 -

Cedar act in good faith toward the preferred stockholders. *See, e.g., Clancy v. King*, 405 Md. 541, 571 (2008) (remanding for a determination as to whether the author Tom Clancy breached his fiduciary duty to his ex-wife (a joint venture partner) by in bad faith with intent to harm her exercising his contractual right to withdraw his name from a book series). This case, however, does not involve a partnership agreement, a fiduciary duty, or an exercise by Cedar of discretion afforded it by a term of the Articles Supplementary.  As the authority cited above demonstrates, imposing an overarching requirement of good faith in every contract would stand objective contract law on its head and is not Maryland law.

The Fourth Circuit and Maryland District Courts regularly dismiss cases asserting a breach of the covenant of good faith and fair dealing for failure to state a claim where the allegations of the complaint – like the current one – do not allege the defendant prevented the plaintiff from being able to perform its obligations under the contract.  *See, e.g., Van Leer v. Deutsche Bank Secs., Inc.*, 479 Fed. App'x 475, 480-81 (4th Cir. 2012) (affirming trial court's dismissal pursuant to Rule 12(b)(6)); *Tate v. Am. Gen. Life Ins. Co.*, No. RDB-21-02726, 2022 WL 4225485, at *7 (D. Md. Sept. 13, 2022) (granting Rule 12(b)(6) motion) (Bennett, J.); *Johnson Sewer and Drain Contractors, Inc. v. Nationwide Prop. & Cas. Ins. Co.*, No. CCB-18-1623, 2018 WL 6727086 (D. Md. Dec. 21, 2018) (same) (Blake, J.); *Willis v. Bank of Am. Corp.*, No. ELH-13-02615, 2014 WL 3829520, at *37-38 (D. Md. Aug. 1, 2014) (same) (Hollander, J.); *Williams v. Fed. Home Loan Mortg. Corp.*, No. PWG-13-2453, 2013 WL 6713278, at *5-6 (D. Md. Dec. 18, 2013) (same) (Grimm, J.); *Gephardt v. Mortg. Consultants, Inc.*, No. JFM-10-1537, 2011 WL 531976, at *2 (D. Md. Feb. 8, 2011) (same) (Motz, J.); *Solid Concepts, LLC v. Fallen Soldiers, Inc.*, No. DKC-09-2377, 2010 WL 3123269, at *3 (D. Md. Aug. 9, 2010) (same) (Chasanow, J.).  The Court should dismiss the claim here as well.

- 18 -

In short, Maryland authority on the scope of the implied contractual covenant of good faith and fair dealing does not expand Cedar's obligations under its contract, Cedar did not exercise any discretion given it by the Articles Supplementary, and Cedar did not take any action to preclude the preferred stockholders from any performance obligations. Accordingly, the allegations that Cedar breached its contractual obligation of good faith and fair dealing should be dismissed.

II.   **THE CLAIM AGAINST WHEELER IN COUNT III FOR INTENTIONALLY INTERFERING WITH THE CONTRACT BETWEEN THE PREFERRED STOCKHOLDERS AND CEDAR SHOULD BE DISMISSED**

In Count III, plaintiffs allege that Wheeler intentionally interfered with the contract between Cedar and Cedar's preferred stockholders.

The elements of the tort of intentional interference with an existing contract have long been established in Maryland. "Tortious interference with contract has five elements: (1) a contract exists between the plaintiff and a third party, (2) the defendant knows of that contract, (3) the defendant intentionally interferes with that contract (and the interference is wrongful and without justification); (4) the third party breaches that contract; and (5) the plaintiff suffers damages from the breach." *Pillar to Post, Inc. v. Maryland Home Inspectors, Inc.*, No. DKC-18-3761, 2020 WL 1158583 (D.Md. March 10, 2020) at *6 (dismissing claim); *Fowler v. Printers II, Inc.*, 89 Md. App. 448, 466 (1991) (same). Maryland follows the intentional interference tort as set forth in the Restatement (Second) of Torts §§ 766 and 767. *See, e.g., Macklin v. Robert Logan Associates*, 334 Md. 287, 297 and n.7 (1994); *Fowler*, 89 Md. App. at 466. The intentional interference element of the interference tort requires both intentional and improper conduct on the part of the defendant done for the purpose of interfering with the contract. Restatement (Second) of Torts § 767 comment a.

- 19 -

The tortious interference count should be dismissed because: (1) there was no breach of contract; (2) the Complaint lacks factual allegations that could establish a claim of intentional interference with a contract; and/or (3) plaintiffs' allegations fail to meet the plausibility pleading standard needed to survive a Rule 12(b)(6) motion to dismiss.

A.     The Plaintiffs Have Not Alleged A Breach Of Contract

The necessary predicate for the intentional interference claim is that Cedar "breached express provisions of the Articles Supplementary and the implied duty of good faith and fair dealing in connection with structuring and consummating the Transactions."  (¶ 178).  Because, as set forth above, Cedar did not breach the Articles Supplementary, the interference count should be dismissed.

B.     The Plaintiffs Have Failed To Allege Facts Sufficient To State A Claim That Wheeler Intentionally Interfered With Their Contract

The plaintiffs allege that Wheeler interfered with their contract with Cedar – *i.e.*, the Articles Supplementary.  The interference cannot be the Merger itself.  Rather, the interference would have to arise out of Wheeler's actions in allegedly convincing Cedar not to fulfill its contractual obligations to Cedar's preferred stockholders after Wheeler became aware of those obligations.

The Complaint lacks any allegations that Wheeler participated in or interfered with Cedar's decision to pursue the Grocery Anchored Sale and the Merger. The plaintiffs allege that on January 19, 2022, representatives of Wheeler met with the chair of Cedar's Board to discuss a potential transaction.  (¶ 97).  On January 27, 2022, Wheeler submitted a bid to acquire Cedar and the Remaining Cedar Properties for $284 million less the liquidation preference, with the preferred stock to remain outstanding.  (¶ 99).  The Cedar Board thereafter elected to sell some of its assets to a non-party in the Grocery Anchored Sale and proceed with the Merger rather

- 20 -

than pursue some other transaction. (¶¶ 100 - 101). The Complaint fails to allege any intentional act by Wheeler that could result in a finding that Wheeler intentionally interfered with the contractual rights between Cedar and its preferred stockholders. [11]

The plaintiffs fail to allege what Wheeler did to cause Cedar to purportedly breach its obligations in the Articles Supplementary to Cedar's preferred stockholders. The plaintiffs merely allege that Wheeler "participated" in negotiations of a merger that Wheeler deemed beneficial. (¶ 179). The Complaint does not even try to explain how Wheeler allegedly interfered with the preferred stockholders' contractual rights, let alone how it did so improperly.[12]

A plaintiff is required to allege how a defendant allegedly caused a third party to breach its contract in order to state a claim. In *Painters' Mill Grille, LLC v. Brown,* 716 F.3d 342, 354 (4th Cir. 2013), the Fourth Circuit affirmed the dismissal of an interference claim as lacking plausibility because it failed to allege how the defendant accomplished the alleged interference:

> . . . Painter's Mill Grille alleged that the defendants intentionally induced the Hineses to cause their company, CiboGrille, to breach its contract to buy the restaurant from Painter's Mill Grille. Yet Painter's Mill Grille's remaining

---

[11] The plaintiffs hurl barbs at Wheeler and its management, including their allegedly poor treatment of Wheeler's own preferred stockholders. (¶¶ 69-87) Those allegations are extraneous to the legal issues before the Court in this motion. Further, while the plaintiffs rely on naked allegations made by Wheeler's preferred stockholders in other litigation, those allegations have no probative force as shown by the Circuit Court of Baltimore County's grant of Wheeler's dispositive motion in one of those cases. *Steamboat Capital Partners Master Fund, LP v. Wheeler Real Estate Investment Trust, Inc.*, Balt. Co. Cir. Ct., Case No. C-03-CV-21-003533 (September 20, 2022). In any event, the Articles Supplementary prohibit any change to preferences accorded Cedar's preferred stock absent the approval by two-thirds of Cedar's preferred stockholders. (Ex. 1, Articles, Section 6(e)).

[12] The Restatement (Third) of Torts § 17 provides that interference with an existing contract is wrongful under any of three circumstances, none of which are alleged here: "(a) the defendant acted for the purpose of appropriating the benefits of the plaintiff's contract; (b) the defendant's conduct constituted an independent and intentional legal wrong; or (c) the defendant engaged in the conduct for the sole purpose of causing harm to the plaintiff."

- 21 -

> allegations regarding *how* the defendants intentionally interfered with this contract fail to state a claim that is facially plausible. Painter's Mill Grille relies on allegations that Sachs and Bell made "unfounded derogatory comments and accusations about [the restaurant], the Plaintiffs, and the Plaintiffs' African–American clientele" at the April 2009 meeting and that Sachs repeatedly used the term "chicken and waffle shack." But without providing any additional factual allegations regarding what Sachs and Bell said, these allegations fail to explain how the statements could form the basis for an interference claim. At bottom, the complaint does not plausibly allege that Sachs and Bell made these comments intending to induce the Hineses to breach the contract with Painter's Mill Grille.

*Id.* at 354.  Here, there are no allegations whatsoever as to how Wheeler allegedly induced Cedar to breach its contract to pay Cedar's preferred stockholders their liquidation preference or exercise their conversion rights.  According to the Complaint, Wheeler suggested a merger agreement where it would acquire Cedar and the Remaining Cedar Properties and cash out Cedar's common stockholders, with Cedar's preferred stockholders remaining as Cedar preferred stockholders.  That cannot amount to interference with the rights of Cedar's preferred stockholders.

Because the plaintiffs do not allege that Wheeler did anything to cause Cedar to allegedly breach its Articles Supplementary, the plaintiffs have failed to state a claim against Wheeler for intentional interference with plaintiffs' contractual rights.

In addition, as set forth above, the Cedar preferred stockholders could not have had any expectation that their liquidation preference would remain fully funded as Section 4(f) of the Articles Supplementary expressly provide that Cedar did not have to take the liquidation preference into account in making dividends or distributions. Absent a contractual obligation, there can be no interference with contract.

C.     The Alleged Claim For Intentional Interference With Contract Is Not Plausible

The plaintiffs allege in a conclusory manner a chain of potential future events unsupported by facts to support their tort claims.  They allege that Wheeler agreed with Cedar to

- 22 -

structure the merger transaction, with knowledge that the stock price of Cedar's preferred stock would drop, thereby positioning Wheeler at some unknown time in the future to be able to acquire the Cedar preferred stock on the open market through tender offers, if Wheeler ever had the cash to do so, which if it ever came to pass would result in Wheeler having acquired Cedar and the Remaining Cedar Properties at a discount, because the future cost of acquiring Cedar's preferred stock on the open market would be less than the liquidation preference used to calculate Wheeler's acquisition cost of Cedar and the Remaining Cedar Properties.  (¶ 179).  The plaintiffs do not allege any facts to suggest that Wheeler ever contemplated any such a course of action.  The plaintiffs do not allege any reason why any belief held by Wheeler that the market price of Cedar's preferred stock would drop when the transaction was announced can give rise to an interference claim against Wheeler based on a farfetched yarn about what *might* happen in the future.  Even if deemed conceivable, the plaintiffs' conclusory speculation is not plausible.

Wheeler acquired additional shopping centers by acquiring Cedar. It is not plausible that Wheeler's intent in doing so was to harm Cedar's preferred stockholders through the hypothetical future stream of events rather than engaging in an acquisition of a company holding valuable real estate assets similar to those already owned and operated by Wheeler. And Wheeler did not misappropriate the benefits held by Cedar's preferred stockholders because Cedar's preferred stockholders' dividend and liquidation preferences under the Articles Supplementary remain following the Merger.

Wheeler acquired Cedar and the Remaining Cedar Properties to have an investment in additional shopping centers consistent with Wheeler's existing business, using the cash flow from those shopping centers to service debt against those properties, with a cash flow sufficient to pay dividends to Cedar's preferred stockholders with the hope of eventually making a profit

- 23 -

on those properties.   There is nothing in the allegations to support the hypothetical future sequence of events the Complaint posits as conceivable.   A complaint cannot stand where the allegations are "'merely consistent with' a defendant's liability, [but] it 'stops short of the line between possibility and plausibility of entitlement to relief'" needed to state a claim.   *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. 544, 557 (2007)).[13]

For any of these reasons, the interference count should be dismissed.

III.   <u>**THE CLAIM AGAINST WHEELER IN COUNT IV FOR AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY SHOULD BE DISMISSED**</u>

In Count IV, the plaintiffs allege that Wheeler aided and abetted the supposed breach of fiduciary duty by the Cedar Board Defendants.   The plaintiffs base their allegations on the same speculative sequence of future events that form the basis of the interference claim – *i.e.*, Wheeler intended at some point in the future (if it only had the funds) to complete the acquisition of Cedar and the Remaining Cedar Properties for a bargain by purchasing the Cedar preferred stock on the market at a depressed price.   (¶¶ 179-83).   According to the plaintiffs, in exchange for this hypothetical bonanza, Wheeler helped the Cedar Board Defendants enter into a transaction that was a breach of their duties to the preferred stockholders.   (¶ 183).

The aiding and abetting claim based on this fiction should be dismissed for any of three reasons:  (1) the Cedar Board Defendants had no duty beyond honoring the preferred stockholders' contract, and therefore did not breach any alleged fiduciary duty to the preferred stockholders, so Wheeler could not have aided and abetted a breach of fiduciary duty; (2) the

---

[13]   The plaintiffs allege an array of speculative horribles they imagine might occur in the future.  For example, they muse that Cedar preferred stock could be delisted at some point in the future or that Wheeler may be unable to find a lender to refinance the $130 million loan.  (¶¶ 119, 143-44). These allegations are not facts; they are conjecture.   Such conclusory speculation without any supporting facts fails to make plausible any of the plaintiffs' otherwise insufficiently alleged legal theories.

- 24 -

complaint is devoid of factual allegations that establishes an aiding and abetting claim; and/or (3) plaintiffs' allegations fail to meet the plausibility pleading standard needed to survive a Rule 12(b)(6) motion to dismiss.

A.     A Claim for Aiding and Abetting A Breach of Fiduciary Duty Does Not Exist Absent A Cognizable Claim That There Was A Breach of Fiduciary Duty

In the absence of any fiduciary duty to the preferred stockholders, there can be no claim for aiding and abetting a breach of fiduciary duty. *Alleco, Inc. v. Harry & Jeanette Weinberg Foundation, Inc.*, 340 Md. 176 (1995) (an aiding and abetting claim exists only where another person has acted tortiously). As set forth in the motion to dismiss filed by the Cedar Board Defendants, no such duty exists and even if it did, the Complaint fails to allege a breach. Rather, the holders of Cedar's preferred stock are only entitled to what their contract with Cedar (the Articles Supplementary) provides. Accordingly, the Complaint fails to state a claim for aiding and abetting the breach of fiduciary duty.

B.     The Plaintiffs Have Failed To Allege Facts Sufficient To State A Claim That Wheeler Aided And Abetted A Breach Of Fiduciary Duty

The Complaint fails to allege actions by Wheeler that could establish aiding and abetting a breach of fiduciary duty. As set forth above, the preferred stockholders merely allege that Wheeler negotiated a merger transaction with Cedar.

Wheeler is not alleged to have taken any actions beyond those which would be taken by any entity seeking to acquire Cedar. Maryland's appellate courts have twice affirmed the dismissal of claims of aiding and abetting a breach of fiduciary duty in the strategic transaction context, based on the failure of the plaintiffs to allege that the defendants did anything more than take actions "normally attendant" to an entity pursuing the acquisition of a public corporation. *Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 353 – 54 (2009); *Sutton v. FedFirst Financial Corp.*, 226 Md. App. 46, 91 – 92 (2015). The same result should apply here.

- 25 -

In recognizing that there is nothing inherently wrongful with a party negotiating an acquisition of another entity, the Delaware Supreme Court has addressed when a complaint contains sufficient allegations to establish a claim that the acquiring entity aided and abetted an alleged breach of fiduciary duty to the common stockholders by the directors of the target corporation. *Malpiede v. Townson*, 780 A.2d 1075, 1096 – 97 (Del. 2001) (affirming dismissal for failure to state a claim). A claim may be stated where the bidder "attempts to create or exploit conflicts of interest in the board." *Id.* Here, there are no allegations of any conflicts among the members of Cedar's Board. A claim may also be stated where the acquiring entity knows the actions constitute a breach of fiduciary duty and the "bidder and the board conspire in or agree to the fiduciary breach." In affirming the dismissal, the Delaware Supreme Court in *Malpiede* affirmed the Chancery Court's conclusion that the claim should be dismissed because the plaintiff failed to adequately allege facts that would support a claim that the defendant participated in the decision by the target's board, conspired with the target's board, or otherwise caused the target's board to make the decisions that it did. *Id.* The same is true here.[14]

The plaintiffs fail to allege that Wheeler had any ability to influence the Cedar Board or that it participated in that Board's decision making process or conspired with Cedar's Board on

---

[14]    In *Morgan v. Cash*, CA. No. 5053-VCS, 2010 WL 2803746 (Del. Ch. July 16, 2010), the Delaware Chancery Court dismissed for failure to state a claim aiding and abetting allegations against an acquiring entity. In that case, the board members of the target owned preferred stock, and had entered into a merger where the preferred stockholders received all the consideration and the common stockholders received nothing. The plaintiff, a common stockholder, was miffed. In dismissing the aiding and abetting claim, the Court aptly noted "the long-standing rule that arm's length bargaining is privileged and does not, absent actual collusion and facilitation of fiduciary wrongdoing, constitute aiding and abetting helps to safeguard the market for corporate control by facilitating the bargaining that is central to the American model of capitalism." *Id.* at 8. The Delaware Chancery Court continues to take a hard line against attempts to allege aiding and abetting liability by an acquiring entity. *See Jacobs v. Meghji*, 2019-1022-MTZ, 2020 WL 5951410 (Del. Ch. Oct. 8, 2020) (dismissing claim because the plaintiff did not allege facts sufficient to satisfy the "stringent scienter requirement" that the defendant knows wrongdoing is afoot and has exploited it.).

9686325.

how to structure the transaction.  The best plaintiffs can do is to broadly assert that Wheeler "actively cooperated" with Cedar's Board of Directors.  (¶ 17).  But that can be said of every negotiation where the parties strive to reach a deal both will accept.  Here, according to the Complaint, Wheeler suggested the deal structure by which the Cedar preferred stock would remain outstanding, and the Cedar Board independently agreed to pursue such a transaction.

The plaintiffs have failed to allege facts sufficient to state a claim against Wheeler for aiding and abetting a breach of fiduciary duty.

C.   The Alleged Claim For Aiding And Abetting A Breach Of Fiduciary Duty Is Not Plausible

Even if, *arguendo*, the Cedar Board owed a fiduciary duty to Cedar's preferred stockholders and plaintiffs have asserted a claim the hypothetical duty was breached (they do not), the plaintiffs have not alleged a plausible scenario to support a claim that Wheeler aided and abetted any breach of that purported duty, for the same reason the interference claim fails to state a plausible claim.

Wheeler acquired Cedar with the intent of making a profit.   Under the Articles Supplementary, Wheeler cannot make any distributions to itself unless Cedar's preferred stockholders have received their dividend preference.  (Articles, Ex. 1, Section 3 c and d).  As set forth above, there is not a single fact alleged to support the plaintiffs' conclusion that because Wheeler (supposedly) knew all along that the price of Cedar preferred stock would plummet, Wheeler entered into the transaction intending to acquire the Cedar preferred stock on the market for a price less than the liquidation preference, that Wheeler had any plans to acquire the Cedar preferred stock on the open market, or that Wheeler either had or would have the financial ability to do so.  A complaint pleading facts that are "merely consistent with" a defendant's liability, "stops short of the line between possibility and plausibility of 'entitlement to relief'" required to

state a claim, and should be dismissed. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Accordingly, the plaintiffs have failed to state a claim for aiding and abetting an alleged breach of fiduciary duty.

## **CONCLUSION**

For the foregoing reasons, the Court should, pursuant to Fed. R. Civ. P. 12(b)(6), dismiss Counts I, III and IV of the Complaint for failure to state a claim upon which relief can be granted.

*/s/ Jerrold A. Thrope*
Jerrold A. Thrope (Bar No. 01376)
Gordon Feinblatt LLC
1001 Fleet Street, Suite 700
Baltimore, Maryland  21202
(410) 576-4295 (Phone/Fax)
jthrope@gfrlaw.com


*/s/ Elizabeth G. Clark*
Elizabeth G. Clark
Alston & Bird
90 Park Avenue
15th Floor
New York, NY  10016-1387
(212) 210-9400 (Phone)
(212) 210-9444 (Fax)
Elizabeth.Clark@alston.com
*admitted pro hac vice*

*Attorneys for Defendants Cedar Realty Trust, Inc.,*
*Cedar Realty Trust Partnership, L.P., and*
*Wheeler Real Estate Investment Trust, Inc.*

9686325.