**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 23-1905**

———————

JULIA KIM, DAVID SYDNEY, MARTIN NOVICK, J. RENEE BRENNAN LIVING
TRUST, SCOTT SCHROEPFER, AND KENNETH KAMHOLZ, individually and on
behalf of others similarly situated,

        Plaintiffs – Appellants,

    v.

CEDAR REALTY TRUST, INC., BRUCE J. SCHANZER, GREGG A. GONSALVES,
ABE EISENSTAT, STEVEN G. ROGERS, SABRINA KANNER, DARCY D. MORRIS,
RICHARD H. ROSS, SHARON STERN, CEDAR REALTY TRUST PARTNERSHIP,
L.P., AND WHEELER REAL ESTATE INVESTMENT TRUST, INC.,

        Defendants – Appellees.

———————

Appeal from the United States District Court for the District of Maryland, at Baltimore.
George L. Russell, III, Chief District Judge.  (No. 22-cv-01103)

———————

Argued:  May 9, 2024                 Decided:  September 4, 2024

———————

Before DIAZ, Chief Judge, and NIEMEYER and RICHARDSON, Circuit Judges.

———————

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Chief Judge
Diaz and Judge Niemeyer joined.

———————

**ARGUED:** Matthew Thomas Heffner, HEFFNER HURST, Chicago, Illinois, for Appellants. William M. Jay, GOODWIN PROCTOR, LLP, Washington, D.C.; Jerrold A. Thorpe, GORDON FEINBLATT LLC, Baltimore, Maryland, for Appellees. **ON BRIEF:** Matthew Hurst, HEFFNER HURST, Chicago, Illinois; Joshua E. Fruchter, WOHL & FRUCHTER LLP, Monsey, New York; Lawrence Deutsch, Andrew D. Abramowitz, BERGER MONTAGUE PC, Philadelphia, Pennsylvania; Donald J. Enright, LEVI & KORSINSKY, LLP, Washington, D.C., for Appellants. Benjamin Hayes, Washington, D.C., Douglas H. Flaum, New York, New York, Jennifer Burns Luz, GOODWIN PROCTER LLP, Boston, Massachusetts, for Director Appellees.

RICHARDSON, Circuit Judge:

It happens to all of us—you buy something and later come to regret it. It may be a toy you splurge on for your kids that they only play with once, a gym membership you never use, or a wild-patterned shirt that you later realize was not just a risky fashion choice but an unforgiveable one. For Plaintiffs here, it is their preferred stock in Cedar Realty Trust.

This buyers' remorse began after Cedar made a series of transactions that resulted in another corporation, Wheeler Properties, acquiring Cedar. When it was acquired, Cedar delisted its publicly traded common stock and paid Cedar common stockholders for their shares. Yet Cedar's preferred stock remained outstanding, and its holders received nothing from the transactions. Meanwhile, the value of those preferred shares tanked.

So Plaintiffs—a putative class of preferred stockholders—sued. They allege that Cedar and its directors breached the contractual and fiduciary duties they owe preferred stockholders by structuring the transactions to rob them of their preferential rights. And they claim that Wheeler tortiously interfered with their contractual rights and aided and abetted Cedar's breach of fiduciary duties.

Plaintiffs now appeal the district court's dismissal of each count of their complaint. But Plaintiffs' complaint does not allege that Cedar or its directors breached any duty— contractual or fiduciary—they owed Plaintiffs. In fact, the complaint does not allege they did anything except comply with the contractual terms Plaintiffs agreed to upon purchasing the preferred stock. Also, since the claims against Wheeler require alleging underlying

3

breaches of contract and fiduciary duties, the complaint fails to state those claims, too.  So

we affirm.

## I.     Background

### A.     Cedar's Preferred Stock

Cedar Realty Trust is a real estate investment trust whose focus is "primarily . . .

ownership, operation and redevelopment of grocery-anchored shopping centers in high-

density urban markets from Washington, D.C. to Boston."  J.A. 32.[1]  As of July 2021, all

classes of its stock were publicly traded on the New York Stock Exchange.  These classes

included common stock and two series of preferred stock, Series B and Series C.[2]

Cedar preferred stockholders' rights are laid out in the Articles Supplementary.  The

perks of the preferred stock are typical—dividend rights and a liquidation preference.  As

for dividend rights, each preferred stockholder is guaranteed an annual fixed amount per

---

[1] Upon review of an order granting or denying a motion to dismiss for failure to state a claim, we consider the complaint's well-pleaded allegations (which we accept as true), *Langford v. Joyner*, 62 F.4th 122, 124–26 (4th Cir. 2023), as well as "documents that are explicitly incorporated into the complaint by reference," *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).  Our opinion thus relies on Plaintiffs' complaint and the documents it references.

[2] Common stock is "[a] class of stock entitling the holder to vote on corporate matters, to receive dividends after other claims and dividends have been paid (esp. to preferred shareholders), and to share in assets upon liquidation," while preferred stock is "[a] class of stock giving its holder a preferential claim to dividends and to corporate assets upon liquidation but that usu[ally] carries no voting rights."  *Stock*, *Black's Law Dictionary* (11th ed. 2019).

share ("Preferred Dividend").[3]    For example, annually Series C holders receive "cumulative preferential cash dividends at the rate of 6.50% of the liquidation preference . . . (which is equivalent to a fixed annual amount of $1.625 per share of Series C Preferred Stock)." J.A. 337. Preferred Dividends have priority over—that is, they must be paid before—any dividends to common stockholders. In addition, preferred stockholders receive priority payouts of $25 per share, plus any accrued and unpaid dividends, "upon liquidation, dissolution or winding up" ("Liquidation Preference"). *Id*. Yet under the Articles, a merger or asset sale is not a liquidation, dissolution, or winding up of the Corporation.

Relevant here, the Articles also provide that preferred stockholders get a "Conversion Right." J.A. 343. This right allows preferred stockholders "to convert some or all of" their preferred stock into common stock "[u]pon the occurrence of a Change of Control." *Id*. The Articles provide that a Change of Control happens when (1) someone obtains more than 50% of Cedar's voting shares and (2) "neither the Corporation nor the acquiring or surviving entity" has publicly traded stock after that acquisition. J.A. 341.

The Articles do not give preferred stockholders other relevant rights or preferences. For example, the Articles contain no mandatory redemption right, meaning "there is no provision allowing Preferred Stockholders to *demand* their Preferred Stock at par." J.A. 45. It's Cedar's choice to redeem them or not. Nor do the Articles grant preferred

---

[3] When to declare Preferred dividends is largely at the discretion of Cedar's Board of Directors. But if the Board doesn't authorize the Preferred Dividend, they "accrue and cumulate" for later payment. J.A. 338.

stockholders any other rights (such as voting or representation rights) relating to a Change of Control, sale of stock or assets, or similar transaction. *See* J.A. 350 ("The shares of . . . Preferred Stock shall not have any preferences, conversion or other rights . . . other than those specifically set forth in these Articles Supplementary."). The relevant rights of Cedar's preferred stockholders, in sum, boil down to (1) annual Preferred Dividends, (2) the Liquidation Preference "upon liquidation, dissolution or winding up," and (3) the Conversion Right conditioned "upon a Change of Control," as defined in the Articles.

### B.    The Transactions

In July 2021, Cedar's Board of Directors began considering liquidating or selling the Corporation. It settled on selling Cedar by "splitting up Cedar's assets into multiple portfolios consisting of Grocery-Anchored Properties, Mixed-Use Projects" and what assets remained in the company (referred to as "Remainco" assets), and selling each portfolio separately. J.A. 56-57. The portfolio sales occurred in two separate transactions (together, "the Transactions"). First, the Board agreed to sell to a single, nonparty buyer its Grocery-Anchored Properties for $840 million in cash and its Mixed-Use Projects for $80.5 million in cash. Second, Cedar agreed to a merger with Wheeler Properties. It did this through a transaction known as "reverse triangular merger." We can break the Wheeler transaction down into four steps.

*Step one.* Cedar used the profits from the sale of the Grocery-Anchored and Mixed-Use properties to pay common stockholders a "Closing Dividend."

*Step two.* Wheeler created a shell subsidiary ("Wheeler Sub") that had one share of common stock privately held by Wheeler.

6

*Step three.* On August 22, 2022—the merger's effective date—two things happened simultaneously: (1) Wheeler Sub merged into Cedar with Cedar being the "Surviving Entity" and (2) all of Cedar's outstanding common stock was delisted and became redeemable for a sum certain per share.

*Step four.* Wheeler obtained a $130 million loan to form a fund from which Cedar common stockholders could redeem their cancelled stock.

In the end, Cedar emerged with a single share of common stock outstanding—the former share of Wheeler Sub. That share remains owned by Wheeler and is not publicly traded, though Wheeler itself has publicly traded stock. As for Cedar's common stockholders, they received a total of about $29 per share between the Closing Dividend and the post-merger redemption payment. Cedar preferred stock, for its part, remained outstanding, and "[a]s of August 2022, [its] market cap . . . had fallen from $151 million to $52 million." J.A. 26, 397. But before, during, and after the transactions, Preferred Stockholders continued to receive their annual one-buck-and-change-per-share Preferred Dividend.

## C.    Procedural History

In May 2022, a putative class of preferred stockholders sued Cedar and members of its Board,[4] along with Wheeler. After the district court dismissed their motion to

---

[4] The Cedar Defendants also include the Cedar Realty Trust Partnership, L.P. ("the Cedar Partnership"), to which Cedar "has contributed substantially all of its assets" and through which Cedar "conducts substantially all of its business." J.A. 32. But the distinction between Cedar and the Cedar Partnership is not relevant to this appeal.

7

preliminarily enjoin the Transactions, the Transactions closed in August.  So in September, Plaintiffs filed an Amended Complaint ("the Complaint").  It alleges four counts.

Count One is a breach of contract claim against Cedar and the Board members (together, "Cedar Defendants").  According to Plaintiffs, the Transactions amounted to a "Change of Control," but Cedar Defendants never gave them the Conversion Right they were due.[5]  J.A. 75.  Plaintiffs also allege that "Cedar Defendants breached the duty of good faith and fair dealing implied in the Articles . . . under Maryland law by exercising their discretion in bad faith and deliberately structuring the Transactions with the intent of injuring Preferred Stockholders and depriving them of the fruits of the Articles Supplementary."  J.A. 75–76.

Count Two alleges that Cedar Defendants breached the fiduciary duty they owe Plaintiffs.  This duty, Plaintiffs assert, "includ[es] without limitation[] a duty to act in good faith and to maximize value for Preferred Stockholders when selling the company."  J.A. 80.  And Cedar Defendants allegedly breached that duty when they "exercis[ed] their discretion in bad faith and deliberately structure[d] the Transactions" to "injur[e] Preferred Stockholders and depriv[e] them of the fruits of the Articles."  *Id.*

Counts Three and Four are against Wheeler.  Count Three is a claim of tortious interference with contractual rights alleging that Wheeler knew of the contractual

---

[5] The Complaint also alleges that Cedar breached the Articles by not honoring the Liquidation Preference.  But Plaintiffs do not challenge the district court's dismissal of that claim in this Court, so we do not address it.  *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to 'develop its argument'—even if its brief takes a passing shot at the issue." (cleaned up)).

Conversion Right and the implied covenant of good faith and fair dealing yet "cooperated with Cedar Defendants to structure the Transactions with intent of interfering with those contractual rights." J.A. 81. Lastly, Count Four alleges that Wheeler aided and abetted Cedar Defendants' breach of their fiduciary duties.

Defendants moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court granted the motions, dismissing the Complaint with prejudice. *Kim v. Cedar Realty Tr., Inc.*, No. GRL-22-1103, 2023 WL 4896635 (D. Md. Aug. 1, 2023).

For the breach-of-contract claim against Cedar,[6] the district court determined that the definition of Change of Control "clearly and unambiguously means that both Wheeler and Cedar cannot have publicly traded stock for a change of control to occur." *Id.* at *8. Since Wheeler had publicly traded stock after the Transactions, no contractual Change of Control occurred and no Conversion Right existed. So the court dismissed the express contractual claim. The district court also dismissed the implied-duty-of-good-faith-and-fair-dealing claim because "[i]t is well-settled law that Maryland does not recognize an independent cause of action for breach of the implied duty of good faith and fair dealing." *Id.* (citing *Mount Vernon Props., LLC v. Branch Banking & Tr. Co.*, 907 A.2d 373, 381 (Md. Ct. Spec. App. 2006)).

---

[6] The district court dismissed the breach of contract claim against the Director Defendants because the Articles are between Plaintiffs and Cedar—not Plaintiffs and the Director Defendants—and "a person cannot be held liable under a contract to which he was not a party." *Kim*, 2023 WL 4896635, at *4 (quoting *Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc.*, 728 A.2d 783, 794 (Md. Ct. Spec. App. 1999)).

As for the breach-of-fiduciary-duty claim, the district court explained that, while a "board generally owes [preferred stockholders] fiduciary duties like those owed to common stockholders," *id.* at \*5, the duties differ because "preferred stock's preferential rights . . . are defined by contract (in this case the Articles)." *Id.* (quoting *Poling v. CapLease, Inc.*, No. 0700, 2016 WL 1749803, at \*3 (Md. Ct. Spec. App. May 3, 2016). Claims that arise from the duties listed in the Articles are thus treated as breach-of-contract claims. Since Plaintiffs' claims dealt with their rights in a merger—which the Articles cover—and the Articles do not include any rights which Plaintiffs alleged Director Defendants violated, the district court dismissed the claim as duplicative of the breach-of-contract claim.

Finally, the district court dismissed the claims against Wheeler. It explained that tortious interference with contract requires alleging an underlying breach of contract, while aiding and abetting the breach of fiduciary duty requires alleging an underlying breach of fiduciary duty. Since the district court had determined the Complaint alleged neither, it dismissed the two claims against Wheeler.

Plaintiffs timely appealed.

## II.    Discussion

In seeking our review, Plaintiffs argue that the Complaint adequately states a claim for each of its four counts. We disagree and therefore affirm the district court's order.[7]

---

[7] We review a district court's Rule 12(b)(6) dismissal *de novo*. *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 179 (4th Cir. 2009). "To survive a Rule 12(b)(6) motion, '[f]actual allegations must be enough to raise a right to relief above the speculative level' and have 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* at 180 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). But we "'need not accept (Continued)

## A.    Subject Matter Jurisdiction

Like all federal courts, we have an independent obligation to ensure that we have subject matter jurisdiction, even if no party challenges it. *Jones v. U.S. Merit Sys. Prot. Bd.*, 103 F.4th 984, 992 (4th Cir. 2024). In this case, the district court purported to exercise jurisdiction pursuant to 28 U.S.C. § 1332(d). That subsection, also known as the Class Action Fairness Act ("CAFA"), provides an exception to § 1331's general rule of complete diversity. Both sides in this case appear to agree that Plaintiffs satisfy this exception: (1) the putative class contains at least one hundred class members; (2) the parties share minimal diversity; and (3) the amount in controversy exceeds five million dollars, exclusive of interest and costs. § 1332(d)(2)(A), (5)(B), (6).

Yet there's one potential hangup. CAFA establishes several carveouts from its exception to § 1331's complete-diversity requirement. In particular, § 1332(d)(9) provides that the exception does not apply to

> any class action that solely involves a claim . . . (B) that relates to the internal affairs or governance of a corporation or other form of business enterprise and that arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized; or (C) that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security . . . .

§ 1332(d)(9)(B)–(C). Pursuant to § 1332(d)(9), the Second Circuit dismissed for lack of subject matter jurisdiction a nearly identical action that a different group of Cedar preferred

---

the [plaintiff's] legal conclusions drawn from the facts,' nor . . . 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Id.* (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006) (first alteration in original)).

stockholders brought against Defendants. *Krasner v. Cedar Realty Tr., Inc.*, 86 F.4th 522, 529–31 (2d Cir. 2023).

In this Circuit, however, the Second Circuit's path is foreclosed. We held in *Dominion Energy, Inc. v. City of Warren Police & Fire Retirement System* that a claim for aiding and abetting breach of fiduciary duty against a corporate outsider does not "relate[] to" internal corporate governance or the rights and duties created by a security. 928 F.3d 325, 335–43 (4th Cir. 2019). So a class action that includes such a claim does not "solely involve[]" the types of claims enumerated in § 1332(d)(9) and thus falls outside the statute's jurisdictional exceptions. *Id.* Because Plaintiffs' action includes a claim for aiding and abetting breach of fiduciary duties against Wheeler, we are bound by our prior decision to hold that the district court had jurisdiction over Plaintiffs' action.[8]

## B.      Breach of Contract

Plaintiffs contend that their Complaint states a claim for breach of contract in two ways.[9] First, they say it plausibly alleges that Cedar breached the Conversion Right because the Transactions resulted in a Change of Control and Cedar did not allow them to

---

[8] Notably, though *Dominion Energy* relied on Second Circuit case law to reach this holding, 928 F.3d at 339–43, the Second Circuit has since rejected our reading because it "strains credulity" to conclude that aiding and abetting breach of fiduciary duty claims "do not 'relate[] to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to' a security," *Krasner*, 86 F.4th at 530 (quoting § 1332(d)(9)(C)).

[9] In their opening brief to this Court, Plaintiffs did not raise any challenge to the district court's dismissal of their breach of contract claim against the Board. We thus consider the issue waived. *Grayson O*, 856 F.3d at 316.

12

convert their shares.  Second, they say it plausibly alleges that Cedar breached the implied duty of good faith and fair dealing under Maryland law.  But the Complaint does neither.

### 1.   The Complaint does not plausibly allege that Cedar breached the Conversion Right provision of the Articles.

Recall that, under the Articles, preferred stockholders get a Conversion Right if a Change of Control occurs.  The Articles define "Change of Control" as:

> (x) the acquisition by any person, including any syndicate or group . . . of beneficial ownership, directly or indirectly, through a purchase, merger or other acquisition transaction or series of purchases, mergers or other acquisition transactions of shares of the Corporation entitling that person to exercise more than 50% of the total voting power of all shares of the Corporation entitled to vote generally in elections of directors . . . ; and (y) following the closing of any transaction referred to in clause (x), *neither the Corporation nor the acquiring or surviving entity has a class of [publicly traded] common securities . . . .*

J.A. 341 (emphasis added).  The parties agree that the Transactions satisfied Clause (x).  The question is whether they satisfied Clause (y):  "neither the Corporation [Cedar] nor the acquiring or surviving entity" has publicly traded common stock.  Plaintiffs argue that the clause is at least ambiguous as to whether a Change of Control occurred, because Cedar, as the surviving entity, had no publicly traded common stock.  According to Plaintiffs, the disjunctive phrase appearing after the "nor"—"the acquiring entity or surviving entity"— gives two alternatives, meaning that a Change of Control occurs so long as *either* the acquiring entity *or* the surviving entity no longer has publicly traded common stock.  Cedar counters that the disjunctive phrase appearing after the "nor" unambiguously identifies a single entity—the entity identified in Clause (x) as acquiring a beneficial interest.  Thus, Cedar explains, Clause (y) provides that a Change of Control occurs only when two

13

entities—the Corporation (Cedar) and the single entity buying or merging with the Corporation (Wheeler)—both lack publicly traded common stock.

Maryland law[10] employs "the objective theory of contract interpretation, which provides that 'unless a contract's language is ambiguous, we give effect to that language as written without concern for the subjective intent of the parties at the time of formation.'" *Plank v. Cherneski*, 231 A.3d 436, 476 (Md. 2020) (quoting *Ocean Petroleum, Co. v. Yanek*, 5 A.3d 683, 690 (Md. 2010)). The textual analysis "look[s] to the entire language of the agreement" and is grounded in the "customary, ordinary, and accepted meaning" of the text. *Id*. at 476-77 (citations omitted). A provision is ambiguous only if, "when viewed from [a] reasonable person['s] perspective, that language is susceptible to more than one meaning." *Id*. at 477 (quoting *Ocean Petroleum*, 5 A.3d at 690-91 (first alteration in original)).

Applying these standards to Clause (y), we agree with Cedar that the clause unambiguously means that a Change of Control occurs only when *both* the Corporation *and* the single entity referred to as the "acquiring or surviving entity" lack publicly traded common stock.[11]

---

[10] Maryland law governs our interpretation. The forum state of Maryland generally accepts parties' choice of what law governs a contract, *Nat. Glass, Inc. v. J.C. Penney Props., Inc.*, 650 A.2d 246, 248 (Md. 1994), and the Articles state that Maryland law governs.

[11] Conjunctions can create ambiguity. *See Pulsifer v. United States*, 144 S. Ct. 718, 737 (2024). Yet that does not mean that the provision here is ambiguous—for "the difficulty in choosing between . . . two constructions [can] fall[] away once [one] consider[s]" the greater text and context. *Id*. Here, the complete definition of "Change of Control" washes away any ambiguity "nor" and "or" may create.

14

Begin with "neither . . . nor." These "correlative conjunctions . . . negate alternatives simultaneously." *The Chicago Manual of Style* ¶ 5.234 (17th ed. 2017). Said differently, these words are used between alternatives "to indicate that they are each untrue or each does not happen." *See Neither, Oxford Dictionaries Online*, https://premium.oxforddictionaries.com/definition/english/neither (last visited Aug. 12, 2024); *see also id.* ("Not either."). Thus, (y) can be rephrased as "*not* the Corporation *and not* the acquiring or surviving entity has" publicly traded common stock. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 119 (2012) ("Since you may not do any of the prohibited things, you necessarily must not do them all."). Or, putting it mathematically:

(y) = has publicly traded stock ((not the Corporation) + (not the acquiring or surviving entity))

*Cf. Pulsifer*, 144 S. Ct. at 726–28.

Moving further down Clause (y), we see that "the acquiring or surviving entity" refers to a single entity, not two entities. There are three key reasons why. First, using the singular article "the" typically particularizes a singular object. *See Corner Post, Inc. v. Bd. of Govs. of the Fed. Reserve Sys.*, 144 S. Ct. 2440, 2455 (2024). Second, "the" is followed by two adjectives and is "coupled with a singular noun"—the acquiring or surviving entit*y*, not entit*ies*. *See Niz-Chavez v. Garland*, 593 U.S. 155, 165 (2021). Third, Clause (y)'s use of the verb "has" shows that "nor" is used to refer to two singular objects: (1) "the Corporation" and (2) "the acquiring or surviving entity." Bryan A. Garner, *Garner's Modern English Usage* 623 (4th ed. 2016); *see also* Gertrude Block, *Language for*

15

*Lawyers*, 54 Fed. Law. 39 (July 2007) ( "if you use the words *neither . . . nor* to connect two singular subjects, the verb you use must be singular," and if "one of the pairs is singular and the other is plural, . . . the rule is that the subject closer to the verb decides the number of the verb").

So "the acquiring or surviving entity" denotes a single entity.  But that begs a question:  Do we look to the acquiring or the surviving entity here?  *Cf. Campos-Chaves v. Garland*, 144 S. Ct. 1637, 1648 (2024).  After the Transactions, there seems to have been an acquiring entity—as Wheeler took possession of the lone remaining share of Cedar's common stock. *See Corporate Acquisition*, *Black's Law Dictionary* (12th ed. 2024).  There also seems to be a surviving entity—because, "pursuant to the merger agreement, [Wheeler's] Merger Sub . . . merge[d] with and into [Cedar], with Merger Sub ceasing to exist and [Cedar] being the surviving entity."  J.A. 102 (Cedar's Proxy Statement describing the Transactions); J.A. 254; *see also* J.A. 63 (Complaint stating Cedar was the "Surviving Company").  So which of these two entities do we consider as "the . . . entity" that must "ha[ve]" no publicly traded common stock?

This question, however, is based on a faulty premise—that when we say "the acquiring or surviving entity" refers to a single entity, we mean that, in a given transaction, it refers to *either* the surviving entity *or* the acquiring entity.  In fact, under the meaning of this contract, "the acquiring or surviving entity" is always the same, singular party:  the entity referenced in Clause (x) that obtained majority voting power in Cedar.

Consider the definition of Change of Control as a whole.  Clause (y) mentions two parties:  the Corporation and "the acquiring or surviving entity."  Logically, the

16

Corporation—which we know is Cedar—must be different than "the acquiring or surviving entity." Clause (x) then gives the answer of who "the acquiring or surviving entity" is, for it also only mentions two parties: the Corporation (*i.e.*, Cedar) and the "person, including any syndicate or group" that acquires the requisite shares. Because "the acquiring or surviving entity" cannot be the Corporation, it must be the "person, including any syndicate or group," that acquires the majority of Cedar's voting shares.

Once this is clear, it becomes easy to see why Clause (y) is phrased as it is. Recall that Clause (x) provides that the acquisition of the requisite shares could occur through "a purchase, merger or other acquisition transaction or series of purchases." Clause (y) therefore describes the entity identified in Clause (x) as "the acquiring or surviving entity" in order capture the full range of possible transactions. Under corporate-law terminology, if one entity acquires another through a tender offer, for example, it would be called the "acquirer." *Tender Offer*, *Black's Law Dictionary*, *supra*; Franklin A. Gevurtz, *Corporation Law* § 7.3 (2d ed. 2010) (defining the "acquirer" as "[t]he individual or company seeking to acquire the target corporation's business"). By contrast, if the entity acquires another through a horizontal merger, it would be called the "surviving corporation." *Corporation*, *Black's Law Dictionary*, *supra* (defining "surviving corporation" as "[a] corporation that acquires the assets and liabilities of another corporation by a merger or takeover"); Gevurtz, *supra*, § 7.2 (defining "surviving corporation" as "the corporation [that] continues to exist after the merger"). So Clause (y) describes the entity in Clause (x) as "the acquiring or surviving entity" in order to capture its technical identity over a broad range of acquisition types.

17

Of course, Clause (y)'s terminology does not perfectly align with the real world in every kind of transaction. Technically, in a reverse triangular merger like this one, the acquiring entity and surviving entity are two separate corporations: the former is Wheeler, while the latter is Cedar. *See* Richard D. Freer, *The Law of Corporations in a Nutshell* 504–05 (8th ed. 2020). But under the grammatical and logical structure of *this contract*, "the acquiring or surviving entity" refers to a *single* entity, and that single entity is the "person" referenced in Clause (x) that acquires the requisite shares. Accordingly, a Change of Control occurs only when neither the corporation nor the purchasing entity has publicly traded stock.[12]

In hopes of convincing us to ditch this reading of Clause (y), Plaintiffs argue that the overall purpose of the Conversion Right "is to protect Preferred Stockholders against a delisting, *i.e.*, holding Preferred Stock in a privately-held entity." Appellants' Br. at 32. So, the argument goes, we should read the definition of Change of Control to reach any transaction that ends with Cedar not having publicly traded stock. Perhaps Plaintiffs are right about the general purpose of conversion rights. *See Poling*, 2016 WL 1749803, at *3.

---

[12] We recognize that reading "surviving or acquiring entity" to refer only to the single entity that acquires voting control of Cedar may seem to create contractual superfluity. But redundancy isn't uncommon in contract drafting; a reasonable drafter might well risk overinclusion for the sake of clarity. *See* Kenneth A. Adams, *A Manual of Style for Contract Drafting* § 1.49 (5th ed. 2023). Given the grammatical and logical structure of Change of Control, "surviving or acquiring entity" is best read to refer only to the acquiring entity and is thus likely an example of drafters' overinclusion. Not to mention, Plaintiffs' reading would create superfluity, too. For if "the acquiring or surviving entity" refers to two entities, one being Cedar when it's the surviving entity, then the entirety of (y) is redundant because Cedar would be included twice: "neither *the Corporation* nor the *surviving* or acquiring entity . . . ."

But we see no reason to believe the Conversion Right in the Articles fully serves the purpose Plaintiffs claim it does. *Cf. Pulsifer*, 144 S. Ct. at 737 ("No law pursues its purposes at all costs." (cleaned up)). Put simply, the Articles define Change of Control to require more than Cedar's stock being delisted. We cannot rely on a broad "purpose" to change a written term of a contract before us.[13]

In the end, the unambiguous meaning of the text of Clause (y), read in context, is that a Change of Control occurs only when neither Cedar ("the Corporation") nor the single entity that obtains majority voting control of Cedar ("the acquiring or surviving entity") has publicly traded stock after the transaction at issue. Here, that single entity is Wheeler, and Wheeler's common stock remained publicly traded after the Transactions. So the district court correctly determined that Plaintiffs' Complaint fails to state a claim that Cedar breached the Conversion Right.

> **2.    The Complaint does not plausibly allege that Cedar breached the implied duty of good faith and fair dealing under Maryland law.**

Plaintiffs next argue that the Complaint plausibly states a breach-of-contract claim because Cedar violated the duty of good faith and fair dealing implied under Maryland

---

[13] We also note that the Articles contemplate occasions when Cedar's common stock would be delisted but a Change of Control would not occur. Indeed, Cedar warned Plaintiffs of that possibility before they bought their Preferred shares: "If our common stock is delisted, your ability to transfer or sell your shares of . . . Preferred Stock may be very limited and the market value of . . . Preferred Stock will likely be materially adversely affected." S.A. 9 (Preferred Stock Prospectus).

law.[14]  According to the Complaint, this breach occurred when Cedar "exercis[ed] [its] discretion in bad faith and deliberately structur[ed] the Transactions with the intent of injuring Preferred Stockholders and depriving them the fruits of the Articles Supplementary." J.A. 75–76.  To support that assertion, the Complaint alleges, *inter alia*, that:  (1) Cedar knew that merging with Wheeler would significantly devalue the price of the preferred stock, given Wheeler's poor record, and that this would reduce the cost of acquiring the Remainco assets for Wheeler; (2) Cedar "repeatedly misrepresented the value of the [Remainco] [p]roperties" as being worth more than they were; (3) the Board never appointed an independent representative for the preferred stockholders in connection with the Transactions; (4) while the Board members all owned common stock, they held, at most, *de minimis* amounts of preferred stock, and thus stood to financially benefit from the Transactions; and (5) "at some point the Cedar Board realized that they would not hit their target payout of $29 per [common] share if they also . . . honored the Conversion Right," so they structured the transaction to avoid it.  J.A. 75–80.

---

[14] The district court dismissed the claim because it determined that Maryland law does not provide a standalone cause of action for breach of the implied duty of good faith and fair dealing.  Yet the Complaint did not present this claim as a standalone cause of action, but as "an element of . . . a breach of contract," *see Mount Vernon Props., LLC v. Branch Banking & Trust Co.*, 907 A.2d 373, 381 (Md. Ct. Spec. App. 2006), which appears permissible under Maryland law, *see id.*; *Gurbani v. Johns Hopkins Health Sys. Corp.*, 185 A.3d 760, 786 n.20 (Md. Ct. Spec. App. 2018).  Regardless, we affirm the district court because the Complaint fails to allege the implied duty of good faith and fair dealing was breached—whether as part of a broader breach of contract claim or otherwise.  *See United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005) (holding that we may affirm a district court "on any grounds apparent from the record").

Maryland law implies a duty of good faith and fair dealing into contracts without such express provisions. *Polek v. J.P. Morgan Chase Bank, N.A.*, 36 A.3d 399, 416 (Md. 2012). This duty "simply prohibit[s] one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." *Id.* (quoting *Parker v. Columbia Bank*, 604 A.2d 521, 531 (Md. Ct. Spec. App. 1992)). "Absent special circumstances, however, no new obligations on the parties are imposed, where the contract is silent, by the implied covenant of good faith and fair dealing."[15] *Id.*; *see also E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 184 (4th Cir. 2000). In other words, the implied duty of good faith and fair dealing ensures that one party to a contract does not inhibit the other from performing its obligations, but it does not guarantee any new rights or obligations that do not already exist in the contract.

None of Plaintiffs' allegations show that Cedar did anything "to prevent [Plaintiffs] from performing [their] obligations under the contract." *Id.* Plaintiffs' obligation under

---

[15] Plaintiffs assert that this is not the correct legal standard under Maryland law. According to them, the implied duty of good faith and fair dealing mandates that a party "refrain from doing anything that will have the effect of injuring or frustrating the right of the other party to receive the fruits of the contract between them." Appellants' Br. at 38. But the principle Plaintiffs ostensibly identify governs how a party exercises discretion afforded to it by the express terms of the contract. *See Clancy v. King*, 954 A.2d 1092, 1108 (Md. 2008) ("In matters of personal discretion in contract, the party with the discretion is limited to exercising that discretion in good faith."); *Questar Builders, Inc. v. CB Flooring, LLC*, 978 A.2d 651, 670 (Md. 2009) ("Th[e] implied obligation governs the manner in which a party may exercise the discretion accorded to it by the terms of the agreement."); *see also WSC/2005 LLC v. Trio Ventures Assocs.*, 190 A.3d 255, 267–68 (Md. 2018). Here, Plaintiffs do not allege that Cedar abused a discretionary right granted to it by the contract (*i.e.*, the Articles Supplementary). Rather, they allege that Cedar abused the authority granted to it by Cedar's organizational documents (most likely the Articles of Incorporation) to execute the Transactions. So even under this flavor of the implied duty, Plaintiffs have failed to state a claim.

the contract was to pay for the preferred stock. They did that before the Transactions ever occurred. When it comes down to it, Plaintiffs' claim is not one for breach of the implied duty of good faith and fair dealing; it seeks to impose "new obligations on [Defendants] . . . where the contract is silent." *Polek*, 36 A.3d at 416 The Articles give preferred stockholders no rights regarding sales of the Cedar beyond the Liquidation and Conversion Preference, neither of which was triggered. Plaintiffs cannot use the implied duty of good faith and fair dealing to shoehorn in rights to be represented in transaction negotiations, to be treated equally as common shareholders, to have certain financial assurances, or any other desirable outcome. They got exactly what they agreed to receive.

We won't belabor the point. Plaintiffs don't allege that Cedar did anything to impede Plaintiffs' performance under the contract, so the Complaint does not allege that Cedar breached the implied duty of good faith and fair dealing.

## C.    Breach of Fiduciary Duty

Having found the breach-of-contract claim properly dismissed, we next consider whether the district court erred in dismissing Plaintiffs' claim that the Board members breached fiduciary duties owed to the preferred-shareholder Plaintiffs.[16]

---

[16] The Complaint states that this claim is against the "Cedar Defendants," which includes Cedar itself. But one likely cannot bring a claim for breach of fiduciary duty against the corporation itself in Maryland, since corporations are not fiduciaries. *See A.W. Fin. Servs., S.A. v. Empire Rsrv., Inc.*, 981 A.2d 1114, 1127 n.36 (Del. 2009) ("Under Delaware law, the issuing corporation does not owe fiduciary duties to its stockholders."); *Oliveira v. Sugarman*, 152 A.3d 728, 736 n. 4 (Md. 2017) ("This Court frequently looks to Delaware courts for guidance on issues of corporate law."). The Complaint therefore fails to state a claim against Cedar, and we limit the remainder of our analysis to the claim against the Director Defendants.

22

Maryland recognizes a cause of action for breach of fiduciary duty.[17] *See* Md. Code, Corps. & Ass'ns § 2-405.1. To prevail, a litigant must show: "(i) the existence of a fiduciary relationship; (ii) breach of the duty owed by the fiduciary to the beneficiary; and (iii) harm to the beneficiary." *Plank*, 231 A.3d at 466 (quotation marks and citations omitted). So Plaintiffs must show, among other things, that the Board members owed them fiduciary duties with respect to the Transactions.

In general, directors owe fiduciary duties to both common and preferred stockholders. *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 594 (Del. Ch. 1986); *see Leviness v. Consol. Gas, Elec. Light & Power Co. of Balt.*, 80 A. 304, 306–07 (Md. 1911). Yet precisely when these duties kick in is a bit more complicated. Preferred stock is distinct from common stock because its holders are granted rights and preferences beyond those of common stockholders. *In re Trados Inc. Shareholder Litigation*, 73 A.3d 17, 38–39 (Del. Ch. 2013). And "as a general matter, the[se] rights and preferences . . . are contractual in nature." *Id.* at 39 (quotation marks and citation omitted); *Poling v. CapLease, Inc.*, No. 24C13006178, 2015 WL 13309114, at *6 (Md. Cir. Ct. May 13, 2015), *aff'd*, *Poling*, 2016

---

[17] Maryland law governs this claim, because Cedar is incorporated in Maryland, and "the law of a corporation's place of incorporation applies to determine the existence and extent of a director's liability to the corporation." *Standard Rsrv. Holdings, Ltd. v. Downey*, No. 24-C-04-0661, 2004 WL 3316264, at *3 (Md. Cir. Ct. July 9, 2004)); *see also* Restatement (Second) of Conflict of Laws § 309 (1971); *Am. Motorists Ins. v. ARTRA Grp., Inc.*, 659 A.2d 1295, 1301 (Md. 1995) (explaining that Maryland often relies on the Restatement to resolve conflict-of-laws questions).

The Supreme Court of Maryland, however, has little caselaw on the fiduciary duties owed preferred stockholders. Lacking precedent, Maryland courts look to Delaware courts for guidance. *See Poling*, 2016 WL 1749803, at *3 n.8; *accord Oliveira*, 152 A.3d at 736. So the district court was right to do just that, and we do the same.

WL 1749803.  Accordingly, preferred stockholders are owed fiduciary duties only "when they do not invoke their special contractual rights and rely instead on a right shared equally with the common stock."  *Trados*, 73 A.3d at 40; *Jedwab*, 509 A.2d at 594 & n.6 (Del. Ch. 1986) (listing possible theories of liability).  But when preferred stockholders invoke their preferential rights, officers and directors do not owe them any fiduciary duties at all, for "those rights are purely contractual."  *MCG Cap. Corp. v. Maginn*, 2010 WL 1782271, at *15 (Del. Ch. May 5, 2010); *Jedwab*, 509 A.2d at 594.  In other words, directors and officers are "contractually bound to honor" preferred stockholders' preferential rights, but they "do not owe a separate fiduciary duty . . . related to" claims that those rights were violated.  *MCG Cap.*, 2010 WL 1782271, at *15.

Plaintiffs allege that the Board members breached the duty of good faith by intentionally structuring the Transactions to avoid triggering the Liquidation Preference and Conversion Right.  This undoubtedly favored the common stockholders over the preferred stockholders, keeping millions of dollars out of the pockets of the preferred stockholders—and in the pockets of the common stockholders.  As a result, the preferred stock price fell sharply.  It's not difficult to see why Plaintiffs would prefer the Transactions' structure to have been otherwise.

But as understandable as Plaintiffs' dissatisfaction is, "a board does not owe fiduciary duties to preferred stockholders when considering whether or not to take corporate action that might trigger or circumvent the preferred stockholders' contractual rights."  *Trados*, 73 A.3d at 39; *McRitchie v. Zuckerberg*, 315 A.3d 518, 549 (Del. Ch. 2024); *Jedwab*, 509 A.2d at 594 & n.6.  Rather, the Articles alone define "the scope of the

duty" that they owed Plaintiffs in this context.  *Jedwab*, 509 A.2d at 594; *see also id*. at 594 n.6 ("The claim that the merger constitutes a wrongful attempt to circumvent the $20 redemption provision of the preferred stock . . . relate[s] to a negotiated preference and must be evaluated strictly as a contract right."); *LC Cap. Master Fund, Ltd. v. James*, 990 A.2d 435, 448–49 (Del. Ch. 2010).  And, as we have explained, Plaintiffs do not plausibly allege that their rights under the Articles were violated.[18]  The Complaint therefore does not allege a fiduciary duty that the Board could have breached, and the district court was right to dismiss the claim.[19]

### D.    Claims Against Wheeler

Our analysis makes addressing Plaintiffs' two claims against Wheeler simple. Tortious interference with contractual rights and aiding and abetting breach of fiduciary duty require, respectively, an underlying breach of contract and breach of fiduciary duty.

---

[18] Plaintiffs also allege that Board members were selfishly motivated by their ownership of common stock when structuring the Transactions.  But having directors own stock is generally thought of as a *good* thing under corporate law, aligning the directors' interests with the interests of the company.  "It is useful to have directors with, as Ross Perot was wont to say, skin in the game." *McRitchie*, 315 A.3d at 553 (cleaned up); *see also In re Columbia Pipeline Grp., Merger Litig.*, 299 A.3d 393, 454 (Del. Ch. 2023) ("For corporate fiduciaries, to act loyally means to promote the value of the corporation for the benefit of its stockholders. As a practical matter, that means to promote the value of the corporation for the benefit of the common stockholders in the aggregate.") (cleaned up).

[19] Plaintiffs note that the Mayland law "allows plaintiffs to plead fiduciary claims arising out of the same facts as contract claims."  Appellants' Br. at 44 (citing *Plank*, 231 A.3d at 466).  That is generally true.  But to successfully plead such claims, Plaintiffs must allege the existence of a fiduciary duty, which they have failed to do.  *Cf. Jolly Roger Fund, LP v. Prime Grp. Realty Tr.*, No. 24-C-06-010433, 2007 WL 3237447, at *8 & n.7 (Md. Cir. Ct. Aug. 16, 2007) (concluding that no fiduciary duty was owed to preferred shareholders on their preferential rights while separately discussing whether a cause of action existed or whether a breach occurred).

*Fowler v. Printers II, Inc.*, 598 A.2d 794, 802 (Md. Ct. Spec. App. 1991) ("Tortious interference . . . has five elements: (1) existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff."); *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 665 A.2d 1038, 1049–50 (Md. 1995) (explaining that a claim for aiding and abetting breach of fiduciary duty requires such a duty to have been breached).  Since the Complaint fails to plausibly allege a breach of contract or fiduciary duty, it necessarily fails to state either claim Plaintiffs assert against Wheeler.

*          *          *

All of us have wished that we could turn back the clock and not make a purchase we've come to regret.  Given the depressed value of the preferred stock, it makes sense why Plaintiffs wish that now.  But courts are not time machines for disgruntled buyers.  We resolve legal claims.  And Plaintiffs do not adequately allege that Defendants violated any legal right or duty—they only allege that they regret the terms they bargained for.  Accordingly, the district court's order dismissing the Complaint for failure to state a claim is

*AFFIRMED*.